# EXHIBIT A

AO 440 (Rev. 8/01) Summons in a Civil Action

# UNITED STATES DISTRICT COURT

SOUTHERN _____   District of _____ NEW YORK _____

MEHDI GABAYZADEH
Plaintiff,

VS.

BENJAMIN BRAFMAN,
BRAFMAN & ROSS, P.C.,
BRAFMAN & ASSOCIATES, P.C.,
ROBERT F. KATZBERG,
KAPLAN & KATZBERG
JENNIFER A. LIANG
DEBORAH A. SCHWARTZ,
Defendants.

TO: (Name and address of Defendant)

**SUMMONS IN A CIVIL ACTION**

**JUDGE CROTTY.**

CASE NUMBER:

# 09 CIV 4095

**YOU ARE HEREBY SUMMONED** and required to serve on PLAINTIFF'S ATTORNEY (name and address)

MEHDI GABAYZADEH
Register No. 68419-053
F.C.I. Fort Dix
P.O. Box 2000
Fort Dix, NJ 08640

an answer to the complaint which is served on you with this summons, within ____20____ days after service of this summons on you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. Any answer that you serve on the parties to this action must be filed with the Clerk of this Court within a reasonable period of time after service.

J. MICHAEL McMAHON

CLERK

(By) DEPUTY CLERK

APR 2 7 2009

DATE

AO 440 (Rev. 8/01) Summons in a Civil Action

## RETURN OF SERVICE

| Service of the Summons and complaint was made by me[1] | DATE |
|---|---|
| NAME OF SERVER *(PRINT)* | TITLE |

*Check one box below to indicate appropriate method of service*

☐ Served personally upon the defendant. Place where served:

☐ Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.

    Name of person with whom the summons and complaint were left:

☐ Returned unexecuted:

☐ Other (specify):

## STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL $0.00 |
|---|---|---|

## DECLARATION OF SERVER

      I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on _____    _____
           Date    *Signature of Server*

                       _____
                       *Address of Server*

(1) As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| MEHDI GABAYZADEH<br>Plaintiff, | ) | |
| | ) | Civil Case No. _____ |
| VS. | ) | |
| | ) | JURY TRIAL DEMANDED |
| BENJAMIN BRAFMAN, | ) | |
| BRAFMAN & ROSS, P.C., | ) | |
| BRAFMAN & ASSOCIATES, P.C., | ) | |
| ROBERT F. KATZBERG, | ) | |
| KAPLAN & KATZBERG | ) | |
| JENNIFER A. LIANG | ) | |
| DEBORAH A. SCHWARTZ, | ) | |
| Defendants. | ) | |

## COMPLAINT

### The Parties

1.    Plaintiff is Mehdi Gabayzadeh ("Gabayzadeh"), who is an incarcerated resident of Fort Dix Correctional Institution, P.O. Box 2000, Fort Dix, New Jersey, 08640.

2.    Plaintiff is prosecuting this case Pro-Se.

3.    Defendant, Benjamin Brafman ("Brafman"), is a citizen of the State of New York and has an office at 767 Third Avenue, 26th Floor, New York, New York, 10017.

4.    Defendant, Jennifer A. Liang ("Liang"), is a citizen of the State of New York with a residence believed to be at 444 East 82nd Street, New York, New York, 10028-5903.

5.    Defendant, Robert F. Katzberg ("Katzberg"),

is a citizen of the State of New York with an office at 767 Third Avenue, 26th Floor, New York, New York, 10017.

6. Defendant, Deborah A. Schwartz ("Schwartz"), is a citizen of the State of New York, with an office believed to be at 210 11th Ave Ste 1103, New York, New York, 10001.

7. Brafman & Ross, P.C., is a law firm with its last known address at 767 Third Avenue, 26th Floor, New York, New York, 10017.

8. Brafman & Associates, P.C., is a law firm with a place of business at 767 Third Avenue, 26th Floor, New York, New York, 10017.

9. Kaplan & Katzberg is a law firm with a place of business located at 767 Third Avenue, 26th Floor, New York, New York, 10017.

## Venue

10. The occurrences and transaction described herein and giving rise to this cause of action occurred and took place substantially within the United States District For The Southern District of New York; all of the Defendants have offices or residences in and acted substantially within, the Southern District of New York.

-2-

## Jurisdiction

11.    The amount in controversy exceeds the amount necessary to establish diversity jurisdiction, and the Plaintiff and the Defendants are residents of different states, pursuant to 28 U.S.C. § 1332.

12.    Jurisdiction is also based on 28 U.S.C. § 1331(a) and § 1343.

13.    Jurisdiction is also based on federal questions regarding the due process clause of the Fifth Amendment of the United States Constitution, the Sixth Amendment of the United States Constitution, and upon the Civil Rights Act, 42 U.S.C. § 1985(2).

## Nature Of Action And Background

14.    At all relevant times, Liang was a licensed attorney, and was an agent and employee of Defendant Brafman & Ross, P.C., and later by Defendant Brafman & Associates, P.C.; she acted as Gabayzadeh's criminal defense attorney both individually and also within the authorized scope of her employment with those firms.

15.    At all relevant times, Brafman was a licensed attorney, and an agent and employee of Brafman & Ross, P.C., and later by Defendant Brafman & Associates, P.C.; he acted as Gabayzadeh's criminal defense attorney, both individually and

-3-

also within the authorized scope of his employment with those firms.

16.   At all relevant times, Katzberg was a licensed attorney, and an agent and employee of Kaplan & Katzberg, acting as a criminal defense attorney to Gabayzadeh and certain of his business entities, both individually and also within the authorized scope of his employment with that law firm.

17.   Gabayzadeh retained Brafman and Brafman & Ross, P.C., on the urging and recommendation of Gabayzadeh's corporate counsel, Nicholas Kaiser, on February 18, 2002, as his criminal attorneys with respect to a pre-indictment federal investigation relating to Gabayzadeh and others. A true and correct copy of the initial retainer agreement is attached hereto and made a part hereof as "Exhibit 1 "

18.   Katzberg and his firm were initially retained for Gabayzadeh by Brafman to associate with Brafman and Brafman & Ross, P.C., in defending Gabayzadeh and certain of his companies against the aforesaid federal investigation, and as such, Katzberg worked closely in concert with Brafman on all matters relating to Gabayzadeh's criminal defense. True and correct copies of documents evidencing Brafman's initial retention of Katzberg are attached hereto and made a part hereof as "Exhibit 2 "

19.   Gabayzadeh then later, at Brafman's urging, on March 26, 2003, hired Katzberg and the firm of Kaplan &

-4-

Katzberg directly as one of his counsel. A true and correct copy of the retainer agreement is attached hereto and made a part hereof as "Exhibit 3."

20.    Brafman also originally retained Schwartz in the case, and then urged Gabayzadeh to hire her as a criminal defense attorney for Ali Amzad, a/k/a Amzad Ali, a co-defendant, and Brafman sent the retainer agreement to Gabayzadeh for his signature as C.E.O. of the company employing Amzad; Brafman collected the initial retainer from Gabayzadeh, deposited it into his account, and later turned it over to Schwartz. True and correct copies of the retainer agreements with Schwartz, and the initial payment history, are attached hereto and made a part hereof as "Exhibit 4."

21.    Schwartz also on occasion sent her bill to Katzberg for processing her legal fees. True and correct copies of that documentation are attached hereto and made a part hereof as "Exhibit 5."

22.    The Gabayzadeh family, friends, and/or his companies later paid legal fees directly to Schwartz at the directions and urging of Brafman.

23.    The Defendants often referred to Schwartz as a member of the "defense team" and although she represented Amzad, the Defendants herein caused Gabayzadeh to view Schwartz as one of his attorneys, and he therefore freely communicated with her by telephone and in person on many occasions, both before and after the federal criminal

-5-

indictment of Gabayzadeh.

24. At all relevant times herein, Katzberg, Liang, Brafman and the Defendant law firms had a fiduciary duty and were otherwise duty-bound to provide competent, loyal, and professionally responsible legal representation to Gabayzadeh in the federal investigation and prosecution against him, for which each of them were very highly compensated by Gabayzadeh.

25. At all relevant times, the Co-Defendants, being Katzberg, Liang, Brafman, Brafman & Ross, P.C., Brafman & Associates, P.C., and Kaplan and Katzberg had a solemn duty to provide appropriate, loyal, informed, honest, zealous, and professionally competent criminal defense representation to Gabayzadeh, and they, along with Schwartz, had a duty to act toward Gabayzadeh at all times within the required ethical and disciplinary standards imposed upon them by New York State, by the guarantees to Gabayzadeh of the Constitution of The United States, and also in obeyance to the prohibitions of the Civil Rights Act, i.e., 42 U.S.C. § 1985(2).

26. At all relevant times, Schwartz was ethically and professionally bound by those disciplinary and ethical standards, and, inter alia, she was prohibited from obtaining confidential, privileged, or secret information regarding Gabayzadeh's defense without a waiver or express authorization from Gabayzadeh and she was ethically and legally prohibited from taking Gabayzadeh's protected, privileged, and secret information and providing it to the prosecuting authorities

-6-

without Gabayzadeh's consent, waiver or express authorization.

27.   At all relevant times, each of the aforementioned Defendants, including Schwartz, were bound <u>not</u> to conspire to intimidate, threaten, or otherwise improperly prevent Gabayzadeh from free access to and his providing of testimony, to prepare and present a defense, to have independent and loyal counsel, and to present his own witnesses in the federal prosecution against him, and they were bound <u>not</u> to conspire to denigrate the functioning and integrity of the federal court pursuant to 42 U.S.C. § 1985(2).

## Facts:

28.   Gabayzadeh was previously the Chief Executive Officer ("C.E.O."), President, and a major shareholder, along with his family, in a conglomerate of tissue product companies known as American Tissue, Inc. ("ATI").

29.   ATI was the fourth largest tissue products manufacturer in North America, with an average of about $500 million in annual sales; with other companies owned by Gabayzadeh (including a company known as American Pad and Paper or "AMPAD"), the gross annual sales were about $1 billion.

30.   ATI suffered economic problems and found it necessary to file for Chapter 11 Bankruptcy protection in The United States Bankruptcy Court for the District of Delaware,

on September 10, 2001, at Case No. 01-10370.

31.   Certain other companies partially owned and controlled by Gabayzadeh did not file for bankruptcy at that time, including American Paper Corp. ("APC").

32.   Thereafter, The United States Department of Justice initiated a fraud investigation regarding the circumstances of ATI's downfall, its accounting practices, and possible fraud regarding the liquidation of the companies and their assets.

33.   When Gabayzadeh hired Brafman and his firm, the parties executed an hourly fee arrangement; Brafman promised to keep Gabayzadeh informed of the work done and the hours put in. See "Exhibit 1 "

34.   The hourly agreement was replaced by a "minimum" flat fee agreement on or about October 15, 2002. An unsigned, true and correct copy of that agreement is attached hereto and made a part hereof as "Exhibit 6 "

35.   In a May 9, 2007, mailing to Gabayzadeh, Brafman acknowledged on page three, note two, that the fixed fee contract became effective in October of 2002. A true and correct copy of that May 9, 2007, letter is attached hereto and made a part hereof as "Exhibit 7."

36.   The flat fee contract called for a payment to Brafman's firm of a "minimum" of $500,000.00 to cover all representation from October 15, 2002 up through the filing of an indictment, and also <u>all</u> work necessary for post-indictment, pre-trial filings and court appearances. See "Exhibit 6."

-8-

37.   Gabayzadeh and his representatives paid Brafman and his firm $441,619.45 for the hourly charges asserted from February 18, 2002, as per specific invoices, up to the end of September, 2002. True and correct copies of the proofs of payment are attached hereto and made a part hereof as "Exhibit 8."

38.   For the "minimum" flat fee agreement, including all work occurring after October 15 of 2002, Gabayzadeh and his representatives paid Brafman $604,038.05, an amount in excess of the $500,000.00 "minimum" flat fee. True and correct copies of the proofs of payment are attached hereto and made a part hereof as "Exhibit 9 ."

39.   The flat fee agreement also provided for an additional "minimum" flat fee of $500,000.00 to Brafman and his firm, for representation at trial. See "Exhibit 6 ."

40.   On or about March 10, 2003, the Government indicted Gabayzadeh on criminal fraud charges.

41.   In late 2003, and early 2004, Plaintiff  paid Brafman two cash currency payments of $50,000.00 each for a total of $100,000.00 solely in cash currency, as a first payment toward the $500,000.00 trial fee. True and correct copies of those proofs of payments are attached hereto and made a part hereof as "Exhibit 10 ."

42.   Gabayzadeh also paid Katzberg at least $150,000.00 for representation during the pre-trial phase. True and correct copies of those proofs of payments are

-9-

attached hereto and made a part hereof as "Exhibit 11 ."

43.    Brafman, Liang, Katzberg, and their law firms withdrew from their representation of Gabayzadeh on or about May 3, 2004, and refused to attend the trial, ostensibly due to a dispute over the pace of Gabayzadeh's payments, such as Brafman's contention that Gabayzadeh was unable to pay the balance quickly enough to satisfy Brafman's needs.

44.    The Defendants, however, had an even more oppressive and overriding reason for withdrawing, and that was because they realized by April of 2004, or earlier, that their malpractice and egregious breaches of their fiduciary duties to Gabayzadeh had caused grievous harm to his defense for trial, as more specifically described herein.

45.    Despite not attending the trial, Brafman and his firm, while being seriously conflicted against Gabayzadeh's interests, as aforesaid, nevertheless wrongly accepted representation of Gabayzadeh at sentencing for which Gabayzadeh paid to Brafman and his firm a separate flat fee of $200,000.00. A true and correct copy of that documentation is attached hereto and made a part hereof as "Exhibit 12."

46.    Despite not representing Gabayzadeh at trial, Brafman and his firm did not refund the $100,000.00 paid in cash currency for trial services, and despite many requests to the present day, have refused to provide an accounting and refund. .

47.    Although Brafman and his firm withdrew during

-10-

the pre-trial phase, they never refunded any part of the $604,038.05 to Gabayzadeh nor did they provide an accounting, despite not performing the bulk of the pre-trial work they had promised under the agreement. See "Exhibit 6."

48.   The aforesaid "minimum" flat fee agreement prepared by Brafman is an ambiguous and fraudulent document, and even though Gabayzadeh paid over $600,000.00, instead of the 'minimum' $500,000.00 'flat fee,' Brafman and his firm have arrogantly refused and continue to refuse to provide Gabayzadeh with a detailed statement of the work done or an explanation of the formula and rationale used to increase the fee in excess of $500,000.00. See "Exhibit 6."

49.   Brafman directed Gabayzadeh to also pay large sums of money, in addition to that aforesaid, to Katzberg, Schwartz, and numerous other attorneys designated by Brafman, with some of the payments of fees made directly to Brafman, on behalf of other attorneys, and some directly to the designated attorneys. A true and correct copy of a chart detailing the specific legal fees that Brafman obtained from Gabayzadeh and then paid to the other attorneys is attached hereto and made a part hereof as "Exhibit 13."

50.   The total paid by Gabayzadeh, his family, friends, or his companies to the Defendants and the other attorneys chosen by Brafman is in excess of $3 million.

51.   A jury convicted Gabayzadeh on April 13, 2005 of various fraud counts relating to the management, collapse,

-11-

and liquidation of ATI.

52.   Gabayzadeh was sentenced on September 25, 2006 to fifteen years imprisonment by the United States District Court Judge of the Eastern District of New York who had presided at the trial.

53.   At diverse times, including up to November of 2008, Gabayzadeh has demanded that Brafman and his firm provide him with an accounting, and with copies of all work product in their possession, and the possession of their associates, including, inter alia, inter-office and intra-office notes, memoranda, witness interviews, e-mails, summaries of lawyer-client meetings and all other work product.

54.   Brafman and his firm have responded with a varying combination of silence, excuses, lies, conflicting statements, extortionist demands, and other manipulations to refuse or fail to provide a detailed accounting and copies of all privileged and confidential attorney work product within their possession, access, or control.

55.   On April 16, 2007, Brafman wrote to Gabayzadeh that he needed more time to locate and assemble the work product; Brafman does not demand therein any additional legal fees and he accedes to Gabayzadeh's right to obtain the work product. A true and correct copy of that letter is attached hereto and made a part hereof as "Exhibit 14."

56.   On May 9, 2007, Brafman, in a drastic switch of

-12-

his previous position, sent a letter to Gabayzadeh demanding $15,000.00 for finding, copying and sending the attorney work product; additionally, for the first time, he demanded pre-payment of legal fees alleged to be past due in the amount of $350,000.00, prior to his release of the work product. See "Exhibit 7."

57. Brafman's creation of a completely _false_ bill for $350,000.00 served to intimidate and extort Gabayzadeh, and to prevent him from examining the details of Brafman's and the other Defendants' actions or omissions.

58. On September 5, 2008, and December 16, 2008, Michael S. Ross, Esquire, Brafman's ethics counsel, wrote to Gabayzadeh reiterating the false claim of a $350,000.00 balance due and the refusal to release the work product unless that bogus bill was first paid. True and correct copies of those two letters are attached hereto and made a part hereof as "Exhibit 15."

59. In those two letters, Ross accentuates, and inaccurately describes, the facts of Gabayzadeh's fraud convictions, while arrogantly ignoring the merits of Gabayzadeh's demands, and also ignoring that there is an active appeal of those convictions: See _United States v. Mehdi Gabayzadeh_, Appeal No. 06-5466, (2nd cir., D.C. No. 03-CR-162).

-13-

60.  In an earlier e-mail to Gabayzadeh's son, John
Gabayzadeh, dated July 13, 2006, Brafman states that he is "not
requesting any additional fees," but that a small bill for
costs would follow; a similar e-mail on August 15, 2006,
conveys the same message. True and correct copies of those
e-mails are attached hereto and made a part hereof as
"Exhibit 16."

61.  In another e-mail to John Gabayzadeh, Brafman
sent a final invoice for the period of August 1, 2006 through
August 31, 2006, in the amount of $3,400.00; at the top of the
invoice is the inscription: **"BEN SAID PAID - NO MORE BILL"**;
Brafman did no more work for Gabayzadeh after that date. A
true and correct copy of that document and the proof of payment
is attached hereto and made a part hereof as "Exhibit 17."

62.  Other earlier letters and communications from
Brafman also do not refer to a balance due and do not demand
additional legal fees prior to releasing the work product.

63.  Letters from Brafman to Gabayzadeh's family
members dated April 21, 2005, April 28, 2005, and July 7, 2005
confirm that Gabayzadeh incurred and pre-paid a bill of
$200,000.00 for services at sentencing; nowhere does Brafman
say that Gabayzadeh owes other legal fees. See "Exhibit 12."

64.  Brafman included several hundred documents in
the May 9, 2007 letter, describing them as being "easily
printable" from his computer's hard drive, but they represent

-14-

only a fraction of the total work product still retained by the Defendants. See "Exhibit 7 ."

65.  Brafman and the Defendants have wrongly and unethically withheld the remaining work product in order to hide their malpractice, their sabotage of his defense, and their conspiratorial interferences with his federal constitutional and statutory rights.

66.  The May 9, 2007 enclosure of partial pre-trial attorney work product marked the first time that Gabayzadeh had seen any of those items, many of which revealed for the first time the Defendants' malpractice and wrongdoing.

67.  In a letter from Brafman to Gabayzadeh dated April 5, 2004, just before Brafman's withdrawal as trial counsel, Brafman told him that he would send the file documents to successor counsel, but he would not send what he described as "work product" to the new counsel unless Gabayzadeh agreed to release Brafman and his firm of all "claims" he may have against them. A true and correct copy of that letter is attached hereto and made a part hereof as "Exhibit 18 ."

68.  That extortionist threat dated April 5, 2004, is evidence that Brafman and his firm were fraudulently hiding, and trying to limit their exposure to  their malpractice, fraud, and conspiratorial wrongdoings.

69.  In that April 5, 2004 letter, Brafman illegally intimidated and threatened Gabayzadeh to the effect that, "we

-15-

will also release our work product, but only with your
assurance that you do not intend to file any claims of any
kind against me or this firm based on our representation of
you, the quality of our work or the fees paid to date. By
signing a copy of this letter you agree to release me and this
firm from any such claims." See "Exhibit 18 ."

70.   Because Gabayzadeh did not sign and return that
April 5, 2004, letter, Brafman agreed with, advised, directed,
and conspired with Liang, Katzberg, their associates, and
their firms, not to release to Gabayzadeh or his trial counsel
the work product that they possessed, and they have continued
that course of action to the present time.

71.   Brafman did not at any time reveal to
Gabayzadeh that the work product included many items absolutely
critical to Gabayzadeh's defense, including witness interviews,
strategy memoranda, and also notes for the many attorney-client
confidential meetings between Gabayzadeh and all Defendants
herein, and Gabayzadeh did not know these items were a part of
the work product until he examined the items revealed for the
first time by Brafman in the May 7, 2007, mailing to him.

72.   One of the documents Brafman revealed in the
aforesaid May 7, 2007, mailing was a letter dated April 29,
2004, from Brafman to Maureen Hoerger, one of Gabayzadeh's
trial counsel, who had been hired upon Brafman's
recommendation, stating that he was forwarding to her his
"entire file" but with the exception that "inter-office

-16-

memoranda and attorney notes" were <u>not</u> included. A true and correct copy of that letter is attached hereto and made a part hereof as "Exhibit 19 ."

73.   Brafman did <u>not</u> send a copy of that April 29, 2004 letter to Gabayzadeh, who saw it for the first time after Brafman released it in his May 7, 2007, mailing.

74.   It is now known, in light of the contents of the May 7, 2007 mailing, that Brafman withheld from Hoerger the vital witness interview summaries, detailed strategy memoranda, and the notes of the many blunderous confidential attorney-client meetings that proved the Defendants' incompetence in providing Schwartz and Amzad with critical privileged and confidential information, without Gabayzadeh's consent or waiver.

75.   Brafman, Liang, Katzberg, the Defendant firms, and any other attorneys privy to the work product, including Schwartz, agreed with Brafman to withhold that product from Gabayzadeh or his trial counsel prior to the trial, during trial, and to the present time, solely to protect their own illegal interests because Gabayzadeh failed to sign a release of any malpractice claims against Brafman and his firm.

76.   Upon information and belief, the Defendants have also withheld recordings of the witness interviews, which are probably in possession of Les Levine, who acted as an agent of Brafman and/or Katzberg, and was paid directly by Brafman and Gabayzadeh; the Defendants have authority and control over

-17-

those recordings.

77. An example of documents revealed for the first time in Brafman's May 7, 2007 mailing, is a June 17, 2003 memo from Liang to the File, in which she states that "Ben Brafman also said that Donna D'Agrosa would be a good witness." A true and correct copy of that memo is attached hereto and made a part hereof as "Exhibit 20."

78. Another document revealed for the first time in the May 7, 2007 mailing is another June 17, 2003, memo from Liang to the File, wherein she summarizes the interview of Paul Repola; Repola said that Gabayzadeh did not do accounting, and instead relied on his C.F.O., Ed Stein, to manage it; Ed Stein reportedly said that _he_ was running the company, and that Gabayzadeh was "out" and _he_ was "in." A true and correct copy of pertinent excerpts from that memo are attached hereto and made a part herof as "Exhibit 21."

79. Another document revealed initially in the May 7, 2007 mailing, is a June 26, 2003 memo from Liang to the File, summarizing the interview of Joe Ferugio, wherein Ferugio quotes Stein as saying he would grow the company to one billion or "bust in the process;" Ferugio said that Stein was "playing around with the books," and he believed Mehdi did not know of that fact. A true and correct copy of the memo is attached hereto and made a part hereof as "Exhibit 22."

80. Another document first revealed in the May 7, 2007 mailing, is a June 27, 2003 memo from Liang to the File

-18-

summarizing an interview with Michael Palumbo, in which Liang concludes that Palumbo, "would be a very good witness on Mehdi's behalf." A true and correct copy of that memo is attached hereto and made a part herof as "Exhibit 23."

81. Another document first revealed by the May 7, 2007 mailing, is an undated interview of Donna D'Agrosa in which D'Agrosa says that Ed Stein and John Lorenz "cooked" the books; D'Agrosa details many instances of wrongdoing ordered by Stein, and she states that Stein was oppressive toward anyone who wanted to take the information to Gabayzadeh. A true and correct copy of that memo is attached hereto and made part hereof as "Exhibit 24."

82. Another document first revealed in the May 7, 2007 mailing, is a March 28, 2002 memo by Liang to Brafman and Katzberg, which memorializes an interview of Ali Amzad; Amzad says that he knew nothing about the financials of the company. A true and correct copy of that memo is attached hereto and made a part hereof as "Exhibit 25."

83. That interview of Amzad could have impeached Amzad at trial if Brafman had not withheld it until May 7, 2007.

84. Most if not all of the many interviews and memos first revealed by Brafman in the May 7, 2007 mailing to Gabayzadeh demonstrate a strong consensus by relevant witnesses that C.F.O. Stein was responsible for personally creating the fraudulent financial records and accounts, but incredibly, due

to the inept and illegal actions of the Defendants herein there were no defense witnesses at trial to contradict or impeach Stein.

85.   In or about April of 2004, Katzberg, who withdrew from the case at or about the same time as Brafman, sent a box of case documents to Gabayzadeh, but Katzberg, acting in agreement with Brafman, withheld all of the work product that he possesed.

86.   The work product being withheld conspiratorially by Brafman, Katzberg and their firms, was the same material that not only formed the critical crux of Gabayzadeh's defense, but which also revealed the malpractice and wrongdoing of the Defendants herein.

87.   As a result, the Defendants prevented Gabayzadeh from presenting a defense to the criminal prosecution in order to protect their own selfish interests, and they hid their malpractice from the client by use of intimidation, fraud, and unlawful extortionist threats, as described herein.

88.   The Defendants therefore egregiously deprived Gabayzadeh of absolutely necessary information vital to his defense, for the illegal and unethical reason that they did not receive a release of any claims that he had against them.

89.   Therefore, in 2007, after Gabayzadeh was convicted and incarcerated, Brafman created and illegally asserted the false bill of $350,000, as a new fraudulent barrier against the revelation of the critical work product.

-20-

90.   Another document first sent by Brafman to Gabayzadeh with the May 9, 2007 mailing , was a memorandum from Liang to Brafman dated March 26, 2002 which described her meeting on March 25, 2002, with  John Curran, the Assistant United States Attorney in charge of the investigation, along with F.B.I. representatives.

91.   The memo stated that the U.S. Attorney's Office was, "amenable to the possibility of a pre-trial disposition of the case with Gabayzadeh's voluntary surrender and cooperation." (emphasis supplied).   A true and correct copy of that memo is attached hereto and made part hereof as "Exhibit 26."

92.  The memo states that Curran wanted to meet with Gabayzadeh, that Gabayzadeh was not necessarily the major focus of the investigation, and that he was interested in Gabayzadeh's knowledge of the role of LaSalle Bank and its executives.

93.   Prior to May 9, 2007, Brafman, Liang, Katzberg, their firms, their employees and associates, did not send a copy of the March 26, 2002 memo to Gabayzadeh or his trial counsel, nor did they tell him that the meeting took place or that the Government made requests for cooperation and early disposition.

94.   Gabayzadeh did not know about the Government requests until Brafman sent him a copy of that March 26, 2002 memo, without identification or comment, in the May 9, 2007 mailing.

-21-

95.   Despite sending extortionist threats to Gabayzadeh in his April 5, 2004, letter, Brafman wrongfully returned to represent Gabayzadeh at sentencing, as aforementioned.

96.   Brafman charged and Gabayzadeh paid $200,000 for Brafman's services at sentencing.  See Exhibit 12 ."

97.   Brafman, who was ominously conflicted against Gabayzadeh, caused Gabayzadeh severe prejudice at sentencing by writing a disgracefully improper letter to the District Judge on July 10, 2006, prior to the September 25, 2006 sentencing.  A true and correct copy of that July 10, 2006 letter is attached hereto and made a part hereof as "Exhibit 27."

98.   In that July 10, 2006, letter to Judge Seibert, Brafman lied to the Judge in an attempt to bolster his prior representation of Gabayzadeh, by attacking Gabayzadeh's character and falsely accusing him of a delusionary belief that he was absolutely innocent; Brafman falsely blamed the lack of a pre-indictment resolution squarely on Gabayzadeh's unrelenting failure to cooperate and plead guilty.  See "Exhibit 27."

99.   Brafman's July 10, 2006, "sealed" letter to the court served to ruthlessly betray Gabayzadeh in order to protect himself and his associates, while insolently ignoring his duty to provide the client with loyal, zealous, and honest representation, and to protect all priveleged attorney-cliet information.  See Exhibit 27."

100.   Brafman in the July 10, 2006 letter and at

-22-

sentencing also tried to barter away Gabayzadeh's appeal rights in return for a reduction for acceptance of responsibility, an unprecedented and desperate move with no hope of success, that the Judge readily dismissed.  See "Exhibit 27."

101.  It is now clear that Brafman had a motive to write off Gabayzadeh's appellate rights at sentencing, because without an appeal and/or related collateral proceedings, the Defendants' wrongdoing would likely never come to light.

102.  Defendants knew that Gabayzadeh could prove LaSalle's theft of about $200 million from the ATI bondholders, and an early meeting with the Government could reasonably have resulted in a vastly different and far more favorable outcome.

103.  Brafman and the Defendants also knew that Gabayzadeh had information proving the criminality of LaSalle and others in several schemes connected with LaSalle's financing -and handling of the ATI credit line.

104.  Gabayzadeh continually told the Defendants of LaSalle's wrongdoing; in fact, Brafman attended a deposition of Chris Clifford, a LaSalle senior executive, in a civil case in Chicago on June 18, 2002; he knew that Clifford was instrumental in LaSalle's criminal activities.  A true and correct copy of a pertinent excerpt of Clifford's deposition that Brafman attended is attached hereto and made part hereof as "Exhibit 28."

105.  Gabayzadeh also told the Defendants that Clifford had requested and received a $150,000.00 unreported cash payment

from him and his partner, Nourallah Elghanayan, but the Defendants did not use that information to Gabayzadeh's benfit regarding a defense or for cooperation with the Government.

106.   Also, in a June 17, 2003, memo first revealed in the said May 7, 2007 mailing, regarding a strategy meeting held on May 29, 2003, Liang reports that Katzberg recommended a paralegal make a chart of "fees given to LaSalle."  See "Exhibit 20 ."

107.   Katzberg in fact did hire a paralegal to work solely on the LaSalle matter, but the Defendants never reported or released any results to Gabayzadeh or to his trial counsel.

108.   The Defendants knew that they should follow, investigate and develop the important facts of LaSalle's criminal involvement, both as a partial defense and as a subject for cooperation with the Government.

109.   However, Defendants prevented developing that defense and from sharing it with the Government.

110.   A.U.S.A. Curran was in charge of the prosecution for a long time after he made the request for cooperation on March 25, 2002.

111.   Neither Brafman, Liang, Katzberg, the Defendant law firms, or any of their employees or associates, ever told Gabayzadeh of any plea offers or requests for negotiations or cooperation at any time made by the Government.

112.   The Defendants often falsely told Gabayzadeh that the Government would not negotiate, and Brafman told him

-24-

that they "hated" him; the Defendants thus prevented Gabayzadeh from deciding whether to enter discussions with the Government.

113.   Before the defendants withheld the work product from Gabazadeh and his trial counsel, thereby compelling him to go to trial without a defense, they had amassed for themselves unprofessionally excessive legal fees.

114.   Brafman autocratically brought into the case, and into related matters, numerous attorneys in various capacities, without consideration of the potential conflicts between their various roles, duties, relationships, and loyalties, and in fact, some conflicts did occur, to Gabayzadeh's detriment.

115.   Brafman made unsubstantiated press statements that Gabayzadeh was totally innocent and it is believed that he told the prosecutors similar claims, despite knowing that Gabayzadeh had accepted responsibility for certain wrongful conduct, which should have compelled good faith plea negotiations, but the Defendants failed to attempt to negotiate.   True and correct copies of several of Brafman's public declarations are collectively attached hereto and made a part hereof as "Exhibit 29."

116.   Thus, Defendants herein prepared for a trial defense, while ruling out plea negotiations and cooperation, and then, after they recklessly facilitated Amzad to become a cooperating witness, and after Gabayzadeh failed to return a release of liability, they withheld his remaining defense evidence in retaliation and to hide their malpractice.

117.   Had Brafman allowed a plea negotiation and/or

cooperation as requested by the Government, and if that option had succeeded Brafman's fee would have only been $100,000.00, instead of the $1,045,657.50 that Gabayzadeh paid him. See "Exhibits 8 and 9."

118.   In withholding <u>absolutely</u> <u>critical</u> defense evidence because Gabayzadeh failed to release them from civil liability, Brafman, Katzberg, their firms and associates, intimidated, threatened, extorted, weakened, and prevented Gabayzadeh from presenting a defense in the federal criminal prosecution.

119.   The defendants caused the federal criminal trial to be a sham and a mere hollow mask of justice by preventing an unknowing Gabayzadeh from obtaining a fair trial and due process, and by directly damaging the integrity and the proper functioning of the federal court proceedings.

120.   The Defendants' substantially caused trial counsel to put on <u>no</u> witnesses and no defense because of their crucial blunders and obstructions, as aforesaid.

121.   Defendants had established through numerous witness interviews that the main actor in the fraud allegations was C.F.O. Stein, but they paralyzed Gabayzadeh's defense when they withdrew and refused to turn over that evidence because their client failed to release them from civil liability.

122.   Furthermore, prior to November of 2003, the Defendants agreed to allow Schwartz, and her client, Ali Amzad, to attend most or all of the over sixty priviledged lawyer-client

-26-

meetings that Gavayzadeh had with them regarding his defense, the evidence, and the trial strategy.

123. Schwartz was egregiously conflicted because she performed the dual role of being Amzad's counsel and also she, in concert with the other Defendants herein, affirmatively misrepresented to Gabayzadeh that she was a member of the "Defense Team" and that she thus reported to Brafman and was under Brafman's command. True and correct copies of documents referencing or treating her as part of the defense team are also attached hereto and made a part herof as "Exhibit 30."

124. Schwartz obtained secret and privileged information from the other Defendants herein and from Gabayzadeh, which she and Amzad then provided, without Gabayzadeh's knowledge, consent, waiver, or authorization, to the prosecution.

125. The other Defendants herein willingly provided and facilitated the communication to Schwartz of virtually all of the privileged and confidential information and evidence that formed the foundation of Gabayzadeh's criminal defense.

126. Schwartz also defalcated and converted significant funds received from Gabayzadeh or his representatives, and she failed to provide an accounting, as detailed hereinafter.

127. Schwartz conversed personally and by telephone many times with Gabayzadeh as though she was also his lawyer and during those occasions she obtained privileged and confidential information from him, without explaining the dangers, complications, or conflicts to him and without getting his

-27-

waiver, consent, or authorization.

128.   Schwartz, by herself and through Amzad, revealed some or all of that privileged, confidential, and secret information to the prosecutors, to get a deal for Amzad, while simultaneously betraying her duty to not reveal that information without Gabayzadeh's authorization, waiver and knowing consent.

129.   Defendants allowed Schwartz to participate with them in some of the witness interviews and she was in continuous contact with Liang, Brafman, and Katzberg, and even the investigator Levine, so that she became privy to the <u>totality</u> of Gabayzadeh's defense.

130.   In a June 12, 2003 memo not revealed to Gabayzadeh until the May 7, 2007 mailing, Liang memorialized three meetings at the U.S. Attorney's Office wherein the "<u>defense team</u>" reviewed a multitude of documents on May 23, 2003, June 2, 2003, and June 10, 2003; Amzad attended all three sessions and Schwartz, as part of the defense team attended June 2 and June 10. See "Exhibit 30."

131.   Therefore, Brafman, Liang, Katzberg, Schwartz, and their firms, acted together against an uninformed Gabayzadeh, to negligently and recklessly share with his co-defendant, Ali Amzad, critical attorney-client confidences and privileged communications, so that they gave Amzad and Schwartz every nuance of Gabayzadeh's criminal defense without Gabayzadeh's waiver, knowing consent, or authorization.

132.   As a result, Amzad was able to advise the

-28-

Government of Gabayzadeh's trial strategy, his investigative findings, the strengths and weaknesses of witnesses, and the secret and privileged matters critical to the defense.

133.   It is now known that Amzad met with the Government at least eighteen times, and he gave voluminous testimony at trial, consisting of three hundred thirty pages of trial transcript.

134.   On or about December 12, 2003, Amzad, under Shwartz's direction and with the knowledge of Brafman and the other Defendants signed, along with Schwartz, a "proffer agreement" with the Government, which set forth the terms of Amzad's cooperation against Gabayzadeh.  A true and correct copy of that agreement is attached hereto and made a part hereof as "Exhibit 31."

135.   On or about April 30, 2004 Amzad signed a "cooperative agreement" with the Government to cooperate against Gabayzadeh; Schwartz also signed as Amzad's counsel.  A true and correct copy of that agreement is attached hereto and made a part hereof as "Exhibit 32."

136.   Brafman, Liang, Katzberg and their associates knew about Amzad's negotiations with the Government as early as November of 2003 or even earlier, but they did not tell Gabayzadeh until April 4, 2004, when Brafman first informed Gabayzadeh of Amzad's cooperation.

137.   At or about the same time, in April of 2004, when they knew that Amzad's turn-around dealt a severe setback to

-29-

Gabayzadeh's defense, the Defendants decided to drop
Gabayzadeh as a client.

138.   If the Defendants had warned Gabayzadeh of the
dangers, he would have rejected Amzad's presence at the meetings
and would not have talked freely with both Amzad and Schwartz;
the risks should have been fully explained to him, and they
should have obtained his written authorization.

139.   Even though Brafman knew of Amzad's cooperation
and negotiations as early as November of 2003, he took a total of
$350,000.00 from Gabayzadeh from November 3, 2003 through February
24, 2004, including the two $50,000.00 cash currency payments for
Brafman to represent Gabayzadeh at trial.  A true and correct copy
of a chart setting forth those payments is attached hereto and made
a part hereof as "Exhibit 33."

140.   Although Brafman refused to represent Gabayzadeh at
trial, he never refunded the $100,000.00 cash currency that
Gabayzadeh paid him for his trial services.  See "Exhibit 10."

141.   After many unanswered phone calls, Gabayzadeh
finally got a written, updated receipt from Brafman for those cash
currency payments; when he had first asked for a receipt, Brafman
said, "What are you crazy?"  Brafman said he could not put the dates
or the word "cash" on the receipt.  See "Exhibit 10."

142.   Throughout that period Brafman was withdrawing as
Gabayzadeh's trial counsel, he falsely expressed to Gabayzadeh that
he feared that Gabayzadeh could not afford the balance of the trial
fees and he better get another counsel.  True and correct copies

-30-

of those communications dated April 4, 2004 and April 15, 2004 are attached hereto and made a part hereof as "Exhibit 34."

143. The witness interviews, and other crucial evidence and memoranda that Defendants withheld from trial counsel, contained substantial evidence that would have allowed for a potent defense for Gabayzadeh.

144. Brafman and his firm directed Gabayzadeh to dismiss Richard B. Friedman, Esq., as counsel to certain "out of the box" companies, due to Friedman's discovery that Nicholas Kaiser, Esq., ATI's longtime corporate counsel, may have acted illegally by conveying assets out of one of the companies in violation of a preliminary injunction dated October 23, 2001

145. When Brafman discovered the dispute he directed Gabayzadeh to terminate Friedman in order to protect Kaiser from criticism or discovery that he had violated or tried to violate a Court injunction.

146. Gabayzadeh had hired Brafman upon the urging of Kaiser, and Brafman throughout the representation acted to protect and shield Kaiser from the investigation, which worked great damage and prejudice to Gabayzadeh's defense.

147. Gabayzadeh felt compelled to comply with Brafman's orders and he fired Friedman. A true and correct copy of the termination, drafted by Brafman and signed by Gabayzadeh, is attached hereto and made part hereof as Exhibit 35."

148. Brafman then hired his brother-in-law, Stephen Wagner, of Cohen, Tamber, Spievack and Wagner, LLP, to replace Friedman, but he improperly did not disclose his family relationship

-31-

with Wagner to Gabayzadeh, who ended up paying Wagner over $600,000.00 in legal fees. A true and correct copy of the retainer agreement showing that Brafman hired Wagner of behalf of Gabayzadeh and the proof of payment, is attached hereto and made part hereof as "Exhibit 36."

**COUNT ONE: EQUITY**

**ACCOUNTING AND INJUNCTIVE RELIEF**

**Gabayzadeh v. All Defendants**

149. Plaintiff incorporates by reference all of the previous paragraphs as though they were set forth here at length.

150. Defendants have withheld most of their work product and they wrongly continue to refuse to provide it to the plaintiff, thereby causing him grievous continuing harm.

151. Defendants, through Brafman and his firm, have refused and continue to refuse to provide a financial accounting and an itemized statement of all services rendered, thereby causing Gabayzadeh grievous continuing harm.

152. Plaintiff will suffer irreparable harm if the requested work product and an accounting are not provided to him by a preliminary Order of the Court.

153. Plaintiff has a right to see the work product preliminarily because it goes directly to the merits of his claims that the Defendants interfered with his civil rights and with the proper functioning of the federal courts by violating 42 U.S.C. § 1985 (2), and any further delay results in irreparable harm to his rights, including continued incarceration and deprivation of property and liberty without due process.

-32-

154.   Plaintiff also must immediately examine that work product to determine its applicability to his appeal of the convictions now pending in the Second Circuit.   See <u>United States v. Mehdi Gabayzadeh</u>, Appeal No. 06-5466, (2nd cir., D.C. No. 03-CR-162).

155.   The documents are also critical to establish the extent of the ineffective assistance of counsel that plaintiff suffered, and further delay thus constitutes irreparable harm, including a deprivation of probable new determinative evidence, which could result in a new trial or other immediate remedial relief, including the right to his release with or without bond.

156.   Additionally, further delay in providing the critical evidence works to prevent Gabayzadeh from asking for immediate <u>habeas corpus</u> relief based on the extraordinary miscarriage of justice that he suffered, and continues to suffer; each additional day of confinement and loss of freedom is irreparable. and is reasonably attributed directly to the Defendants' egregious wrongdoing in directly depriving Gabayzadeh of a fair criminal trial in the federal court.

157.   Plaintiff has no adequate remedy at law under the circumstances.   Waiting for normal discovery procedure herein will impact negatively upon his constitutional and statutory rights, and will delay and compromise his collateral requests for relief, and the strength of his pending appeal, causing his illegal detention to continue in deprivation of his basic rights.

158.   The Court should also order Schwartz to turn

over any work product she developed in the meetings with
Gabayzadeh and/or the other Defendants herein; most or all of
that product deals with the merits of Gabayzadeh's defense,
which she obtained wrongfully, without his knowing consent,
waiver, or authorization; her retention of those materials
continues to deprive Gabayzadeh of his rights to fully exercise
his remedies, as aforementioned.

159.   Plaintiff is entitled to a preliminary Order of
this Court compelling the Defendants to affirmatively turn over
all designated documents, duly numbered and labeled, and to
provide a complete accounting of all funds received from the
Plaintiff, all expenditures made, and an itemized, chronological
listing of the nature of the services rendered by each Defendant,
and the dates and the precise amount of time spent by each
Defendant on each date.

**WHEREFORE,** Plaintiff requests that this Honorable Court
Order the Defendants preliminarily to affirmatively perform the
following actions:

(a)   Provide Plaintiff with a detailed accounting
of all fees or expenses paid by him, his family, friends or his
companies, to any of the Defendants herein, or to any other
attorneys in related matters, and credited to his account or to
that of any co-defendants in the criminal prosecution, or to any
related businesses, with the dates, amounts, and other identifying
matter for each receipt;

-34-

(b)   Provide Plaintiff with a listing and true and correct copies of all invoices sent to him or to his family or representatives regarding charges for services or expenses to his account or to the account of any other co-defendants in the criminal case or to any related busines entities;

(c)   Provide Plaintiff with a detailed accounting of all expenditures from his account, and from related accounts, including a statement of the date, amount, payee, and purpose of the expenditure;

(d)   Provide Plaintiff with true, complete and correct copies of all of the said work product produced or acquired by each Defendant, or by any of their associates, employees, investigators, or contact attorneys, each page to be duly Bates-numbered or otherwise consecutively labeled, in all forms of media in which they are stored, including but not limited to, all:

(1)   Attorney notes and memos of any kind;

(2)   Intra-office and inter-office notes, letters, memos, messages, e-mails, and memoranda of any nature;

(3)   Indicia or memorializations of all witnesses statements or interviews, including all summaries, recordings, transcripts or verbatim accounts of the statements or interviews;

(4)   Notes, transcriptions, recordings, and all forms of records memorializing each of the over sixty attorney-client confidential, priveleged stategy meetings that took place with plaintiff in attendance, at any location;

-35-

(5)   Notes, transcriptions, recordings and all forms of records memorializing all other meetings attended by any of the within named Defendants, at any locations, when plaintiff was not present;

(6)   All other documents classified, or normally regarded to be, either work product, confidential, secret or privileged attorney-client information;

(7)   All documents pertaining to plea negotiations, Government offers or request for cooperation, meetings or conversations with prosecutors, and any other communications or work product dealing with that subject matter;

(8)   All documentation of any kind demonstrating the efforts of any of the Defendants herein to discuss, encourage, or determine case strategy, plea bargaining, and/or a non-trial resolution of the case, with Gabayzadeh;

(9)   Documentation of any kind evidencing discussions, communications or meetings that any of the Defendants herein had at any time with any prosecutors, F.B.I. agents, U.S. Postal Inspectors, or any other Government authority regarding the prosecution of Gabayzadeh or others in the case ;

(10) Any material pertinent to the specific allegations set forth in this Complaint that is within the scope of confidential attorney work or privileged information produced by any of the Defendants for or in connection with Gabayzadeh's defense or related prosecutions.

(11) Any other information or documents deemed pertinent by the Court.

## COUNT TWO:
### CONSPIRACY TO VIOLATE CIVIL RIGHTS
### 42 U.S.C. § 1985(2)
### Gabayzadeh v. All Defendants

160.   Plaintiff incorporates here by reference all of the previous paragraphs as though set forth fully at length.

161.   As aforesaid and incorporated herein, the Defendants conspired together to deprive Plaintiff of a fair trial in the federal court by their intimidating and extortionist actions that created an impermissable interference with his right and ability to testify, to present witnesses, and to present a defense, and constituted a denigration and undermining of the proper functioning and integrity of the federal courts, all being in violation of 42 U.S.C. § 1985(2).

162.   As aforesaid and incorporated herein, the Defendants conspired together to use intimidation, threats, and other improper means, in violation of 42 U.S.C. § 1985(2), to withhold critical factual and investigatory information, and confidential and privileged attorney work product from Gabayzadeh and his trial counsel, and they therefore effectively prevented him from presenting any witnesses or a

-37-

defense at trial, due to Gabayzadeh's failure to sign and return a release of Defendants' civil liability to Brafman.

163.  As aforesaid, and incorporated herein, the Defendants conspired to deprive Gabayzadeh of a defense in the federal district court by agreeing to allow a co-defendant, Ali Amzad, and his attorney, Defendant Schwartz herein, to participate in over sixty confidential, privileged, lawyer-client meetings, between Gabayzadeh and the Defendants, thus giving Amzad and Schwartz confidential and privileged defense information without Gabayzadeh's knowing consent, waiver or authorization.

164.  Schwartz, whom the other Defendants referred to as a member of the "defense team", then wrongly used that privileged, secret, and protected matter, to negotiate a cooperation agreement with the prosecution that greatly damaged Gabayzadeh's rights to a fair jury trial, due process of law, independent and informed counsel, to present a defense, and to present his own testimony and the testimony of favorable witnesses in the federal court proceedings, all being in violation of 42 U.S.C. § 1985(2).

165. The conspiratorial  actions of the Defendants directly resulted in the improper and unlawful revealing to the prosecution of virtually every aspect and detail of both the strengths and weaknesses of Gabayzadeh's intended defense, much to his detriment, and in deprivation of his basic and fundamental constitutional rights to due process of the law

-38-

in the federal criminal prosecution against him.

166.   The actions of the Defendants were carried out
in a wanton, cruel, and reckless manner, in callous disregard
of Gabayzadeh's statutory and constitutional rights, to the
extent that warrants the imposition of punitive damages against
them, jointly and severally.

167.   As a result of the illegal conspiracy of the
Defendants, Plaintiff suffered the following injuries, and he
has or will incur the following losses and expenses, for which
he claims damages:

(a)   Unconstitutional and illegal deprivation
and confiscation of both property and freedom, without due
process, both past, present, and future, for which he claims
compensation;

(b)   Unconstitutional and illegal deprivation
of his rights to a fair trial, independent counsel, and due
process in the federal courts, for which he claims compensation;

(c)   Extreme and permanent pain, suffering, shock
to his nervous system, loss of life's pleasures, anxiety disorder,
depression, and other emotional ailments, both past, present,
and future, for which he claims compensation;

(d)   Loss of wages, earning capacity, and other
economic benefits, both past,present, and future, for which he
claims compensation;

(e)   Legal fees wrongfully obtained, retained,
and/or diverted by the Defendants in an amount in excess of

-39-