# EXHIBIT 13

# MEMO

**FROM:**   Benjamin Brafman

**TO:**   Mehdi Gabayzadeh *[via telefax 631-342-9777]*

**DATE:**   September 18, 2002

### HAPPY NEW YEAR!

As per your request I have prepared a **"chart"** which reflects all of the funds wired into this firm's Special Account and then either paid to this firm or per your instructions paid to other law firms and/or a Private Investigator retained to assist us in your case.   I hope this chart is helpful.   Should you require any further documentation please do not hesitate to call my office.

I am also enclosing last month's statement of account which reflects a balance due of **$108,622.98.** This balance continues despite all prior payments.  I would very much appreciate it if you would do your best to forward some additional payment at your earliest convenience.

## GABAYZAL J LEGAL FEES

| Wired Funds | P Brafman & Ross | A Deborah Schwartz | Y M Cohen Tauber Spievack & Wagner | E Kaplan & Katzberg | N Les Levine | T Meissner Kleinberg & Finkel | S Saul Bienenfeld | TO: Avi Moskowitz |
|---|---|---|---|---|---|---|---|---|
| $50,000 (2/20/02) | $50,000 (2/21/02) | $10,000 (4/12/02) | $25,000 (4/29/02) | $20,000 (3/19/02) | $10,000 (3/19/02) | $5,000 (4/12/02) | $5,000 (6/6/02) | $5,000 (6/6/02) |
| $50,000 (3/4/02) | $50,000 (3/4/02) | $3,306.79 (7/8/02) | $12,582.89 (6/4/02) | $1,150 (5/21/02) | | $481.18 (7/8/02) | | |
| $20,000 (3/19/02) | $80,100 (5/21/02) | | $20,000 (7/16/02) | $7,537.50 (7/8/02) | | | | |
| $10,000 (3/19/02) | $18,674.53 (7/12/02) | | | | | | | |
| $10,000 (4/10/02) | $25,000 (7/16/02) | | | | | | | |
| $5,000 (4/10/02) | $26,131.44 (8/12/02) | | | | | | | |
| $25,000 (4/26/02) | $41,945 (8/29/02) | | | | | | | |
| $81,250 (5/21/02) | 29,851,47 (circled) | | | | | | | |
| $12,582.89 (5/31/02) | | | | | | | | |
| $5,000 (6/4/02) | | | | | | | | |
| $5,000 (6/4/02) | | | | | | | | |

PAGE 03   BRAFMAN ROSS   21275083906   09/18/2002 12:29

| Wired Funds | P Brafman & Ross | A Deborah Schwartz | Y Cohen Tauber Spievack & Wagner | M | E Kaplan & Katzberg | N Les Levine | T Meissner Kleinberg & Finkel | S Saul Bienenfeld | TO: Avi Moskowitz |
|---|---|---|---|---|---|---|---|---|---|
| $30,000 (7/3/02) | | | | | | | | | |
| $45,000 (7/9/02) | | | | | | | | | |
| $26,131.94 (8/5/02) | | | | | | | | | |
| $41,945 (8/29/02) | | | | | | | | | |

**TOTAL FUNDS WIRED:** ▓▓▓▓

**TOTAL FUNDS PAID OUT: $416,909.33**

**DIFFERENCE OF FUNDS WIRED AND PAID:** ▓

**TOTAL PAID TO BRAFMAN & ROSS: $291,850.97**

**TOTAL PAID TO DEBORAH SCHWARTZ: $13,306.79**

**TOTAL PAID TO COHEN TAUBER SPIEVACK & WAGNER: $57,582.89**

**TOTAL PAID TO KAPLAN & KATZBERG: $28,687.50**

**TOTAL PAID TO LES LEVINE: $10,000.00**

**TOTAL PAID TO MEISSNER KLEINBERG & FINKEL: $5,481.18**

**TOTAL PAID TO SAUL BIENENFELD: $5,000.00**

**TOTAL PAID TO AVI MOSKOWITZ: $5,000.00**

# EXHIBIT 14

# BRAFMAN & ASSOCIATES, P.C.

ATTORNEYS AT LAW

767 THIRD AVENUE

26TH FLOOR

NEW YORK, NEW YORK 10017

TELEPHONE: (212) 750-7800

FACSIMILE: (212) 750-3906

E-MAIL: BBRAFMAN@BRAFLAW.COM

BENJAMIN BRAFMAN

JENNIFER A. LIANG
ANDREA ZELLAN
BRIAN E. KLEIN
KAREN NEWIRTH

MARK M. BAKER
OF COUNSEL

April 16, 2007

**VIA EXPRESS MAIL**
**LEGAL MAIL TO BE OPENED**
**IN PRESENCE OF INMATE**
Medhi Gabayzadeh
Inmate No 68419-053
FCI- Fort Dix
P.O. Box 7000
Fort Dix, New Jersey 08640

Dear Medhi:

I received your letter dated April 4, 2007, in which you make certain "demands" on my office and request that we provide you with certain records, threatening to file a Grievance against me with the Bar Association if I do not respond to your letter.

To be perfectly candid, I was surprised by the "tone" of your letter, as throughout our professional relationship I have always tried my best to give you sound legal advice and have accommodated you and your family with every possible courtesy. To receive such a cold, angry, threatening letter was disappointing, especially since you and your family all told me how much everyone appreciated the extraordinary effort made by me personally at the time of your sentencing, which allowed Judge Seybert to impose a lower sentence then the Guidelines required and that which the government was requesting.

Your letter makes certain demands that will require a substantial undertaking to comply with and simply cannot be completed within 10 days. As you are well aware, the files in your case are massive and are in several different locations, at my office, in storage and with the vast majority of the materials with Perini and Hoerger the law firm you substituted as trial counsel in this case

BRAFMAN & ASSOCIATES, P.C.

several years ago. The files retained are extensive and will take weeks to retrieve from storage and review.[1]

I will provide you with the information the Disciplinary Rules require that a lawyer maintain. Your understanding however of what records a law firm must retain may not be consistent with what the Rules require. Nevertheless, I will do my best to gather the information and forward it to you at my earliest opportunity. Part of this gathering process, will unfortunately be delayed because I will need to confer with Perini and Hoerger and will also need to contact Jennifer Liang, the Associate at this firm who was primarily responsible for assisting me in your case. Ms. Liang, is presently on maternity leave following the recent birth of her daughter. We will also need the cooperation of your son John, as according to Ms. Hoerger, he has 85 boxes of materials.

I will try to gather the relevant materials and forward them to you as quickly as possible, but you must be patient. I am not ignoring your request, it will simply take some time to comply with it. I am an honest, responsible lawyer who always treated you honestly. You and every member of your family knows that and I would hope that when this correspondence is completed you will concede that fact and recognize that I always acted in your best interests. Unfortunately, on many important matters you refused to accept our advice.

Sincerely,

Benjamin Brafman

cc:    John Gabayzadeh [via facsimile (516) 706-2352]

---

[1]    I have been advised by Ms. Hoerger that she currently has 60 boxes of materials related to your case and that another 85 boxes were returned by her to your son.

2

# EXHIBIT 15

LAW OFFICES OF
# MICHAEL S. ROSS
THE LINCOLN BUILDING
60 EAST 42ᴺᴰ STREET
FORTY-SEVENTH FLOOR
NEW YORK, NY 10165

September 5, 2008

TELEPHONE
(212) 505-4060
FACSIMILE
(212) 505-4054
E-MAIL
michaelross@rosslaw.org

Mehdi Gabayzadeh
Inmate #68419-053
FCI - Fort Dix
P.O. Box 7000
Fort Dix, New Jersey 08640

Dear Mr. Gabayzadeh:

I represent Benjamin Brafman, Esq., and his law firm, Brafman & Associates, P.C., in connection with your August 18. 2008.

First, with respect to your "demands" for all materials in the Firm's computer hard-drive, your request is denied. You owe Mr Brafman's firm approximately $350,000; and the further downloading and printing out of computer-based information will cost approximately $1,000 in Firm staff time and expenses. These cost issues are important because cases such as Sage Realty Corp. v. Proskauer Rose Goetz & Mendelson, 91 N.Y.2d 30 (1997), stand for the proposition that a client is not entitled to a copy of his or her file if the client still owes the attorney money; and, the client is responsible for any assemblage and delivery charges in terms of producing the files to the client. The same principles articulated in the Sage Realty case apply to your request for computer data in the Firm's possession. Accordingly, Mr. Brafman's firm will produce the material you request if you: 1) pay your outstanding balance of approximately $350,000; and 2) forward to me a payment of $1,000 to secure payment for the time and expense of generating the computer-based materials you request.

Second, you request the inter-office memoranda and attorney notes of Mr. Brafman's firm. As to this request, in order to receive those materials, you would be required to make the $351,000 payment outlined in the preceding paragraph.

Finally, please be advised that in the future, all communications between you and Mr. Brafman and his firm should be directed to me.

Very truly yours,

Michael S. Ross

LAW OFFICES OF
MICHAEL S. ROSS
THE LINCOLN BUILDING
60 EAST 42ᴺᴰ STREET
FORTY-SEVENTH FLOOR
NEW YORK, NY 10165

TELEPHONE
(212) 505-4060
FACSIMILE
(212) 505-4054
E-MAIL
michaelross@rosslaw.org

December 16, 2008

Mehdi Gabayzadeh
Inmate #68419-053
FCI - Fort Dix
P.O. Box 7000
Fort Dix, New Jersey 08640

Dear Mr. Gabayzadeh:

I am writing you this letter in response to your November 17, 2008 letter to me and in connection with my client, Benjamin Brafman, Esq. In that letter you repeated the claims you *previously* made against Mr. Brafman in your Complaint to the Departmental Disciplinary Committee in you September 2007 letter; and as you know, your Complaint was rejected by the Committee in a letter sent to you by the Committee on March 26, 2008.

I want to make it clear to you that I have no intention of wasting further time and effort responding to your baseless accusations. In my November 5, 2007 31-page letter to the Committee which addressed your Complaint to the Committee I addressed your false accusations against Mr. Brafman. Simply consider that 31-page letter to be restated again as a full answer to your recent November 17ᵗʰ letter to me. In particular, I do want to make several simple points.

*First*, your November 17ᵗʰ letter seems to repeat your earlier assertion that you are entitled to a refund of fees from Mr. Brafman. That claim is absurd – you, in fact, owe Mr. Brafman $350,000; and the fact that Mr. Brafman has not sued you for that amount does not diminish the fact

LAW OFFICES OF
MICHAEL S. ROSS

Mehdi Gabayzadeh
December 16, 2008
Page 2

that the amount is owed.

*Second*, you now seem to be making the wildly silly and false assertion that Mr. Brafman

somehow did not act competently and zealously on your behalf and somehow failed to obtain a

shorter sentence for you. Your theory is that Mr. Brafman did not diligently work on your behalf

because he wanted to "run up" your fees. You even make the absurd claim that you should have

been able to obtain a "non-criminal disposition" of your case as a cooperating witness. This is pure

fantasy on your part! As I explained in my November 5, 2007 letter to the Committee, Court filings

against you demonstrated that:

- You caused your company (American Tissue) to make
  various public filings with the Securities and
  Exchange Commission[1], which were false and which
  fraudulently led the public to believe that American
  Tissue was financially healthy when, in fact, it was
  being kept financially afloat only through your
  fraudulent financial scheme.

- Beginning as early as 2000, you – both personally and
  with the help of your staff – created false sales
  documents which allowed your company to obtain
  tens of millions of dollars from the bank consortium.

- You directed that the internal books and records of
  your company be manipulated to falsely reflect tens of
  millions of dollars of inflated and non-existent sales.

- You borrowed almost ten million dollars from
  independent brokers by fraudulently selling them your
  company's inventory-receivables when: 1) you knew

---

[1]Although your company was privately owned, in 1999, it had sold $165 million in bonds to
the public and, therefore, S.E.C. filings were required under federal law. By inflating the value of
your company's books, you deceived the investors into purchasing your company's bonds.

\o o

LAW OFFICES OF
MICHAEL S. ROSS

Mehdi Gabayzadeh
December 16, 2008
Page 3

that you could never repay those brokers; and 2) the receivables you sold were *already* subject to legal claims by the bank consortium.

• You directed a phoney "shell company," New England Market Pulp Company, to fraudulently divert inventory, which should have belonged to American Tissue, and to otherwise falsely hide American Tissue's financial troubles.

• You personally directed one of your staff members and a relative of his to have other companies create false invoices in the amount of $20 million and other false documentation in order to defraud the bank consortium to advance even more money to your company.

• You personally engineered a series of false financial transactions in which you persuaded one of your relatives to "purchase" a million dollars of product from your company. The entire transaction was a financial sham, which fraudulently induced the bank consortium to advance more money to you.

• You personally participated in multiple acts of obstruction. Among other things, when you learned that auditors from the bank consortium were attempting to confirm the legitimacy of the sales recorded in the documents which you had sent to the consortium (and upon which the tens of millions of dollars had been loaned to your company), you urged your customers to lie about the amount of money which they owed to your company.

• At a bank consortium meeting in August 2001, you admitted that your company had diverted tens of millions of dollars from the consortium to improperly pay off its debt. The consortium's auditors were in the process of discovering that there were tens of millions of dollars of financial improprieties at the

\o\

LAW OFFICES OF
MICHAEL S. ROSS

Mehdi Gabayzadeh
December 16, 2008
Page 4

Company. However, even though you had directed
the scheme yourself, and in an effort to deflect blame
away from yourself and to save your company, in
September 2001, you forced one of your company's
executives – to whom you were giving orders – to
take the fall and resign from your company.

- Eventually, the discovery of your fraud reached the
point where creditors no longer had confidence in
your company, your company – and a patchwork of
twenty affiliated companies which you had created –
were forced into bankruptcy. The bankruptcy was
caused by, and only by, your repeated fraudulent acts
and that bankruptcy fraud caused $20 million in losses
to your victims.

- Following the bankruptcy of your company, you
embarked on a new campaign to obstruct justice by
lying, and attempting to have others lie on your behalf
and to otherwise frustrate the United States Attorney's
Office, the Securities and Exchange Commission, the
Bankruptcy Court and the Bankruptcy Trustee.
Among other things:

  › In order to fraudulently transfer assets,
  to defraud creditors and to deceive the
  Bankruptcy Trustee, you engineered
  and directed others to create and
  distribute a fraudulent bill of sale
  which would have allowed $20
  million worth of valuable equipment
  to escape sale by the Trustee.

  › You directed a company executive to
  appear in Bankruptcy Court and to
  testify falsely about the supposed
  transfer of this equipment.

\0 2

LAW OFFICES OF
MICHAEL S. ROSS

Mehdi Gabayzadeh
December 16, 2008
Page 5

> During the pendency of the bankruptcy proceeding, you schemed to obtain more than $8 million which belonged to the creditors of your company. You instructed one of your executives to create fraudulent paperwork which would have made it seem that a non-bankrupt company owned by you owned the equipment and that the creditors owed you the $8 million for this equipment.

> As part of your obstructionist activity, you urged some of your attorneys to offer fraudulent evidence.

> As part of your obstructionist activity, you persuaded another individual to lie to F.B.I agents. And, you directed that individual to submit a forged document in response to a grand jury subpoena issued as part of the investigation into your company.

• Separate and apart from your massive fraud on the bank consortium, the bankruptcy fraud and the obstruction of justice, as part of your standard manner of doing business over the years, you committed various other crimes. For example, in order to render unenforceable a legitimate lien on a nearly million-dollar piece of equipment you had purchased on credit from a company called Perini Rewinders (in Italy), you engaged in a shell game of improperly moving that equipment from location to location within the United States and then out of the United States to Mexico in order to defeat the lien. Then, you created false documents claiming that the equipment had been sold to some limited liability corporation in New Jersey (against whom no recovery was likely). And eventually, you had the gall to offer the lien-holders

103

LAW OFFICES OF
MICHAEL S. ROSS

Mehdi Gabayzadeh
December 16, 2008
Page 6

> assistance in recovering the equipment if they would
> pay you $200,000. In the end, the lien-holder lost
> over $754,000 as a result of your criminal
> machinations.

Your various criminal schemes – which resulted in losses to victims totaling more than **$193 million** – were so broad and pervasive that the victims were too numerous to identify. You were facing a life sentence under the United States Sentencing Guidelines.   Notwithstanding the incredible breadth and scope of your criminal conduct, you refused to allow Mr. Brafman to seek a pre-Indictment resolution of your case (which might have resulted in a much lighter sentence for you and which might have eliminated early on the danger that others in your family might be indicted).

Moreover, you refused to allow Mr. Brafman to engage in any plea bargaining which would not guarantee you a non-jail sentence – which simply was not realistic. Over time, Mr. Brafman and his staff repeatedly demonstrated to you that there was documentary proof of your misconduct, but you refused to listen and you ignored the warnings that other co-schemers were cooperating against you. Your claim that Mr. Brafman somehow did not allow you to cooperate in a way which would have allowed you to obtain a non-criminal disposition of the your case borders on lunacy.

Although the Government expressed some interest early on in its investigation in the Spring of 2002 in speaking to you concerning individuals you had contact with at LaSalle Bank as part of a *possible* cooperation deal, such a deal was never possible for me to put in place for two very simple reasons. Those reasons were: 1) you had no hard facts (as opposed to wild speculation) concerning misconduct by individuals at the Bank; and 2) you refused to consider any such cooperation without a *guarantee* that you would receive a non-jail sentence – which, given your crimes, was simply not

10⁴

LAW OFFICES OF
MICHAEL S. ROSS

Mehdi Gabayzadeh
December 16, 2008
Page 7

realistic and such a non-jail guarantee was never offered by the Government.

Indeed, over time it was quite clear to the Government and everyone else associated with the case that you were the top target in the case, and the Government was not interested in having you cooperate against lesser targets who were simply taking orders from you. Nonetheless, Mr. Brafman, his staff and others are, as I indicated in my November 5th letter, ready to demonstrate that you were, in fact, urged to plead guilty at an early point in time. They are also all ready to confirm that you stubbornly and adamantly refused to consider such an early plea.

Finally, in April 2004, you discharged Mr. Brafman; sought new counsel; went to trial; and were convicted. After you were convicted at trial, you and your family urged Mr. Brafman to represent you at sentencing; and through Mr. Brafman's very capable efforts, you received a 15-year sentence, as opposed to the 25 to 30 year sentence recommended by the Probation Department and the Government. For all of these reasons, your claim that somehow Mr. Brafman failed to obtain for you a non-criminal disposition of the case is, to be generous, absurd.

*Third*, I will not again here discuss your demand for documents and other information. My position was made clear in my September 5, 2008 letter to you. In Mr. Brafman's May 2007 letter to you, he sent you many documents and other internal memoranda; and as part of the transition to your new trial counsel in the Spring of 2004, boxes containing many thousands of documents were turned over to your new counsel.

*Fourth*, as to your threat that you will bring a lawsuit against Mr. Brafman, that is your choice. Rest assured, however, that any lawsuit you bring will be defended vigorously. Moreover,

105

LAW OFFICES OF
MICHAEL S. ROSS

Mehdi Gabayzadeh
December 16, 2008
Page 8

any lawyer or law firm who makes false claims against Mr. Brafman and his firm will be the subject

of all appropriate sanctions motions.  Frankly, you are bankrupt of all credibility, and if you wish to

spend your time and energy and blaming others for your own predicament, rather than accepting

responsibility for your own many criminal acts, so be it.

Very truly yours,

Michael S. Ross

# EXHIBIT 16

From: John Gabayzadeh <JGabayzadeh@tmo.blackberry.net>
Subject: **Re: Sentencing Memorandum**
Date: July 13, 2006 2:57:20 PM EDT
To: Ben Brafman <bbrafman@braflaw.com>
Cc: Jennifer Liang <jliang@braflaw.com>, Nima Nili <nnili@mac.com>,
"Queengabaz@aol.com" <Queengabaz@aol.com>
Reply-To: JGabayzadeh@tmo.blackberry.net

Ben
The memorandum was really touching. Thank you for everything. I am waiting
for my father to call me to see which way he would like to proceed. I informed
jennifer earlier today during our conversation that I will call her when my father
will call me shortly this afternoon and to be available. I am sorry to hear about
your back, I hope your procedure will go well. Please send me the invoice for out
of pocket expenses as you indicate below to my home. Thanks
Sent wirelessly via BlackBerry from T-Mobile.

-----Original Message-----
om: "Benjamin Brafman" <BBrafman@braflaw.com>
Date: Thu, 13 Jul 2006 14:49:34
To:<JGabayzadeh@tmo.blackberry.net>
Cc:"Jennifer Liang" <JLiang@braflaw.com>, <nnili@mac.com>,
<Queengabaz@aol.com>
Subject: Sentencing Memorandum

I hope you , your father and the rest of your family are pleased with the
sentencing memorandum we prepared.

 A great deal of time and effort went into the preparation of this massive
submission that we think paints a very compelling portrait of your father and the
many serious issues that sourround him and his case at this time.

 I am not requesting any additional fees, despite the extraordinary effort this
project required that was well beyond anything I anticipated at the time we
agreed to come back in as co-counsel for sentencing. My office will however be
sending you a small invoice for the few thousand dollars that we incurred in
 oducing, copying, binding and delivering 12 copies of the report and exhibits

to you , your dad, the ct, probation, Dr Kirwin, and co-counsel. I expect that you ill pay reimburse us for those out of pocket expenses.

Finally, I have just been told that I will require back surgery for a herniated disc and that the surgery is to be performed either wed. July 19th or Thurs July 20th. This is obviously not something I expected or hoped for. The procedure cannot be adjourned any longer as I can barely walk now and I am in considerable pain. Accordingly, we have no choice but to adjourn the sentence if your father wants me to participate personally, as I expect he will. Jennifer will discuss rescheduling.

Benjamin Brafman  Brafman & Associates, P.C.
767 Third Avenue, 26th Floor
New York, NY 10017
T:  212-750-7800
F:  212-750-3906

This message is a PRIVATE communication. This message and all attachments are a private communication sent by a law firm and may be confidential or protected by attorney-client privilege or work product protection. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of the information contained in or attached to this message is strictly prohibited.  Please notify the sender of the delivery error by replying to this message, and then delete it from your system.  Thank you.

From: Benjamin Brafman <BBrafman@braflaw.com>
Subject: **Fw: US v. Adelson**
Date: August 15, 2006 12:16:13 PM EDT
To: Jennifer Liang <JLiang@braflaw.com>, nnili@mac.com


-----Original Message-----
From: Benjamin Brafman
To: 'jgabayzadeh@premierpaperproducts.com' <jgabayzadeh@premierpaperproducts.com>
Sent: Tue Aug 15 12:15:33 2006
Subject: Re: US v. Adelson

. All of these cases are helpful because they allow a ct in its discretion to conclude that the
Guideline sentence is simply "too harsh" which is precisely our argument. So it does not hurt to
have this decision.  On the other hand, the second Circuit just affirmed a 25 year sentence of
Bernard Ebbers who is 65 years old. The Worldcom fraud was however Billions of dollars. There is
simply no way to predict how the Judge will sentence. My hope is that she will be compassionate.

 n a separate note, I would appreciate it if you would reimburse me for the outstanding invoiceds
 ʋr the expenses we incurred in preparing the Sentencing Memorandum

-----Original Message-----
From: John Gabayzadeh <jgabayzadeh@premierpaperproducts.com>
To: 'Nima Nili' <nnili@mac.com>; Jennifer Liang; Benjamin Brafman; 'Raymond Perini'
<PERINIHOERGER@aol.com>
Sent: Tue Aug 15 15:04:14 2006
Subject: RE: US v. Adelson

Ben,

Can you comment on the case below? My father wants to know what you think and how it could
be similar to his case. Thanks


-----Original Message-----
From: Nima Nili [mailto:nnili@mac.com]
Sent: Friday, August 11, 2006 5:06 PM
To: Jennifer Liang; bbrafman@braflaw.com; Raymond Perini
 ʿ: John Gabayzadeh; nima nili

Subject: US v. Adelson

Mehdi found below regarding US v. Richard Adelson.  He asked that I share it with you in hopes it will help his case....

United States v. Adelson, No. S2 05 CR. 325 (JSR), 2006 WL 2008727 (S.D.N.Y. July 20, 2006)

"This is one of those cases in which calculations under the Sentencing Guidelines lead to a result so patently unreasonable as to require the Court to place greater emphasis on other sentencing factors to derive a sentence that comports with federal law"

http://federalsentencing.typepad.com/developments_in_federal_s/2006/07/judge_rakoffs_s.html

Tks - Nima

Benjamin Brafman
Brafman & Associates, P.C.
767 Third Avenue, 26th Floor
New York, NY 10017
T:  212-750-7800
F:  212-750-3906

This message is a PRIVATE communication. This message and all attachments are a private communication sent by a law firm and may be confidential or protected by attorney-client privilege or work product protection. If you are not the intended recipient, you are hereby notified that any disclosure, copying, distribution or use of the information contained in or attached to this message is strictly prohibited.  Please notify the sender of the delivery error by replying to this message, and then delete it from your system. Thank you.

# EXHIBIT 17

**BEN SAID PAID - NO MORE BILL**

<u>**PERSONAL & CONFIDENTIAL**</u>
Mr. John Gabayzadeh
5 Pheasant Run
Great Neck, New York 11024                    **RE: MEHDI GABAYZADEH**

August 1, 2006 - August 31, 2006

**DISBURSEMENTS:**

**Balance Forward from July 1, 2006 - July 31, 2006:**
Preparation of Sentencing
Memorandum (12) copies,
photocopying, indexing, tabs,
binding, Federal Express,
computer costs, etc.  . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **<u>$3,400.00</u>**



**WACHOVIA**

Business Checking

05   2000012709766 751 130      0  36      SAFEKEPT     Replacement Statement

Other Withdrawals and Service Fees continued

| Date | Amount | Description |
|------|--------|-------------|
| 8/25 | 3,400.00 | FUNDS TRANSFER  (ADVICE 060825015856)<br>SENT TO  BANK OF NEW YORK /<br>BNF=BRAFMAN AND ASSOCIATES<br>OBI=<br>RFB=                    08/25/06  09:46AM |
| 8/25 | 3,860.00 | FUNDS TRANSFER  (ADVICE 060825016077)<br>SENT TO  SUFFOLK COUNTY NA/<br>BNF=MAYER AND COMPANY<br>OBI=<br>RFB=                    08/25/06  09:50AM |
| 8/25 | 5,000.00 | FUNDS TRANSFER  (ADVICE 060825015658)<br>SENT TO  BANK OF AMERICA, /<br>BNF=COLE SCHOTZ MEISEL FORMAN LEONARD<br>OBI=<br>RFB=                    08/25/06  09:45AM |
| 8/25 | 6,500.00 | FUNDS TRANSFER  (ADVICE 060825015955)<br>SENT TO  RABOBANK, NA    /<br>BNF=ED MEALEY<br>OBI=<br>RFB=                    08/25/06  09:48AM |
| 8/25 | 10,000.00 | FUNDS TRANSFER  (ADVICE 060825016404)<br>SENT TO  NEW YORK COMMUNIT/<br>BNF=MARIANNE NEISSANY<br>OBI=<br>RFB=                    08/25/06  09:53AM |
| 8/25 | 11,000.00 | FUNDS TRANSFER  (ADVICE 060825015469)<br>SENT TO  AMEGY BANK, N.A. /<br>BNF=STORAGE SPECIALTIES AND EQUIPMENT<br>OBI=<br>RFB=                    08/25/06  09:43AM |

Total    $328,620.92

Service Fees

| Description | Quantity | Amount | Total |
|-------------|----------|--------|-------|
| Total |  |  | $0.00 |

Average balance                                    $9,012.64
Minimum balance                                      $198.67

Daily Balance Summary

| Dates | Amount | Dates | Amount | Dates | Amount |
|-------|--------|-------|--------|-------|--------|
| 08/01 | 3,816.96 | 08/11 | 6,223.63 | 08/21 | 8,916.00 |
| 08/02 | 265.27 | 08/14 | 1,223.63 | 08/22 | 7,827.00 |
| 08/04 | 12,236.95 | 08/15 | 223.63 | 08/24 | 53,223.97 |
| 08/08 | 236.95 | 08/16 | 9,144.67 | 08/25 | 3,397.43 |
| 08/09 | 198.67 | 08/17 | 27,144.67 | 08/28 | 1,397.43 |
| 08/10 | 38,612.89 | 08/18 | 12,354.92 |  |  |

HOVIA BANK, N.A. ,  FORDS                                        page 5 of 6

114

# EXHIBIT 18

# BRAFMAN & ROSS, P.C.

### ATTORNEYS AT LAW
767 THIRD AVENUE
26TH FLOOR
NEW YORK, NEW YORK 10017
TELEPHONE: (212) 750-7800
FACSIMILE: (212) 750-3906

BENJAMIN BRAFMAN
CHARLES A. ROSS

CHRISTOPHER L. PADURANO
JENNIFER A. LIANG
MELINDA SARAFA
ANDREA ZELLAN

MARK M. BAKER
OF COUNSEL

April 5, 2004

## VIA TELEFAX (631) 342-9777
## PERSONAL & CONFIDENTIAL
Mehdi Gabayzadeh
President and CEO
American Paper Corporation
300 Rabro Drive
Hauppauge, New York 11788

Dear Mr. Gabayzadeh:

Following our meeting on Sunday, April 4, 2004 we <u>both</u> agreed that it would be best if at this time you were to change counsel in connection with the criminal case presently pending before the Honorable Joanna Seybert in the United States District Court for the Eastern District of New York in Central Islip. Your April 4, 2004 fax to my office confirms that the decision to sever our professional relationship is by <u>mutual</u> agreement.

As you requested, I am providing you with the names of four highly experienced criminal defense lawyers who practice out on Long Island and who all have substantial experience in the Federal Court for the Eastern District of New York. It is my belief that any of these four attorneys can represent you very effectively and that each will also have the substantial time that your case will demand during the next several months as you prepare for trial.

Please be advised that once you have had an opportunity to select new counsel, my office is prepared to meet with that attorney and see to it that there is an orderly transition. If you sign this letter where provided, we will also provide your new attorneys with all of the work-product that we have developed during these past many months.

116

**BRAFMAN & ROSS, P.C.**

I would suggest that you meet with each of the four lawyers whose names and addresses we set out below and then advise me if you have selected any of them to replace you. If you choose any other lawyer, please inform me of who that person is so that my office and that attorney's office can then interface. Please let whoever it is who replaces me know that your case is scheduled for a status conference on **Friday, April 23, 2004 at 12 p.m.** before the Honorable Joanna Seybert in the Eastern District of New York in Central Islip. On that date, a formal substitution of counsel should be made with you, me <u>and</u> your new attorney present before the Court.

The attorneys I recommend are:

**Stephen Scaring, Esq.**
**Stephen P. Scaring, P.C.**
**666 Old Country Road, Suite 501**
**Garden City, New York 11530**
**Tel. (516) 683-8500**

**Paul Gianelli, Esq.**
**Reynolds, Caronia, Gianelli & Hagney, LLP**
**200 Motor Parkway, P.O. Box 11177**
**Hauppauge, New York 11788**
**Tel. (631) 231-1199**

**Ray Perini, Esq.**
**Perini & Hoerger**
**1770 Motor Parkway**
**Hauppauge, New York 11749**
**Tel. (631) 232-2224**

**Edward P. Jenks, Esq.,**
**332 Willis Avenue,**
**Mineola, New York 11501,**
**Tel. (516) 741-2920**

We are starting the process of organizing the massive files we have developed and maintained on your behalf so that those materials are available for transfer to your new attorney without delay. We will also release our work-product, but only with your assurance that you do <u>not</u> intend to file any claim of any kind against me or this firm based on our representation of you, the quality of our work or the fees paid to date. By signing a copy of this letter you agree to

2

117

# BRAFMAN & ROSS, P.C.

release me and this firm from any such claims.

Thank you for the many courtesies that you have extended to this firm during the past many months. I wish you every success in the outcome of your case.

On a personal note, please accept my best wishes to you and your family for a Happy and Healthy Passover Holiday.

Very truly yours,

Benjamin Brafman

**SIGNED AND AGREED TO:**

_____

**MEHDI GABAYZADEH**

_____

**DATE**

3

# EXHIBIT 19

April 29, 2004

**BY HAND**
Maureen Hoerger, Esq.
Perini & Hoerger
1770 Motor Parkway
Hauppauge, New York 11749

### Re: Mehdi Gabayzadeh

Dear Ms. Hoerger:

This will confirm that as of today's date we have forwarded our entire file pertaining to our representation of Mehdi Gabayzadeh to you with the exception of our inter-office memoranda and attorney notes.

If you should have any questions, please do not hesitate to contact me or my associate, Jennifer Liang. Thank you for your courtesy with respect to this matter.

Very truly yours,

Benjamin Brafman

Enclosure

# EXHIBIT 20

## PRIVILEGED AND CONFIDENTIAL ATTORNEY WORK PRODUCT

### MEMORANDUM

TO:        File

FROM:    Jennifer A. Liang

RE:        Mehdi Gabayzadeh (May 29, 2003 meeting)

DATE:    June 17, 2003

The following is a summary of our meeting on May 29th 2003. Ben Brafman, Medhi Gabayzadeh, John Gabayzadeh, Deborah Schwartz, Les Levine, Bob Katzberg, Ali Amzad, Matin Emouna and myself were in attendance.

John Gabayzadeh indicated that "Mike G." had given him a cd-rom and said, "it was a gift from me to you." Les has been assisting John in an attempt to open the disk.

Medhi proposed the idea where he would assist the Super American Tissue Inc. (SATI) trustee in recovering the assets of the debtor corporations but he wanted to ensure that he would not waive his fifth amendment privilege. Medhi claims that SATI has no secured creditors. Bob Katzberg indicated that it would not be a good idea and that maybe we would only play that card if the trustee was trying to bring trouble upon us.

It was also noted that Ed Stein's laptop is currently in Bob Gottlieb's possession. With respect to paragraph 37 of the search warrant, Medhi noted that he never said the cost was 4.2 million dollars, he said that his price was 4.2 million dollars. He also indicated that he bought the rewinder for 1.8 million dollars or 2.3 million euros.

Ben indicated that Nicholas Kaiser does not want to speak with us since he is now involved with his mal-practice insurance attorneys. Ben Brafman also said that Donna

1

D'Agrosa would be a good witness.

Medhi indicated that Steve Catalfamo had violated his confidentiality provision with A.T.I. Catalfamo went on 85% of his trips with Medhi Gabayzadeh. Catalfamo made a handbook regarding the policies and procedures. There was a confidentiality provision within the handbook. However, Catalfamo spoke with Russ Taylor every day and therefore violated the confidentiality provision.

A review of Steve Catalfamo's expense reports shows that he is a thief. Medhi did not discover this until Steve Catalfamo left the company. This is consistent with Medhi's defense. It appears that Steve Catalfamo inflated his miles by over 70,000 in 2001 and he would receive 15 cents a mile. In a two year period Steve Catalfamo submitted expense reports in excess of 130,000 miles. Les is following up with respect to this.

Steve Catalfamo bought land through money he borrowed from Medhi and then cleared the land with American Paper's machines.

Bob Katzberg indicated that a good paralegal assignment would be a chart of fees given to LaSalle.

Paul Repola was the risk manager. He took care of all insurance. He was with the company for 6-8 years and reported to Ed Stein. Ed Stein forced him to report to him. He is currently working in Manhattan. Ed was trying to push Repola out. We reviewed questions to be reviewed with Repola.

Medhi indicated that Ed Stein had Ali Amzad hire [first name unknown] Rodriguez who had worked in the mail room at Koplik. He started him with a salary of $42,000.00 annually. He is currently driving a cab in New York City. Les is going to follow up with respect to Rodriguez.

2

Medhi indicated that there were 689 company trailers running around the country at the same time just for inter company shipments. Medhi wanted a monitoring system for the trailers and he tried to put in a security system but Stein stopped him.

3

# EXHIBIT 21

**PRIVILEGED AND CONFIDENTIAL ATTORNEY WORK PRODUCT**

**MEMORANDUM**

TO:      File

FROM:    Jennifer A. Liang

RE:      Mehdi Gabayzadeh (Paul Repola Interview)

DATE:    June 17, 2003

      The following is a summary of our recent meeting with Paul Repola. Bob Katzberg, Les Levine and I were in attendance.

      Repola appeared to be credible and answered all questions in a frank manner. Repola noted that he spoke with the F.B.I. on the day of the raid. However, Repola noted that once he started to speak about insurance, their eyes quickly glazed over. He also had extensive conversations at American Paper with USDL with respect to health insurance and had spoken with Bob Handler of Kugman with respect to insurance, as well.

      Repola resides at 125 Mastic Beach Road. His telephone number is 631-399-6764. His date of birth is December 29th, 1954. His social security number is 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.

1

ı ıb

## Employment History

Repola is currently employed as the Director of Risk Management with Tri-State Employment Services, which is located at 160 Broadway. Paul Repola had spent many years in the insurance business. He worked for Franklin United from 1988 through 1993. He then started his own brokerage agency called First Suffolk Financial Services.

Prior to his current employment at Tri-State, Repola was employed with American Paper. In February of 1997, Repola was hired by Frank De Maio to be in charge of Risk Management at ATC. Repola had responded to an ad in Newsday. He reported to Nourollah and Mehdi.

## ATI Insurance Issues

Repola noted that when he arrived at American Tissue, the insurance "was out of control" and that "American Tissue was overpaying." During the first year, Repola trimmed the cost by 1 million dollars. The insurance involved property, liability, workers compensation, cargo, auto coverage, health benefits package, and fleet insurance. Frank De Maio was in charge of health benefits prior to Repola.

When Repola started in February of 1997, he "got renewals under control and then health benefits."

Repola noted that A.T.I. was trusting brokers too much. The brokers were more concerned about their commissions. There were gaps in coverage. The company was being under protected and overcharged. This came to the company's

2

112

attention when a fire broke out in 1995. It was a huge claim worth approximately 20 million dollars. It was a huge loss for the company. Ultimately, Traveler's paid on the claim.

The substantial growth of A.T.I. during his employment made Repola's job more difficult. The acquisitions really began in 1999.

## Mehdi Gabayzadeh

During his first year, Paul Repola reported directly to Medhi. He always had a "direct line" to Nourollah. Repola noted that expansion was Medhi's "baby", that Medhi always traveled, and that Medhi's traveling increased during the expansion of A.T.I. However, he also noted that Medhi was involved to a certain extent in the minuteness of details. Repola gave an example of how Medhi increased the space on a machine called a pulp lapper by an inch so that it could produce that much more pulp per year. He said he never saw anyone so excited. Repola also noted that Medhi also wanted to know the numbers on insurance when the renewal came. He wanted input from Repola on how Repola valued machinery and buildings.

Repola indicated that although Medhi dealt with the bank at a high level, Medhi had little to do with the accounting. He relied upon the then CFO, Ron Gasper, and, subsequently, Stein to manage the accounting.

Medhi was the type of guy that you needed to go to more than once or he lost respect for you. Medhi's direction to Paul Repola was always to "get up to the line, stub your toe on the line but do not cross the line." That was Medhi's "mantra."

3

Repola would hear him saying this in meetings. Repola noted that Medhi wanted them to be creative.

## Ed Stein

When Medhi informed Repola that Gasper would be leaving the company and that Stein would be replacing him, Repola called Stein at Koplik pursuant to Mehdi's request. Stein told Repola at that time that he hated Marsh McClennan. When Repola started, Aon was the broker. Then Repola chose Marsh McClennan. Repola had them both bid, and Marsh McClennan won the bid. Repola "had to fight Ed Stein off and kept him away from the brokers from day one.

Within weeks of Stein's arrival at the company, Repola told Mehdi that Stein was a "crook" and a "bully." Mehdi told Repola that Stein was "not God" and noted "Be respectful but be strong." Paul Repola never discussed financial manipulations or Stein's "cooking the books." Later, Stein was trying to push Repola out of the company so Repola went to Medhi. Medhi said not to worry. He would not be forced out. Repola had a very strong relationship with Medhi and Nourollah.

Repola described Ed Stein as a "belligerent bully." Repola provided an example where a Yankee dryer was not properly working at the Mechanicsville facility. As a result, Repola had a meeting with Ed Stein and brought Rudi, a broker, and Peter Cahn, a forensic accountant, to the meeting. Stein was so belligerent that Rudi and Peter Cahn walked out. Repola indicated that it was in Stein's nature to be belligerent and that Stein was a control freak.

4

Repola indicated that Stein wanted control over broker selection. Stein wanted Tannenbaum and Harbor on 57th Street in Manhattan to take over as broker. Repola believed that Ed Stein wanted kick-backs from them. Paul Repola wanted world class brokerage assistance and "that was not Tannenbaum and Harbor."

At one point, Ed Stein came into Repola's office, stinking of liquor, and said "we are going to fire your brokers and hire mine." This battle continued. Ed Stein had indicated to Medhi that he was bringing in "his guys" to merely review insurance, but instead he signed them up to be the new brokers. Stein denied that he had replaced the brokers. Repola had difficulty getting Medhi's attention with respect to this issue. Thereafter, there was a meeting among Medhi, Stein, and Repola where Medhi confronted Stein about firing Repola's brokers. During that meeting, Repola grabbed a letter showing in fact that Ed Stein had fired the brokers at the end of 2000 and finally Stein confirmed and conceded that he had.

In the winter of 1999 or early Spring of 2000, Ed Stein took Mike Palumbo out to dinner at Mario's. Stein was drunk. He indicated to Palumbo that he was "the guy that was running the company now, Medhi was out and he was in." Stein also indicated that he was in charge of the Ampad and Pulp and Paper acquisitions. He wanted Palumbo to know that he would be phased out and wanted Palumbo to go away quietly with a small commission. Repola also indicated that Mike Palumbo may be able to give us some names of some of the health insurance brokers.

Repola indicated that the company benefitted from Cigna Insurance.

5

However, Ed Stein could not grasp the nuance of the program with Cigna. During a meeting with the individual from Cigna, Stein "took the kid apart, Stein just laughed, that was the kind of guy he was." In July of 2001, A.T.I. owed Cigna money. Stein would not pay the bill and as a result the company was not covered.

The people that Ed brought into the company were not loyal to Ed but they feared him. Ed Stein could not deal with people who could not be bullied. Therefore, Repola was in Stein's way.

Rumors were that Stein was impotent. Nicholas Kaiser and Greg Bruccia indicated to Repola that Stein was "into kiddy porn".

**Ron Gasper**

Repola indicated that the investment bankers wanted Stein in and that Gasper was being asked to manipulate numbers by the investment bankers. Repola mentioned Jonathon Mischkin's name. Gasper would not manipulate the numbers. Gasper expressed some concerns. Repola remembers that it was said that Gasper was not enough of a "team player" and Repola took this to mean "team player" in a negative sense.

**John Lorenz**

Lorenz was bullied by Stein. Lorenz had a great deal of paper and financial experience. He sold his house in Kentucky and moved his family up to New York. Lorenz did what he was told to do. Repola would see Lorenz and Lorenz would say to him "we're cooking the books."

6

Repola indicated that over Labor day weekend in 2001, John Lorenz sat with Medhi and a yellow pad and outlined everything that Stein was doing.  Lorenz indicated to Repola that, in Lorenz's estimation, Medhi did not know what was going on and that Mehdi was shocked.

## Nick Galante

Subsequent to his employment at A.T.I., Repola was on a flight with Nick Galante.  At that time, Nick Galante said to Repola that he couldn't understand how people didn't know what Stein was doing at the company.  Paul Repola said to Nick Galante, "I was wondering the same about you since you worked so closely with Ed on acquisitions."  Nick Galante just became quiet at that point.  Repola indicated that Nick Galante and Ed Stein did in fact work very closely with one another, he indicated that they worked "scotch bottle to scotch bottle."

## Ali Amzad

Repola indicated that Ali Amzad was a "mechanic."  Repola explained that if Amzad was told to cut a check, he cut a check.  Ali did exactly what he was told to do.  Repola also opined that there was no sense to indict him.

7

## Former ATI Employees

Repola explained that Carl Caputo never had a smile on his face from the day he began and that he always looked like he was "stressed, sad and sorry." However, Repola explained that on the day he resigned, Caputo looked great.

Scott Gater was the type of person who just stayed "under the radar and just collected his pay check." It was common knowledge among the department head level that he had been asked to do bad things.

Raymond [last name unknown] was a bright individual who understood systems. Lorenz had asked him to move certain numbers.

Steve Catalfamo was competent. Repola believed that he was not involved.

Donna D'Agrosa reported up the financial lines. Stein wanted Donna out and he brought in other credit people.

8

# EXHIBIT 22

## PRIVILEGED AND CONFIDENTIAL ATTORNEY WORK PRODUCT

## MEMORANDUM

TO:        File

FROM:    Jennifer A. Liang

RE:        MEHDI GABAYZADEH (May 5, 2003 Interview of Joe Ferrugio)

DATE:     June 26, 2003

The following is a summary of our interview with Joe Ferrugio.  Les Levine, Bob Katzberg and myself were in attendance.

Joe Ferrugio was born on May 7th, 1953.  His social security number is 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.

### Employment History

Joe Ferrugio is currently the Corporate Credit Manager for Concord Fabrics. He will be employed with them for two years this July. Prior to working with Concord Fabrics he was employed with American Tissue. He had responded to an ad in the newspaper.  Ed Stein had hired him.  He was let go in July of 2000.

Prior to working at American Tissue, Ferrugio had worked at Quality King Distributors in Ronkonkama. When he left the company, they were doing 1.2 billion dollars. Prior to his employment with Quality King, he did credit investigation work with Solo Credit International. Prior to working with Solo Credit International, he was employed with S. Rothchild for 8 years performing credit work.  He finished high

1