school. He dropped out of college since his father was ill. He then attended the New York Institute of Credit.

## Stein Hires Feruggio

Feruggio was only interviewed for his employment with American Tissue by Stein. He met Stein at Stein's office at 7:20 in the morning. He was to replace Don Powers. Stein wanted Ferrugio to be in and out prior to Power's arrival that day. Stein went through five credit managers during his ten years at American Tissue. Joe was "number three." In late January, Ed Stein and Joe Ferrugio met at Mario's, a restaurant that Stein had frequented. Stein indicated that Joe Ferrugio would be running the collection department and responsible for the billing department. Joe would be supervising both Deborah Horvath and Donna D'Agrosa.

## Billing

Horvath was the billing manager. There was a billing department problem. The invoice was required to be created within two days of the bills coming in. Nine billers worked for Horvath. Ferrugio mentioned Barbara Gaissert, Marie Leo, and Ms. McMillan. They were required to take information off fax machines coming from a dozen mills. The information included the type of material shipped, the quantity shipped, the price shipped, and the proper taxation. Horvath was responsible for ensuring that invoices were accurate. There was a log for each mill and each log ran its individual numbers. Ferrugio indicated that when he checked the number on the billings to the number on the logs, they were correct.

2

Late invoicing sometimes occurred. Sometimes the invoices were late for over a week. Ferrugio did not understand that late billing affected the credit line of the company. He just did not want payments delayed due to late invoices. Ferrugio opined that there could have been a better collection effort. He was responsible for aging of receivables to see how efficient the system was.

Ferrugio stated that Donna D'Agrosa was a very capable individual who ran the accounts receivable department. She would ensure that money came in. Donna D'Agrosa had a good relationship with creditors.

### Joe Ferrugio's Meeting with Ed Stein and Carl Caputo

At one point, Joe Ferrugio, Ed Stein and Carl Caputo met at Mario's. Ed Stein said that he intends to grow the company to 1 billion or "bust it in the process." At that point, Ferrugio just thought that Ed Stein was being "gungho" about the job but that he should not be saying that. Ferrugio indicated that Stein wanted 1 billion dollars in sales.

### Collections

Joe Feruggio noted that there was a time when the collections department was hitting its stride in collections, but not hitting "Ed Stein's numbers." Joe Ferrugio spoke with Ed Stein about this but Stein would not accept that Joe Ferrugio was collecting on a timely basis even though he was.

On January 4, 2000, Medhi said to Joe Ferrugio, "We are not collecting enough." Ferrugio indicated to us that Stein was "beating up on them that they were

3

not collecting enough" even though Stein knew better. Feruggio noted that Paul Scalesi, a collector working for him, often had tears in his eyes. Ferrugio noted the procedure: "the day you collect the money the receivables need to be taken down by the next day." That number would then reflect what the borrowing basis was.

## Collateral Report to Lasalle and Ferrugio's Exit

Ferrugio indicated that 6.5 to 8 million dollars was not reflected on the cash collateral report to LaSalle in the last week of June, 2000. Ferruggio believed that Ed Stein knew that these funds had been collected.

Late in June of 2000, Feruggio met with Mehdi and told Mehdi that the collateral basis to the bank was wrong. Mehdi's mouth dropped and he said, "Show me the documents." Feruggio showed him the borrowing base certificate and the spreadsheet. Feruggio noted that Mehdi did not have these documents. Feruggio opined that "it was either plausible deniability" on Mehdi's part "or Ed Stein was hiding this from Mehdi." Mehdi indicated to Joe Feruggio that he did not understand "what Ed was doing." Joe Feruggio said to Mehdi that Mehdi would need to talk to Stein.

On the morning of Wednesday, July 5th 2000, Ed Stein, Mehdi and Ferrugio met. Mehdi wanted to confront Stein with Ferrugio's claims. Stein denied that the borrowing basis was wrong. Ferrugio did not want to say anything at that time since Medhi was there. He did not want to confront Stein because he believed that he would be fired for doing so. After the meeting, Stein said to Ferrugio, "I thought you

4

were my white knight, but you turned out to be my black knight. We have no use for you." Stein had a severance check for Ferrugio. Ferrugio wanted the severance check so he did not put up a fight.    Ferrugio does not recall who signed his severance check. It was not typed. It was handwritten.

Joe Ferrugio never spoke to Mehdi about this. Mehdi was traveling.

## Stein's "Cooking the Books"

Ferrugio indicated that Ed Stein was "playing around with the books." Dominic Nocera and Carl Caputo would go into Ed Stein's office with numbers. Caputo would say, "This is not the number it should be, the number came in from the mills' inventory numbers." Ferrugio noted that Nocera and Caputo's numbers were "not good enough" for Ed Stein. In 2000, Dominic Nocera left. At one point ,Ferrugio said to Carl Caputo, "He is asking you to change numbers, right ?" Carl replied, "We are having a terrible disagreement." Ferrugio then asked, "Is it pushing the value of the numbers up ?". Carl Caputo said, "What do you think ?".

## Mehdi Gabayzadeh

Joe Ferrugio was in every Saturday. Mehdi would go in every Saturday as well. However, Mehdi was out of the office more than he was in.

Ferrugio and Mehdi had several meetings. Ferrugio never warned Medhi about Stein. He felt that it was not his place to do. Ferrugio opined that Mehdi should have had better checks and balances over the financial department. Ferrugio believed that Donna D'Agrosa could have been a compliance officer and that she

5

139

would have done that well. He noted that D'Agrosa had done it for department stores in the past.

Ferrugio believed that when it came to the underlying financials Mehdi did not know what was going on. Ferrugio wanted D'Agrosa to get involved as a free lance troubleshooter for Mehdi. Ferrugio believed that they were collecting enough money. Ferrugio noted that Mehdi did not believe this since he did not have supporting documents. Mehdi was not a "hands on guy". He fulfilled his job as C.E.O. and delegated the business.

## Ed Stein

Joe Ferrugio explained that Ed Stein loved golf and Mario's restaurant. He would drink in his office. He frequented Mario's. He had the same table which was reserved for him.

Stein had been over at Koplik for fifteen years. Ferrugio indicated that Ed Stein "busted Koplik" -- had put Koplik into bankruptcy. When Ed Stein left Koplik, Koplik had a party. Ferrugio explained that Ed Stein has a harsh demeanor, is a bully and an only child and had to have his own way. Ferrugio explained that Stein was not a sexist. However, he would belittle people and was condescending.

## Deborah Horvath

As a result of Horvath's termination, a sexual harassment claim was brought against Joe Ferrugio. In December of 2001, Joe Ferrugio was served with papers with respect to the harassment claim.

6

140

1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - -   X

UNITED STATES OF AMERICA, :    CR 03 162

      v            :    U.S. Courthouse
                            Central Islip, New York

MEHDI GABAYZADEH,             :

                                  TRANSCRIPT OF SENTENCE

      Defendant.             :

                                  September 25, 2006
- - - - - - - - -   X     10:00 a.m.

BEFORE:

      HONORABLE JOANNA SEYBERT, U.S.D.J.

APPEARANCES:

For the Government:    ROSLYNN R. MAUSKOPF
                    United States Attorney
                    100 Federal Plaza
                    Central Islip, New York 11722
                    By:  JAMES M. MISKIEWICZ, ESQ.
                          JOHN G. MARTIN, ESQ.
                          Assistants, U.S. Attorney

For the Defendant:     PERINI & HOERGER
                    1770 Motor Parkway, Suite 300
                    Hauppauge, New York 11749
                    By:  RAYMOND G. PERINI, ESQ.
                          MAUREEN S. HOERGER, ESQ.

                    BENJAMIN BRAFMAN, ESQ.
                    767 Third Avenue
                    New York, New York 10017

Court Reporters:       HARRY RAPAPORT
                    MARYANN STEIGER
                    U.S. District Court
                    100 Federal Plaza
                    Central Islip, New York 11722
                    (631) 712-6105

12

1   to deal with the humanitarian issues that this Court needs
2   to address in imposing sentence.

3          Whether the fraud here is sixty-five million or
4   eighty-five million, again, the spread is so wide that I'm
5   not certain at the end of the day it impacts directly on
6   the actual sentence that the Court intends to impose.

7          So, we will do it any way you prefer, your
8   Honor.  But that's just a suggestion.

9          THE COURT:  The government has expressed in its
10  papers their opposition to any such waiver.  And
11  initially, I'm troubled with this.  While it is not the
12  first time that a defendant can be considered for
13  acceptance of responsibility if they go to trial and are
14  convicted; but these are generally cases where for the
15  most part a defendant raises an issue of the
16  constitutionality of the statute -- that's rather not so
17  unusual.  But in a situation where the defendant may
18  contest certain portions of his factual guilt, such as
19  Cortez and Ocha Gayton (ph), these cases seem to indicate
20  they are very rare as the commentary notes demonstrate.
21  But I'm troubled with it because it gives the impression,
22  and I think society's interest here are really damaged.

23         Because what happens in a situation where you
24  have a defendant who says I want to go to trial, and it
25  has been throughout this entire proceeding

13

1  Mr. Gabayzadeh's position that he is not factually guilty.

2       He didn't come in with a very sophisticated

3  defense. He got on the stand and he denied, despite the

4  evidence -- and it was overwhelming -- he repeatedly

5  denied any culpability.

6       MR. PERINI: Your Honor, Mr. Gabayzadeh never

7  testified. We didn't put in a defense.

8       THE COURT: Yes. He didn't put in a defense

9  here, yes. But he testified in a deposition in a civil

10  case where he denied just about everything. And all the

11  evidence indicated is that he was contesting, as he had a

12  right to do, and required the government to put in its

13  proof.

14       So, Mr. Gabayzadeh comes into court and not

15  having testified, which is obvious after an eleven week

16  trial, and say, I have accepted responsibility.

17       Now, what is that worth in terms of a waiver of

18  appeal? The government points out that it is not worth

19  very much. They can respond to it with a brief, with lots

20  of documentation and make that determination.

21       I don't know if it is even enforceable. I don't

22  want to get two months down the road a motion or a habeas

23  from Mr. Gabayzadeh based on an ineffective assistance of

24  counsel.

25       MR. BRAFMAN: Judge, let me make it easy then.

15

1   had violated the law and that he had done so knowingly and

2   intentionally.

3       If what your Honor wants to do is to proceed

4   with denying the acceptance points with the understanding

5   that we are withdrawing our waiver, we can do that and

6   then you don't have to reach that issue.

7       THE COURT:  I don't see it as an enforceable

8   waiver, frankly.  And I feel uncomfortable about that.

9       I also feel uncomfortable with specifically to

10  the fact that it is almost as if it is a game show here.

11  And I'm not belittling the genuine bona fide request you

12  are making here, Mr. Brafman and Mr. Perini.

13      Think of the message sent out to the community.

14  One goes to trial and puts the government to its proof and

15  exercises their constitutional right and relies on the

16  presumption of innocence. Then after some 17 months

17  approximately they proceed to say, well, I will waive

18  appeal because that way you don't have to be bothered on

19  appeal.

20      So, it is almost as if you are saying I took my

21  chances.  I didn't beat the charges.  And now I want to

22  waive appeal so I can get a reduction.  It is not a good

23  source of reserving the Court's resources.

24      MR. BRAFMAN:  I understand.  But in fairness to

25  everyone here, I can think of twenty occasions in the past

17

1   has brought upon himself and his family.

2          So, there was no gamesmanship and it was perhaps

3   an issue where a waiver of the appeal would be another

4   message to the government that in the event he were able

5   to cooperate, in the event he would be able to deal with

6   them on a going-forward basis, it would be an item on the

7   checklist.  And it was brought up prior to sentencing,

8   with the hope that it would resonate well.

9          THE COURT:  What is the government's position?

10         MR. MARTIN:  I believe we made clear in our

11  papers, we oppose this for many of the reasons your Honor

12  cited.  And particularly one of the reasons is the

13  important societal interest achieved by awarding credits

14  to a defendant pleading guilty before trial.  If the

15  defendants are able to play the game, as your Honor said,

16  challenge the evidence at trial and simply waive the

17  appeal and get the same benefits they would have gotten if

18  they pled guilty, sends a terrible message.

19         I think this case is a good example.  We have

20  four defendants, three charged in this indictment, and one

21  in a separate indictment in this case, all of whom pled

22  guilty at a fairly early stage of the proceedings.  And

23  all of them would be entitled to the full credit of

24  acceptance of responsibility I suspect.

25         To give this defendant the same credit that

# EXHIBIT 28

9C03482
Christopher Clifford - June 18, 2002

1          IN THE UNITED STATES DISTRICT COURT

2        FOR THE NORTHERN DISTRICT OF ILLINOIS

3                 EASTERN DIVISION

4                  - - -

5    LASALLE NATIONAL BANK
     ASSOCIATION, a National        )
6    Banking Association,           )
                                    )
7                                   )
              Plaintiff,            )
8                                   )
        vs.                         ) No. 02 C 0734
9                                   )
     MEHDI GABAYZADEH, an           )
10   individual,                    )
                                    )
11            Defendant.            )
                                    )

12

13

14

15              DEPOSITION OF

16            CHRISTOPHER CLIFFORD

17             CHICAGO, ILLINOIS

                JUNE 18, 2002

18

19

20   ATKINSON-BAKER, INC.
     COURT REPORTERS
21   330 North Brand Boulevard, Suite 250
     Glendale, California  91203
22   (800) 288-3376

23   REPORTED BY:  HEATHER PERKINS, CSR NO. 84-3714

24   FILE NO.:  9C03482

25

Page 1

Atkinson-Baker, Inc.

1-800-288-3376

9C03482
## Christopher Clifford - June 18, 2002

---

1  IN THE UNITED STATES DISTRICT COURT
2  FOR THE NORTHERN DISTRICT OF ILLINOIS
3  EASTERN DIVISION
4  - - -
5  LASALLE NATIONAL BANK )
   ASSOCIATION, a National )
6  Banking Association, )
                          )
7  Plaintiff, )
                          )
8  vs. ) No. 02 C 0734
                          )
9  MEHDI GABAYZADEH, an )
   Individual, )
10                        )
                          )
11  Defendant. )
12 _____)
13  Deposition of CHRISTOPHER CLIFFORD,
14  taken on behalf of Defendant, at 20 North
15  Clark Street, 32nd Floor, Chicago, Illinois,
16  commencing at 9:05 o'clock a.m., Tuesday,
17  June 18th, 2002, before Heather Perkins-Reiva,
18  CSR NO. 084-3714.
19
20
21
22
23
24
25

Page 2

---

1  I N D E X
2  WITNESS                    PAGE
3  CHRISTOPHER CLIFFORD
4  By Mr. Tracy
5  Examination                05
6  By Mr. Gibbs
7  Examination                143
8
9  EXHIBITS          MARKED FOR ID
10 Deposition Exhibit
11 No. 1 DEF 00445-DEF 00446     138
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

---

1
2  A P P E A R A N C E S :
   LATHAM & WATKINS
3  BY: MR. PATRICK E. GIBBS
   Sears Tower
4  Suite 5800
   Chicago, Illinois 60606
5  (312) 876-7700

6  On behalf of the Plaintiff;

7  FOGNANI GUIBORD HOMSY & ROBERTS
   BY: MR. CHRISTOPHER E. TRACY
   20 North Clark Street
8  32nd Floor
   Chicago, Illinois 60602
9  (312) 596-7777
10     and
11 BRAFMAN & ROSS, P.C.
   BY: MR. BENJAMIN BRAFMAN
12 767 Third Avenue
   26th Floor
13 New York, New York 10017
   (212) 750-7800
14
   On behalf of the Defendant.
15
16 Also Present:
17 Ms. Jessica Allison; Fognani,
   Guibord, Homsy & Roberts;
18
   Mr. Mehdi Gabayzadeh, Defendant;
19
   Ms. Kristina Mattson; Fognani,
20 Guibord, Homsy & Roberts.
21
22       *   *   *
23
24
25

Page 3

---

1       (Witness duly sworn.)
2          CHRISTOPHER CLIFFORD,
3  having been first duly sworn, was called as a
4  witness herein, was examined and testified as
5  follows:
6          E X A M I N A T I O N
7  BY MR. TRACY:
8    Q.  Good morning, Mr. Clifford.
9    A.  Good morning.
10   Q.  My name is Chris Tracy. We have met,
11 obviously, for the first time this morning.
12 We are going to, for the next several hours,
13 take your deposition in the LaSalle versus
14 Mehdi Gabayzadeh matter. Perhaps you have had
15 your deposition taken before -- I'm going to
16 ask you about that in a few minutes -- but
17 let me just give you a couple of preliminary
18 instructions.
19   A.  Okay.
20   Q.  If you ever need a break, please just
21 let me know, and we will take a break and come
22 back when you are ready to proceed again. If
23 you don't understand something in terms of a
24 question or a word I'm using, or whatever,
25 please let me know. If you don't ask me to

Page 5

---

Atkinson-Baker, Inc.

1-800-288-3376

9C03482

## Christopher Clifford - June 18, 2002

1    Answer if you can.
2        THE WITNESS: My understanding was
3    they were the moving force behind that.
4    BY MR. TRACY:
5        Q. And how did you come to understand
6    that?
7        A. I believe the company, through
8    Nicholas Kaiser told us that.
9        Q. So your understanding of that came
10   through conversations with Mr. Kaiser?
11       A. Right.
12       Q. Roughly, do you remember, to try to
13   put it in context in the time frame shortly
14   before Mr. Stein joined American Tissue, do
15   you recall is that when Mr. Kaiser informed
16   you of the fact that DLJ was a moving force
17   behind Mr. Stein being brought in?
18       MR. GIBBS: Objection, vague.
19       THE WITNESS: It was right before the
20   bond deal.
21   BY MR. TRACY:
22       Q. And how did he inform you of that?
23   What did it tell you?
24       A. Basically, he said that DLJ wanted to
25   upgrade the financial staff at American Tissue

Page 30

1    extent that we do, just so there is an
2    understanding as to why these questions are,
3    in our view, at least, relevant, the guaranty
4    does not occur in a vacuum; the guaranty
5    occurs on a date certain, but the banking
6    relationship between LaSalle and American
7    Tissue and the history of that relationship
8    leading up to the signing of the guaranty is,
9    in our view, extremely relevant, and that's
10   why these questions are being asked. We are
11   just not curious about the nature of the
12   relationship.
13       I understand the position you are
14   taking, and if we have to visit the issue with
15   the Judge, we will do it; but just so you are
16   understanding, we are not going to spend seven
17   hours discussing background, but the history
18   of the banking relationship, in our view, is
19   extremely relevant when the issue of a
20   guaranty, and why it was signed, and when it
21   was asked to be signed is noted.
22       MR. GIBBS: I understand that, and I
23   appreciate your effort to make me understand
24   the relevance of it, and I hope we are not
25   going to spend that much more time on it; but

Page 32

1    and to get the bond deal done, and they needed
2    to bring in somebody else.
3        Q. Did you have any understanding of
4    Mr. Stein's background at that point in time?
5        MR. GIBBS: I renew the relevance
6    objection. None of this has anything to do
7    with our view or any of the issues of this
8    lawsuit. I'm going to let him answer for
9    background purposes, but at some point, if we
10   are going to spend seven hours here talking
11   about stuff that is years remote from the
12   agreement, then we may need to call the Judge.
13       Answer if you can.
14       THE WITNESS: Would you mind repeating
15   it?
16   BY MR. TRACY:
17       Q. Yes. At that point in time, when
18   Mr. Stein was being considered in moving from
19   Koplik to American Tissue, did you have any
20   understanding of what his background was, or
21   experience, et cetera?
22       A. No.
23       MR. BRAFMAN: Can I just put something
24   on the record? Hopefully, we don't have to
25   involve the Judge at any point, but to the

Page 31

1    I would note that just reciting that the
2    banking relationship is relevant to the
3    agreement doesn't really answer the question
4    of the scope of discovery; and we visited this
5    issue in front of Judge Leinenweber -- I think
6    it was before your appearance — and I think
7    Judge Leinenweber made it clear that although
8    some of the circumstances surrounding the
9    execution of the guaranty would be relevant, I
10   think he made it pretty clear that the entire
11   banking relationship is not at issue here.
12   Again, that's why I'm not instructing the
13   witness not to answer.
14       MR. TRACY: Okay.
15   BY MR. TRACY:
16       Q. What was the nature of your
17   relationship with Mr. Stein?
18       A. I don't understand what you mean by
19   "nature."
20       Q. Was it a business relationship?
21       A. Yes.
22       Q. Did you get along?
23       A. Yes.
24       Q. Did you know him outside the context
25   of a business relationship?

Page 33

9C03482
## Christopher Clifford - June 18, 2002

**Page 66**

1  besides him, that were involved with American
2  Tissue and the loans?
3      A.  Maybe his partner Barry Mandell, that
4  I know of.
5      Q.  But your main point of contact was
6  Mr. Kaiser himself?
7      A.  Yes.
8      Q.  Did Mr. Kaiser, besides speaking with
9  you about issues involving American Tissue,
10 when that was occurring, also talk with Tom
11 Brennan or others from LaSalle, do you know?
12     MR. GIBBS:  Objection, vague.
13     THE WITNESS:  I don't know.
14 BY MR. TRACY:
15     Q.  How about any representatives from the
16 co-lenders; do you know whether Mr. Kaiser
17 ever directly spoke with any of them?
18     A.  No, I don't.
19     Q.  Let's use the time frame, again, say
20 from a little before July of '99, when you
21 were entering into the loan agreement, and
22 August of 2001.  How often would you speak
23 with Mr. Kaiser pertaining to American Tissue
24 issues?
25     A.  I don't know how to answer that.  I

**Page 67**

1  mean, as needed.
2      Q.  Would you speak with him almost on a
3  weekly basis; do you know?  Was it a monthly
4  basis?  Give me some sort of approximation, if
5  you can.
6      MR. GIBBS:  Objection, compound.
7      THE WITNESS:  Just whenever I needed
8  to.
9      MR. BRAFMAN:  How about if we take a
10 five-minute break.  Perhaps if we have a
11 chance just to talk, we may be able to
12 expedite some of these matters and give the
13 stenographer five minutes to rest.
14     (Recess taken from 9:57 a.m.
15     to 10:09 a.m.)
16 BY MR. TRACY:
17     Q.  When Mr. Stein became involved with
18 American Tissue or was hired by them a little
19 before July of 1999, do you know whether
20 Mr. Kaiser and his firm's level of involvement
21 or participation changed?
22     A.  To me it didn't appear that it
23 changed.  They always championed American
24 Tissue's cause.
25     Q.  I guess another way of asking what I'm

**Page 68**

1  trying to get at is:  Did Mr. Stein take over
2  any of the responsibilities that at one time
3  you were contacted more by Mr. Kaiser
4  regarding those?
5      A.  No.
6      Q.  Do you recall whether obtaining a
7  guaranty from Mr. Gabayzadeh for the July 1999
8  loan agreement was discussed prior to that
9  particular loan agreement being finalized?
10     A.  I don't understand.
11     Q.  Well, prior to that loan agreement
12 being put in place, you have a history of a
13 loan relationship, as I understand it --
14     A.  Right.
15     Q.  -- where both Mehdi and Nourollah had
16 signed personal guarantees; is that right?
17     A.  Correct.
18     Q.  Now you are coming up into the time
19 where the July 1999 loan agreement is being
20 considered.
21     A.  Okay.
22     Q.  Were their discussions regarding
23 whether you would need to obtain personal
24 guarantees from Mehdi and Nourollah in order
25 to guaranty that July 1999 loan agreement?

**Page 69**

1      A.  I don't recall discussions.
2      Q.  Why wasn't that discussed?
3      A.  The structure of the company based on
4  the bond deal and the usage of the collateral,
5  the usage of the revolver, the projections of
6  what they showed really didn't dictate the
7  need for the guaranty.
8      Q.  And you were comfortable with that?
9      A.  Yes.
10     Q.  Were your co-lenders comfortable with
11 that?
12     A.  The co-lenders signed the agreement.
13     Q.  Was there ever any discussion from the
14 co-lenders with you asking about that issue?
15     A.  I don't remember.
16     Q.  The July 1999 loan agreement, is there
17 a portion of it that was collateralized?
18     A.  I don't understand.
19     Q.  Specifically a portion that was
20 designated that was not like supposed to be
21 used or ever tapped into of the moneys that
22 were being loaned.
23     MR. GIBBS:  Objection, vague.
24     THE WITNESS:  I don't understand the
25 question.

Atkinson-Baker, Inc.

18 (Pages 66 to 69)

1-800-288-3376

# EXHIBIT 29

**Newsday.com**

http://www.newsday.com/business/printedition/ny-bztiss182929684sep18(0,7420640).story

# Tissue Owners' Firms Targeted

By James T. Madore
STAFF WRITER

September 18, 2002

The consultants liquidating bankrupt American Tissue Inc. want to seize its former owners' other businesses to pay off huge debts and to foil what they claim is a shell game that resulted in 4,700 people losing their jobs at paper mills across the country.

In a lawsuit filed last month, the consultants target a dozen companies that Mehdi Gabayzadeh and Nourollah Elghanayan sought to exclude from the yearlong bankruptcy process involving American Tissue and 27 subsidiaries. Both men continue - with limited success - to sell napkins, toilet paper and towels through other entities.

In court testimony, the pair is accused of diverting money and equipment from Hauppauge-based American Tissue to American Paper Corp. and other companies over six years. The diversion was part of the men's complex plan to avoid repaying nearly $500 million in debt by bankrupting American Tissue and then immediately opening a new company to salvage some of their business, according to the suit.

Benjamin Brafman, one of Gabayzadeh's lawyers, said, "We are addressing all of the legal issues presented by this and other lawsuits that have been filed. We are confident that at the end of our investigation Mr. Gabayzadeh will be shown to have done nothing improper."

Elghanayan's lawyers did not return telephone calls seeking comment.

Still, the consultants' attorney, Laura Davis Jones, said, "Since 1996 or earlier, defendants Gabayzadeh and Elghanayan have participated in and allowed various financial improprieties to take place. They repeatedly and intentionally abused their joint control and domination of the conduct of American Tissue's affairs with the intent and result of misleading and defrauding creditors."

The lawsuit claims the men used American Tissue's treasury as if it was their personal checking account. Nearly $24 million in loans were made with no interest or repayment schedule, and an additional $2.3 million was given to family and friends, according to the suit.

Some of these transactions were hidden by more than 4,000 bogus checks and hundreds of false invoices, the suit said. The company's financial records also were allowed "to exist in utter disarray," according to court documents.

Gabayzadeh and Elghanayan admitted American Tissue's financial statements were incorrect for the past three years but blamed the chief financial officer and independent auditor, Arthur Andersen

accountants, both of whom were fired. They also said the inaccurate statements contributed to American Tissue's bankruptcy filing on Sept. 10, 2001, which threw 4,700 people out of work in 15 states.

Federal agencies - the U.S. Attorney's office, FBI and Securities and Exchange Commission - are continuing their probe of how the fourth-largest U.S. tissue manufacturer collapsed last year in a matter of months, sources tell Newsday.

But Kugman Associates, the consultants hired to run American Tissue, aren't waiting for the investigation's outcome. They've asked the U.S. Bankruptcy Court in Wilmington, Del., to punish Gabayzadeh and Elghanayan by leveling fines of at least $100 million and seizing the men's other businesses to repay creditors.

Targeted for seizure are American Paper's headquarters in Hauppauge, along with paper mills and warehouses in Huntington; Augusta, Maine; Gilman, Vt.; Parchment, Mich.; Brownstown, Ind.; Memphis, Tenn.; and Mexicali, Mexico. Some have been closed or rented to subcontractors. A Tennessee subsidiary is being liquidated under court supervision.

The men also have an ownership stake in American Pad and Paper, which originated the legal pad more than 100 years ago. It has operations in Holyoke, Mass.; Leola, Pa.; Salt Lake City; and Plano, Texas.

Of American Tissue's assets, the consultants sold most of the paper mills; only a factory in Winchester, N.H., awaits a buyer. In addition, four locations in Suffolk County have been foreclosed upon by Roslyn Savings Bank, which is seeking buyers.

*Copyright © 2002, Newsday, Inc.*



On the Cover
# Paper Trail
Nathan Vardi, 11.25.02

**Two Iranian immigrants assembled the nation's fourth-largest tissuemaker by buying distressed mills. But when their company collapsed, creditors couldn't find most of the assets. What kind of shell game is this?**

There are plenty of reasons why Mehdi Gabayzadeh and Nourollah Elghanayan, the former chiefs of Hauppauge, N.Y.-based American Tissue, made enemies from Main Street to Wall Street. Loggers in northern New York developed a keen antipathy for Gabayzadeh after he told them last year that he would pay them whenever he wanted for their lumber because they needed him more than he needed them. The residents of tiny Berlin, N.H., started plastering bumper stickers on their cars that declared "Mehdi go home," after American Tissue stopped payroll payments to workers and idled the town's pulp mill in September 2001.

A millworker, however, has no wrath like a banker scorned. A year ago lenders to American Tissue seized the now-bankrupt company and are currently funding a $100 million lawsuit on behalf of the papermaker against Gabayzadeh and Elghanayan, alleging fraud. According to the civil complaint, the duo inflated American Tissue's assets so they could borrow large sums of money to finance other paper companies they controlled separately, draining cash from American Tissue--and leaving creditors with little hope of collecting much of the $422 million or so they were owed.

The allegations have gotten the attention of law enforcement officials. The Federal Bureau of Investigation is investigating Gabayzadeh and Elghanayan, and the U.S. Attorney's Office for the Eastern District of New York is presenting evidence related to companies they controlled to a grand jury. Gabayzadeh isn't helping: He pleaded the Fifth 540 times in American Tissue's bankruptcy proceedings last April, making it even harder for creditors to track down their money. "We simply don't know where the money went," says Andrew Rosenberg, lawyer for American Tissue's bondholders.

The creditors don't know much about the life histories of Gabayzadeh, 58, and Elghanayan, 86, beyond the fact that they are immigrants from Iran and that Elghanayan has been a successful developer of commercial real estate. (His three sons run Manhattan-based Rockrose Development, whose properties include Carnegie Hall Towers and the Cast Iron Building; there is no evidence the sons have been involved with American Tissue.) The pair set up American Tissue, a producer of paper products, in 1981, with Elghanayan furnishing much of the initial capital and Gabayzadeh responsible for running the daily operations. The families of the two men split ownership 50-50.

Using mainly bank loans, they bought distressed mills on the cheap, a strategy that dramatically escalated in the late 1990s. The company's biggest acquisition came in 1999, when it bought the pulp mill in Berlin and a paper mill in nearby Gorham, N.H. for $45 million in cash and assumed debt from Crown Vantage, which later filed for Chapter 11. By 2000 American Tissue's empire stretched from Oregon to New York and included eight mills capable of producing 919,000 tons of pulp and paper annually, 8 product-producing plants and 12 distribution centers. Securities & Exchange Commission filings show the company earned $24 million on $494 million in sales for the fiscal year ended Sept. 30, 2000. With 6% of the North American tissue market, the company trailed only Georgia-Pacific, Kimberly-Clark and Procter & Gamble.

The owners apparently were not content with being the fourth-largest tissue company in the U.S. Gabayzadeh built a Byzantine holding structure around the operation. American Tissue held its assets through 26 subsidiaries that had 40 different bank accounts. The company itself was owned by an entity called Middle American Tissue, which had no other assets and which, in turn, was owned by Super American Tissue, a holding company controlled by the Gabayzadeh and Elghanayan families (see graphic, p. 72). The financing needed to run this sprawling network was significant. By 2000 American Tissue secured a $145 million credit line with a syndicate

led by ABN Amro-owned LaSalle Bank and placed $165 million of bonds yielding 12.5% and rated B by Standard & Poor's, increasing interest expenses 83% to $31 million that year.

But in order to raise those funds, American Tissue had to bolster its balance sheet. The bond deal, led by Donaldson, Lufkin & Jenrette, required Middle American Tissue to kick in $20 million to American Tissue, which it raised by placing bonds and warrants (with "a nominal exercise price") with DLJ Merchant Banking Partners, the private equity arm of the investment banker. To further solidify the balance sheet American Tissue offloaded liabilities, too, transferring $24 million in debt owed largely to Elghanayan and his family to Super American Tissue.

At the same time Gabayzadeh set up a labyrinth of 45 companies with 100 bank accounts described as affiliates of American Tissue, but held apart from it by the Gabayzadeh and Elghanayan families. As a result, the affiliated companies were not liable for American Tissue's debt--even though, creditors claim, the affiliates benefited by receiving financing from American Tissue. These affiliates owned paper mills, machinery and two divisions of American Pad & Paper, a bankrupt Dallas-based stationery supplier, bought for $67 million in cash and assumed debt in 2000. The fact that there were so many separate affiliates also meant that a single entity could declare bankruptcy without dragging all the affiliate companies down with it.

Money had a habit of sloshing around all these companies--and away from creditors, the suit alleges. American Tissue's SEC filings show that by Sept. 30, 2000 the affiliated companies, together with the Gabayzadeh and Elghanayan families, owed American Tissue $23.9 million in non-interest-bearing loans carrying no maturity. American Tissue claims in court documents that the loans remain outstanding.

Court documents also allege that at least $15 million was siphoned from American Tissue to Super American Tissue, its ultimate parent, when customers made cash advances to Super American Tissue for inventory shipped to them by American Tissue. In a separate lawsuit funded by creditors, American Tissue accuses Elghanayan of constructing a transaction that saw the company buy machinery for $3.3 million, then turn around and sell it to Elghanayan for $1 two months later.

Inevitably American Tissue's balance sheet became stretched, making interest payments difficult. With only $4 million left on its bank credit line, American Tissue needed an infusion of $5 million from its parent to make a January 2001 interest payment of $10.3 million to bondholders. In order to keep paying bondholders and creditors, Gabayzadeh moved to refinance the whole operation in American Tissue. His plan was to combine the assets of American Tissue and the affiliated companies to create a larger (and supposedly more viable) company, called American Paper, and to use that entity to borrow $400 million by selling bonds with coupons as high as 12.75%, and another $200 million in bank credit. He almost pulled it off: Standard & Poor's gave the new bonds a B+ rating in July 2001 and UBS Warburg prepared to manage the deal.

But at the last moment the deal was shelved. S&P blamed it on market conditions. Perhaps someone figured out that the numbers at American Tissue did not add up. Indeed, two months later in September, the company announced that its financial statements for the first three quarters of 2001, together with fiscal years 2000 and 1999, contained material inaccuracies. Edward Stein, the company's chief financial officer, resigned, and American Tissue, which had by then defaulted on its loans, filed for bankruptcy protection.

American Tissue's lenders lost their patience with Gabayzadeh at an October 2001 meeting where he refused to work with them on selling assets to pay back an unspecified portion of the debt. They thought they had negotiated the resignation of both Gabayzadeh and Elghanayan, but after the two refused to go quietly the banks filed for a court order to wrest the company from their control. With the help of Kugman Associates, a Chicago restructuring firm, lenders tried to revive American Tissue, but ran into all sorts of obstacles.

# A House of Cards?

Federal officials and creditors are still trying to piece together the Gabayzadeh and Elghanayan empire, which consisted of 74 companies. American Tissue and its 26 subsidiaries raised $305 million from banks and bondholders. Lenders claim the money disappeared into affiliates, leaving them little once American Tissue filed for Chapter 11. Many affiliates are also in bankruptcy courts.



Kugman says it found at least $10 million in accounts receivable based on fraudulent invoices for goods customers never received. It uncovered customer payments diverted to Super American Tissue, as well as inventory that should have been written down and damaged equipment that couldn't operate at break-even volume levels. "The more we investigated, the more fraud we uncovered," says Dale Marcus, a Kugman senior partner. "It would have been too much economically for the secured creditors to finance the reorganization."

## Pulp Friction

American Tissue's acquisitions, financed with debt, ended in bankruptcy and lawsuits.

### July 1999
American Tissue sells $165 million in bonds, secures $100 million credit facility, and buys mills for $45 million.

### Jan.-Nov. 2000
The company draws $142 million on new credit facility. Affiliates buy assets in Tennessee, Maine, Vermont and Texas.

### Jan.-July 2001
American Tissue gets $5 million from its parent to make an interest payment. Affiliates acquire three more mills.

### Aug.-Dec. 2001
Bid to combine American Tissue with affiliates and raise $600 million in debt fails. The company says financial statements are bogus; files for Chapter 11. Gabayzadeh and Elghanayan are forced out.

### Aug.-Sept. 2002
Backed by creditors who seize the company, American Tissue sues Gabayzadeh, Elghanayan and Arthur Andersen.

Creditors decided to sell the assets of American Tissue, listed on its last quarterly filing as being $569 million, to recover as much as they could. But, after selling almost all the mills and inventory, they have not recovered much-an estimated $61 million. Unsecured creditors, owed at least $73 million, are out in the cold. Bondholders, including Credit Suisse First Boston and Foothill Capital, a unit of Wells Fargo & Co., owed $165 million, have been paid 10 cents on the dollar. The LaSalle Bank syndicate, owed $140 million, has been relatively lucky, getting 32 cents on the dollar.

Creditors are placing some of the blame on Arthur Andersen, American Tissue's auditor. They are funding an $800 million lawsuit by American Tissue against the crippled accounting firm, charging professional malpractice. In essence, they allege, Arthur Andersen put its stamp of approval on inflated asset numbers and ignored insider self-dealing. The suit claims the company's collateral, such as inventory, was overstated by $39 million, and that accounts receivable were overblown by millions more. Separately, the U.S. Justice Department is investigating

Andersen for its alleged role in shredding American Tissue documents.

Says Patrick Dorton, an Arthur Andersen spokesman: "This is the most egregious example of the blame-the-auditor tactic that we have seen this year." He says his firm shouldn't be held responsible for decisions made by Gabayzadeh and Elghanayan.

What are they now up to? Losing control of those mills they held separate from American Tissue under the of American Paper--and leaving even more creditors in the lurch. Their American Paper Mills of Vermont was forced into bankruptcy court in July by employees owed back wages. A court auction of the company's assets is not expected to recoup more than $5 million; its liabilities are $17.6 million. One of their mills in Memphis, Tenn., with liabilities of at least $28 million, was sold for $24 million through foreclosure and a bankruptcy court in August over Gabayzadeh's objections. Their mill in Augusta, Me. has been idle since the summer and owes $350,000 in overdue property taxes. They have also lost management control of the divisions they bought from American Pad & Paper, and are on the verge of losing their grip on three mills in Georgia, Tennessee and Wisconsin. In October the FBI raided the Hauppauge, N.Y. offices of American Paper.

Benjamin Brafman, Gabayzadeh's lawyer, insists his client has done nothing wrong. "He is a successful man involved in a variety of complicated business ventures," says Brafman. "I was never active into business," Elghanayan said in a deposition during American Tissue's bankruptcy last July. "I was a partner--50-50 with Mehdi's family, my family 50-50--but I was not responsible."

There was one loan that Gabayzadeh and Elghanayan made a point of repaying. In July 2001 Super American Tissue made its last installment, $11.6 million, to retire bonds, held by DLJ Merchant, that had warrants which could have been converted into a 12% stake of Middle American Tissue, the direct parent of American Tissue. So apparently eager were Gabayzadeh and Elghanayan to retain control of Middle American that they were willing to give DLJ Merchant a 60% return ($32 million for the $20 million it had invested less than two years earlier).

Coincidentally, perhaps, the same month the final payment on the bonds was made, Super American Tissue took out an $11 million loan, guaranteed by Gabayzadeh and Elghanayan, from Atlantic Bank of New York. After American defaulted on the loan in August 2001 by missing a principal payment, Atlantic Bank sued Gabayzadeh and Elghanayan, and won a $12 million judgment last April.

The catchphrase "maximizing shareholder value" is heard everywhere these days. This pair of businessmen seems to have pursued a variation you might call "minimizing creditor value." You can get away with it in this country--up to a point.

**Newsday.com**

http://www.newsday.com/business/ny-biz-tissue0310,0,7460678.story?coll=ny%2Dbusiness%2Dheadlines

# American Tissue Indictments

## Andersen auditor also facing charges in a $300M fraud

By James T. Madore
Staff Writer

March 11, 2003

Charging that banks and investors were defrauded out of nearly $300 million, federal prosecutors Monday announced the indictments of four former executives of American Tissue Inc., including its president.

Roslynn R. Mauskopf, the U.S. attorney in Brooklyn, said repeated acts of fraud led to the collapse in September 2001, of American Tissue, once the fourth-largest U.S. manufacturer of toilet paper, napkins and paper towels. Thousands of workers in small towns across the country lost their jobs when the Hauppauge-based company filed for bankruptcy.

The Justice Department also indicted a former employee of the Arthur Andersen accounting firm who allegedly ordered the shredding of documents and deletion of e-mail after learning an investigation of American Tissue's financial statements was underway. Andersen had certified the statements were truthful.

Two of the American Tissue executives, chief financial officer Edward I. Stein and finance vice president John Lorenz, pleaded guilty earlier to sealed indictments and await sentencing. Stein faces a maximum of 35 years in prison plus fines for conspiracy to commit securities fraud and bank fraud. Lorenz could serve up to 5 years and pay fines for conspiracy to commit securities fraud.

The others, company founder and president Mehdi Gabayzadeh and purchasing manager Amzad Ali, surrendered to FBI agents and postal inspectors at the federal courthouse in Central Islip. Gabayzadeh faces up to 45 years in jail if convicted on charges of securities fraud, bank fraud and conspiracy. Ali could serve up to 35 years if convicted of conspiracy and bank fraud. Both pleaded not guilty at an afternoon arraignment.

Attorneys for three of the defendants declined to comment. But Gabayzadeh's lawyer, Benjamin Brafman, said "this is a complicated case and the government has a version of only a part of all the facts." He added that Gabayzadeh would be found not guilty of all charges.

"The defendants' fraud scheme, when pared down to its essentials, was really quite simple," Mauskopf, the U.S. attorney, said. "As American Tissue's business began to fail and its lenders became alarmed, the defendants created bogus accounts receivable to give the appearance of a profitable company and thereby allow the company to borrow even more investor funds," she said.

The scheme, first reported a year ago by Newsday, was the byproduct of Gabayzadeh's aggressive plan to expand American Tissue by gobbling up distressed paper mills. The buying spree saddled the company with enormous debts that it sought to refinance with junk bonds and bank loans.

Prosecutors said the company's finances were so precarious that Gabayzadeh, Stein and others falsified records to show at least $25 million in sales that never occurred. The fraud allowed them to meet bank requirements for more loans. They also diverted tens of millions of dollars from American Tissue to a related firm, Super American Tissue Inc.

When the company's principal lender, LaSalle National Bank in Chicago, discovered in March 2001 that toilet paper and other inventory wasn't being sold to pay off loans, it placed more restrictions on American Tissue. In an attempt to get around these limits, the defendants allegedly inflated reports to show more than $20 million worth of products had been sold.

"Each defendant had a decision to make between right and wrong," said William Kezer of the U.S. Postal Inspection Service. "They made the wrong decision and they are being held responsible." The investigation is continuing.

The defendants were released on bail of $5 million for Gabayzadeh, and $250,000 for Ali.

After learning that American Tissue's lenders were questioning its financial statements, Arthur Andersen senior auditor Brendon McDonald allegedly made a series of "urgent calls" on Sept. 4, 2001 to arrange for shredding of several bins of documents at Andersen's Melville office, according to prosecutors. He pleaded not guilty and posted $50,000 in bail.

Also, American Paper Corp., a company started by Gabayzadeh and partner Nourollah Elghanayan after their ouster from American Tissue, was charged with fraud for allegedly trying to sell machinery in Neenah, Wis. that it didn't own. The actions delayed the reopening of the paper mill.

"I suspected all along there was fraud and malfeasance," said Glen Benzschawel, 52, of Appleton, Wis., who lost his job as a millwright at the Neenah plant. "I'm glad [federal authorities] are finally doing something but I'm not sure how it's going to help me," he said, adding his current job pays less and doesn't provide benefits.

*Staff writer Robert E. Kessler contributed to this article.*

*Copyright © 2003, Newsday, Inc.*

# Tissue execs blew $300M

## Feds charge 2 and Andersen auditor with fraud in collapse

**By KATI CORNELL SMITH**

Former top executives at American Tissue Inc. drove the company into bankruptcy — and flushed $300 million down the drain — by inflating profits with the help of a document-shredding auditor from Arthur Anderson, the feds have alleged.

Former President Mehdi Gabayzadeh, and an ex-employee, Ali Amzad, were arrested on corporate fraud charges yesterday in connection with the collapse of the Hauppauge, L.I.-based paper company on Sept. 10, 2001.

Brendon McDonald, a former senior auditor with the now-defunct Arthur Anderson, was also nabbed on obstruction of justice charges for allegedly shredding documents in his Melville, L.I.,

office one week before American Tissue went belly-up.

"This is a classic case of corporate greed, fraud and obstruction," said U.S. Attorney Roslynn Mauskopf, announcing the case to be prosecuted in federal court in Central Islip.

Authorities said American Tissue — formerly the fourth-largest tissue manufacturer in the country — recorded $25 million in phony sales between November of 2000 and May of 2001 on the orders of Gabayzadeh, who allegedly concocted an elaborate shell game that involved two affiliated companies.

"When the scheme was ultimately uncovered, and American Tissue's house of cards collapsed, its investors, its lenders, and its bond holders lost nearly

$300 million and most of American's 2,700 employees were laid off," Mauskopf said.

Two additional executives, Edward Stein, the former chief financial officer, and John Lorenz, the former vice president of finance, pleaded guilty to fraud charges earlier this year and helped investigators build their case against McDonald, court papers show.

American Tissue's financial problems began in 1999, when company executives aggressively pushed for expansion — purchasing several additional manufacturing facilities — despite an increasingly depressed paper market, prosecutors said.

The "desperate" and "cash poor" company made "a false appearance of a profitability" for its lender LaSalle National Bank

— which offered a $145 million revolving credit line — by manipulating the books to show $25 million in sham sales, Mauskopf said.

American Tissue obtained further financing through $165 million in publicly traded bonds in July of 1999.

Company executives avoided paying money they owed LaSalle and others by diverting millions of dollars to other affiliated companies, including American Paper Corp. and Super American Tissue Inc. — two Hauppauge-based companies also named in the indictment unsealed yesterday.

The scheme unraveled when American Tissue declared bankruptcy in September 2001, and began to restructure under new management. The new lenders

quickly uncovered the $25 million in phony sales and notified authorities, court papers say.

These bogus sales, which were reported to the SEC, are the basis of a new civil fraud action announced yesterday.

Gabayzadeh, 58, of Kings Point, faces up to 45 years in prison if convicted of bank and securities fraud. McDonald, 27, of Levittown, faces a maximum 10-year sentence for obstructing justice.

"The government is simply wrong in its assessment of facts," Gabayzadeh's lawyer Benjamin Brafman said. "I believe that Mr. Gabayzadeh will be completely exonerated when he get to try this case before a jury of his peers."

He was released on $5 million bail.

# EXHIBIT 30

**PRIVILEGED AND CONFIDENTIAL ATTORNEY WORK PRODUCT**

## MEMORANDUM

**TO:**      **FILE**

**FROM:**    **Jennifer Liang**

**DATE:**    **June 12, 2003**

**RE:**      **FINAL INVENTORY**

On May 23, 2003, June 2, 2003 and June 10, 2003, the defense team reviewed documents at the U.S. Attorney's Office in the presence of FBI Special Agent Angela Jett and Postal Inspector Lou La Fleur.

On May 23, 2003, Mehdi Gabayzadeh, John Gabayzadeh, Ali Amzad, Mayo Schrieber, and myself were in attendance. On June 2, 2003, Mehdi Gabayzadeh, Ali Amzad, Deborah Schwartz, Matin Emouna, and myself were in attendance. On June 10, 2003, Mehdi Gabayzadeh, Ali Amzad, Deborah Schwartz, Matin Emouna, Stephanie Knepper, and myself were in attendance.

Set forth below is a general inventory of the documents that we reviewed on those dates.

### K16 (American Tissue)

1. Collateral reports submitted to LaSalle, June, August 2000 – October 2001
2. Collateral Availability including Loan balances Analyses, April – June, August – October, December 1998, January 1999 – August 2000
3. Released Check List, September 2000
4. Pulp price formula document including "Mehdi Report", January – December 1997, January – November 1998, January – December

# EXHIBIT 31

$12 - 12 - 03$

PROFFER.wpd
2/2003

GOVERNMENT
EXHIBIT
**3500-AA-10**
03 CR 1626(S-2)(JS)

### PROFFER AGREEMENT

With respect to the meeting of Ali Amzad ("Client") and his attorney, Deborah A. Schwartz, Esq., with James Miskiewicz, John Curran and John Martin of the United States Attorney's Office, and Louis LaFleur of the U.S. Postal Inspection Service and Charles Butruch of the Federal Bureau of Investigation held at the offices of the United States Attorney for the Eastern District of New York ("the Office") on December 12, 2003 (the "Meeting"), the following understandings exist:

1. **THIS IS NOT A COOPERATION AGREEMENT.** Client agrees to provide the Office with information, and to respond to questions, so that the Office may evaluate Client's information and responses in making prosecutorial decisions. By receiving Client's proffer, the Office does not agree to confer immunity, make a motion on Client's behalf, or enter into a cooperation agreement, plea agreement or non-prosecution agreement. The Office makes no representation about the likelihood that any such agreement will be reached in connection with this proffer.

2. In any prosecution brought against Client by the Office, except a prosecution for false statements, obstruction of justice, or perjury with respect to acts committed or statements made at or after the Meeting, the Office will not offer in evidence any statements made by Client at the Meeting (A) in its case-in-chief or (B) at sentencing. The Office will, to the extent it believes it is required by law, notify the Probation Department and the Court in connection with sentencing of any statements made by Client at the Meeting. If such notification is made, the Office also will notify the Probation Department and the Court of the Office's agreement not to offer in evidence any such statements at sentencing.

3. Notwithstanding paragraph (2) above, the Office may use any statements made by Client: (A) to obtain leads to other evidence, which evidence may be used by the Office in any stage of a criminal prosecution (including but not limited to detention hearing, trial or sentencing), civil or administrative proceeding, (B) as substantive evidence to cross-examine Client, should Client testify, and (C) as substantive evidence to rebut, directly or indirectly, any evidence offered or elicited, or factual assertions made, by or on behalf of Client at any stage of a criminal prosecution (including but not limited to detention hearing, trial or sentencing).

4.    It is further understood that this agreement is limited to the statements made by Client at the Meeting and does not apply to any oral, written or recorded statements made by Client at any other time or to any other information provided at the Meeting. Moreover, the provisions of Fed. R. Crim. P. 11(e)(6) and Fed. R. Evid. 410 do not apply to any statements made by Client at the Meeting, and Client shall not assert any claim under these or any other provisions of law that such statements or any leads therefrom should be suppressed.

5.    No understandings, promises, or agreements have been entered into with respect to the Meeting other than those set forth in this agreement, and none will be entered into unless memorialized in writing and signed by all parties.

Dated:    Central Islip, New York
          December 12, 2003

                            ROSLYNN R. MAUSKOPF
                            United States Attorney
                            Eastern District of New York

                    By: _____
                            James Miskiewicz
                            Assistant U.S. Attorney

                    By: _____
                            John Curran
                            Assistant U.S. Attorney

                    By: _____
                            John Martin
                            Assistant U.S. Attorney

                         _____
                            Louis LaFleur,
                            U.S. Postal Inspection Service

                         _____
                            Charles Butruch
                            Federal Bureau of Investigation

3

I have read the entire agreement and discussed it with my attorney.
I understand all of its terms and am entering into it knowingly and
voluntarily.

_____
Ali Amzad (a/k/a Amzad Ali)
Client

_____
Deborah A. Schwartz, Esq.
Attorney for Client

# EXHIBIT 32

GRB:JMM:jmm
F. #2001r02291
ali agreement

GOVERNMENT
EXHIBIT
3500-AA-11
03 CR 162(S-2)(JS)

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

$4 - 3c - 04$

- - - - - - - - - - - - - - -X

UNITED STATES OF AMERICA                    COOPERATION AGREEMENT

    - against -                              03 CR 0162(JS)

AMZAD ALI,

           Defendant.

- - - - - - - - - - - - - - -X

        Pursuant to Rule 11 of the Federal Rules of Criminal
Procedure, the United States Attorney's Office for the Eastern
District of New York (the "Office") and AMZAD ALI (the "defendant")
agree to the following:

        1.    The defendant will plead guilty to Count Three of
the above-captioned indictment charging a violation of 18 U.S.C. §
1344. The count carries the following statutory penalties:

            a.    Maximum term of imprisonment: 30 years
                 (18 U.S.C. § 1344).

            b.    Minimum term of imprisonment: 0 years
                 (18 U.S.C. § 1344).

            c.    Maximum supervised release term: 5 years, to
                 follow any term of imprisonment; if a
                 condition of release is violated, the
                 defendant may be sentenced to up to 3 years
                 without credit for pre-release imprisonment or
                 time previously served on post-release
                 supervision
                 (18 U.S.C. §§ 3583 (b), (e)).

2

    d.    Maximum fine: $250,000 or alternatively
          twice the pecuniary loss.
          (18 U.S.C. § 3571).

    e.    Restitution: Approximately $300 million.
          (18 U.S.C. § 3663).

    f.    $100 special assessment
          (18 U.S.C. § 3013).

    g.    Other penalties: Deportation

    2.    The defendant's sentence is governed by the United States Sentencing Guidelines. The Office will advise the Court and the Probation Department of information relevant to sentencing, including all criminal activity engaged in by the defendant, and such information may be used by the Court in determining the defendant's sentence. Based on information known to it now, the Office will not oppose a downward adjustment of two levels for acceptance of responsibility under U.S.S.G. § 3E1.1. If the defendant pleads guilty on or before May 7, 2004, the Government will move the Court, pursuant to U.S.S.G. § 3E1.1(b), for an additional one-level reduction.

    3.    The defendant will provide truthful, complete and accurate information and will cooperate fully with the Office. This cooperation will include, but is not limited to, the following:

    a.    The defendant agrees to be fully debriefed and
          to attend all meetings at which his presence
          is requested, concerning his participation in
          and knowledge of all criminal activities.

    b.    The defendant agrees to furnish to the Office

all documents and other material that may be relevant to the investigation and that are in the defendant's possession or control and to participate in undercover activities pursuant to the specific instructions of law enforcement agents or this Office.

c.   The defendant agrees not to reveal his cooperation, or any information derived therefrom, to any third party without prior consent of the Office.

d.   The defendant agrees to testify at any proceeding in the Eastern District of New York or elsewhere as requested by the Office.

e.   The defendant consents to adjournments of his sentence as requested by the Office.

4.   The Office agrees that:

a.   Except as provided in paragraphs 1, 8, and 9, no criminal charges will be brought against the defendant for his heretofore disclosed participation in criminal activity involving fraudulent activities committed in connection with the management and operation of American Tissue Inc. and affiliated companies, as well as conspiracy to obstruct justice and commit bankruptcy fraud all from the period July 2000 through October 2003.

b.   No statements made by the defendant during the course of this cooperation will be used against him except as provided in paragraphs 2, 8, and 9.

5.   The defendant agrees that the Office may meet with and debrief him without the presence of counsel, unless the defendant specifically requests counsel's presence at such debriefings and meetings. Upon request of the defendant, the Office will endeavor to provide advance notice to counsel of the place and time of meetings and debriefings, it being understood

4

that the Office's ability to provide such notice will vary according to time constraints and other circumstances. The Office may accommodate requests to alter the time and place of such debriefings. It is understood, however, that any cancellations or reschedulings of debriefings or meetings requested by the defendant that hinder the Office's ability to prepare adequately for trials, hearings or other proceedings may adversely affect the defendant's ability to provide substantial assistance. Matters occurring at any meeting or debriefing may be considered by the Office in determining whether the defendant has provided substantial assistance or otherwise complied with this agreement and may be considered by the Court in imposing sentence regardless of whether counsel was present at the meeting or debriefing.

6.    If the Office determines that the defendant has cooperated fully, provided substantial assistance to law enforcement authorities and otherwise complied with the terms of this agreement, the Office will file a motion pursuant to U.S.S.G. § 5K1.1 and 18 U.S.C. § 3553(e) with the sentencing Court setting forth the nature and extent of his cooperation. Such a motion will permit the Court, in its discretion, to impose a sentence below the applicable Sentencing Guidelines range and also below any applicable mandatory minimum sentence. In this connection, it is understood that a good faith determination by the Office as to whether the defendant has cooperated fully and provided substantial

128

5

assistance and has otherwise complied with the terms of this agreement, and the Office's good faith assessment of the value, truthfulness, completeness and accuracy of the cooperation, shall be binding upon him. The defendant agrees that, in making this determination, the Office may consider facts known to it at this time. The Office will not recommend to the Court a specific sentence to be imposed. Further, the Office cannot and does not make a promise or representation as to what sentence will be imposed by the Court.

7. The defendant agrees that with respect to all charges referred to in paragraphs 1 and 4(a) he is not a "prevailing party" within the meaning of the "Hyde Amendment," 18 U.S.C. § 3006A note, and will not file any claim under that law. The defendant waives any right to additional disclosure from the government in connection with the guilty plea. The defendant agrees to pay the special assessment by check payable to the Clerk of the Court at or before sentencing.

8. The defendant must at all times give complete, truthful, and accurate information and testimony, and must not commit, or attempt to commit, any further crimes. Should it be judged by the Office that the defendant has failed to cooperate fully, has intentionally given false, misleading or incomplete information or testimony, has committed or attempted to commit any further crimes, or has otherwise violated any provision of this

6

agreement, the defendant will not be released from his plea of guilty but this Office will be released from its obligations under this agreement, including (a) not to oppose a downward adjustment of three levels for acceptance of responsibility described in paragraph 2 above, and (b) to file the motion described in paragraph 6 above. Moreover, this Office may withdraw the motion described in paragraph 6 above, if such motion has been filed prior to sentencing. The defendant will also be subject to prosecution for any federal criminal violation of which the Office has knowledge, including, but not limited to, the criminal activity described in paragraph 4 above, perjury and obstruction of justice.

9. Any prosecution resulting from the defendant's failure to comply with the terms of this agreement may be premised upon, among other things: (a) any statements made by the defendant to the Office or to other law enforcement agents on or after December 12, 2003; (b) any testimony given by him before any grand jury or other tribunal, whether before or after the date this agreement is signed by the defendant; and (c) any leads derived from such statements or testimony. Prosecutions that are not time-barred by the applicable statutes of limitation on the date this agreement is signed may be commenced against the defendant in accordance with this paragraph, notwithstanding the expiration of the statutes of limitation between the signing of this agreement and the commencement of any such prosecutions  Furthermore, the

7

defendant waives all claims under the United States Constitution, Rule 11(e)(6) of the Federal Rules of Criminal Procedure, Rule 410 of the Federal Rules of Evidence, or any other federal statute or rule, that statements made by him on or after December 12, 2003, or any leads derived therefrom, should be suppressed.

11.   Based upon the defendant request, which in the Office's judgement is reasonable, the Office will recommend to the Department of Justice that the defendant be issued an S Visa Classification, it being understood that the Office has authority only to recommend and that the final decision whether to grant such relief rests with the Department of Justice, which will make its decision in accordance with applicable law.

12.   This agreement does not bind any federal, state, or local prosecuting authority other than the Office, and does not prohibit the Office from initiating or prosecuting any civil or administrative proceedings directly or indirectly involving the defendant.

13.   No promises, agreements or conditions have been entered into other than those set forth in this agreement, and none will be entered into unless memorialized in writing and signed by all parties.   This agreement supersedes any prior promises,

8

agreements or conditions between the parties.  To become effective,

this agreement must be signed by all signatories listed below.

Dated:    Central Islip, New York
          April 30, 2003

                                    ROSLYNN R. MAUSKOPF
                                    United States Attorney
                                    Eastern District of New York

                          By:
                                    James Miskiewicz
                                    Assistant United States Attorney


                          By:                            for JGM
                                    John G. Martin
                                    Assistant United States Attorney

                          Approved by:


                                    Cynthia Monaco, Deputy Chief
                                    Long Island Criminal Division

I have read the entire agreement and discussed it with my attorney. I
understand all of its terms and am entering into it knowingly and
voluntarily.



AMZAD ALI
Defendant

Approved by:



Deborah A. Schwartz
Counsel to Defendant

# EXHIBIT 33

# Nov. 3, 2003 to Feb. 24, 2003

| No. | Date | Flat Fee Payments | Trial Fees Paid |
|-----|------|-------------------|-----------------|
| 1 | Nov. 03, 03 | $100,000.00 [1] | |
| 2 | Dec. 09, 03 | | $50,000.00 [2] |
| 3 | Jan. 13, 04 | $50,000.00 [1] | |
| 4 | Jan. 09, 04 | | $50,000.00 [2] |
| 5 | Jan. 26, 04 | $50,000.00 [1] | |
| 6 | Feb. 24, 04 | $50,000.00 [1] | |
| | Total | $250,000.00 | $100,000.00 |

[1]   See details at Exhibit 9;

[2]   See details at Exhibit 10;