USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 12/2/2010

PRO SE OFFICE

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

—————————————————— :

MEHDI GABAYZADEH,                    :

        Plaintiff,           :

vs.                                  :        09 Civ. 4095 (PAC) (JCF)

                                     :

BENJAMIN BRAFMAN, BRAFMAN            :
& ROSS, P.C., BRAFMAN &             :
ASSOCIATES, P.C., ROBERT            :
F. KATZBERG, KAPLAN &               :
KATZBERG, JENNIFER A. LIANG,        :
DEBORAH A. SCHWARTZ,                 :

        Defendants.          :

—————————————————— :

## PLAINTIFF'S OBJECTIONS TO THE REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

    Mehdi Gabayzadeh, Plaintiff, acting Pro Se, declares and affirms under penalty of perjury and pursuant to 28 U.S.C §1746, that this filing is true and correct to the best of his knowledge, information, and belief.  He hereby files these Objections to the Report and Recommendation (R&R) of the Magistrate Judge in the within matter, as follows:

    1.    The magistrate judge's R&R does not give to the plaintiff the required standard of accepting the plaintiff's allegations as true and the drawing of all reasonable inferences in favor of the plaintiff.  The plaintiff's claim contains sufficient allegations to state a claim to relief that is plausible on its face.  Erickson v. Pardus, 551 U.S. 89, 93-94 (2007);  Bell Atlantic v. Twombly, 550 U.S. 544, 555 (2007).

2.     Despite professing allegiance to the required stan-
dard, the magistrate judge does not read this pro se claim "to raise
the strongest arguments that they suggest." <u>Green v. United States</u>,
260 F.3d 78, 83 (2nd Cir. 2001); <u>Graham v. Henderson</u>, 89 F. 3d 75,
79 (2d Cir. 1996).

3.     The R&R mistakenly and incorrectly bases its con-
clusions on the premise that the parties were here governed by
a flat fee agreement.  The fact is that at the time of the bulk
of the negligent omissions, misrepresentations, and other breaches
of his fiduciary duties, the defendant Brafman was under an hourly
retainer agreement with the plaintiff.  His failure to provide the
plaintiff with detailed billing statements resulted in severe dam-
ages to the plaintiff.  It was not until March 18, 2003 that the
parties entered into a flat fee agreement.  See letter agreement
dated March 18, 2003 attached.  Prior to March 18, 2003, the parties
were governed by a traditional retainer-hourly fee agreement in **Exhibit "A"**
which the defendant Brafman undertook to "keep careful track of the
time expended by me and the other attorneys associated with this
firm in connection with these matters and so advise you by monthly
statements of account..."  See February 18, 2002 hourly fee ag-
reement between the parties attached hereto.     **Exhibit "B"**

4.     The R&R fails to recognize, additionally, that the
billing practices of the defendant Brafman under the circumstances
violated the ethical rules of the ABA and the New York Bar Assoc-
iation, as promulgated by the highest federal and state courts.

5.     The R&R thus fails to recognize that during much of
the malpractice committed by defendant Brafman he was under the

duty to provide the plaintiff with detailed descriptions of his work for the plaintiff and he did in fact fail substantially in those duties. Furthermore, the ommissions of billing and failure to inform of the work being done are well-stated breaches of the February 18, 2002, fee contract between the parties.

6.    The R&R does not discuss the allegations that Brafman failed to advise the plaintiff of an offer of plea negotiations made by the government on or about March 25, 2002. On March 26, 2002 defendant Brafman's associate, Jennifer Liang, sent a memorandum to Brafman telling him that AUSA John Curran "would be interested in speaking to Mehdi." Liang also advised Brafman that Curran requested other information from Gabayzadeh, that indictment was not imminent, and that Gabayzadeh at that time was not necessarily the "top guy" in a fraud. Brafman did not at any time report that meeting between his office and the AUSA and other federal investigators to Gabayzadeh because, the plaintiff alleges, that Brafman wanted to continue to collect on his hourly billing at that time. He therefore sacrificed Gabayzadeh's chance to obtain favorable treatment and significantly lesser sentence than he ended up with. See 3-26-02 memorandum attached. **Exhibit "C"**

Attached is a billing statement from Brafman to Gabayzadeh dated April 5, 2002 for the period from March 1, 2002 through March 31, 2002. This statement was "for professional services rendered". Notably, Brafman's charge for his services is $650 per hour, with lesser rates for his listed associates. It is seen that, despite at that time being under an hourly fee agreement, there is no statement whatsoever regarding the nature of the ser-

-3-

vices rendered.  Thus, Brafman simply advises that he is charging Gabayzadeh for 45 hours of work at $650 per hour for a total for the month of March 2002 for Brafman himself of $29,250.00.  And, his associate Jennifer Liang charges in the same monthly bill the total sum of $31,875.00 for 85 hours at $375 per hour.  **Exhibit "D"**

Brafman's billing of the plaintiff for the period of March 1,2002 through March 31, 2002 is violative of the ethical require- ments for professionally responsible billing practices.  It also violates the rule set forth in <u>New York Association for Retarded Children v. Carey,</u> 711 F.2d 1136 (2nd Cir. 1983).  The Second Circuit in that case stated that "contemporaneous time records are a prerequisite for attorney's fees in this Circuit."  Id. at 1147.  Althought that case dealt with a statutory fee award, the reasoning and need for detailed reporting applies as much in the instant case. At $650 and $375 per hour, can it be reasonably asserted that the client does not have the protection of being informed of what was done for that premium price?

And as indicated above, Brafman promised to provide such inf- ormation as a part of his obligations under the fee agreement of Feb. 18, 2002.

The value and necessity for such information is a matter of common sense that is embraced by all of the ethical mandates governing lawyers billing practices.  The necessity of such information is easily demonstrated in the instant case.

Thus, for example, had Brafman stated in the attached bill covering services rendered from March 1, 2002 through March 31, 2002 that Jennifer Liang met on March 25, 2002 with the prosecutors

and FBI agents, Gabayzadeh would have been given not only the op-
portunity to know what kind of work specifically that Liang was
performing for the $31,875 billed by her for that month, but he
would also have been informed that she met with the government on
that date.  This information would have given him the opportunity
to question the purpose and outcome of the meeting.

Even given Brafman's negligent or intentional failure to
discuss the meeting with Gabayzadeh, a reasonable and fair billing
procedure would have provided a backup system for allowing clients,
including the plaintiff herein, to question the nature, purpose,
and outcome of the events and tasks set forth in the billing
statements.

If he had been provided with the necessary information,
Brafman's firm would have been held to a higher standard of
accountability with respect to the premium prices imposed on
Gabayzadeh.  Not only would the prohibition against excessive
billing have been furthered, but also the client would have had
an opportunity to inquire into the purpose of the Liang meeting
with federal prosecutors and agents.

The client's ability to inquire about the detailed services
listed would in this case have provided Gabayzadeh with the know-
ledge that the government had requested Gabayzadeh's cooperation
and was asking to talk to him.  If given the opportunity by way
of standard billing practices among law firms, Gabayzadeh would
surely have inquired into the details of the meeting.  But Brafman
chose to give the client no information whatsoever, so that his
bill of $70,600.00 for the single month of March, 2002 contained

-5-

not a shred of information as to anything being done by the def-
endant herein for the huge amount of fees charged.

Gabayzadeh was kept in the dark to his severe detriment.
Brafman failed to tell his client about the government's request
to meet with Gabayzadeh and Brafman failed to provide the necess-
ary minimum standard of information mandated by standard law firm
billing practices.

Brafman's reckless and unethical failure to provide the
information about the government meeting robbed Gabayzadeh of
a chance to respond to the government's request at that early
period in the process when a plea bargain could be highly bene-
ficial and more easily negotiated.

It is clear that Gabayzadeh needed to be informed of that
meeting and he needed to consider plea negotiations at that point
in the process. Gabayzadeh faced serious consequences and he had
already admitted to Brafman and Liang that he had engaged in
wrongdoing. For example, attached is a memo dated February 22,
2002, a few days after Gabayzadeh retained Brafman. The memo
is from Liang to Brafman and it informs Brafman on page three of
numerous instances of wrongdoing by himself and/or his corporate
entities. **Exhibit "E"**

Attached hereto, in pertinent part, is the Presentence
Investigation Report (PSR) in the criminal prosecution against
the plaintiff herein in the United States District Court for
the Eastern District Of New York (Docket No. 03-CR-162 (S-2)-04)).
At pages 8 and 10 of the PSR, paragraphs 15, 16, and 22, it is
shown that the matters that Gabayzadeh discussed and revealed

to Jennifer Liang as early as February 22, 2002, were in fact
part of the ultimate criminal charges against the plaintiff
herein.  The details revealed by Gabayzadeh, as reported to Braf-
man by Liang in her February 22, 2002 memo, support Gabayzadeh's
assertion that Brafman ignored the need to offer cooperation to
the government in favor of continuing to bill his client on an
hourly basis.  Nor did Brafman give Gabayzadeh an opportunity to
decide if he wanted to cooperate in the face of such serious
conequences.  Although Brafman now asserts vociferously that he
had several incidents of verbally admonishing plaintiff to neg-
otiate, there is in fact no contemporaneous written mention of
that assertion in any of the volumes of written material com-
municated by Brafman and his office to Gabayzadeh.

   Although Brafman mentions diagreements with Gabayzadeh
and instructs Gabayzadeh on even the smallest details at times,
he nowhere contemporaneously documents having a disagreement with
his client regardig plea negotiations.  In fact, nowhere does
Brafman in any of the volumes of materials in this case refer to
plea negotiations or the prospects of advising the plaintiff
herein to take that course of action, with the exception of face-
saving declarations issued by Brafman after Gabayzadeh's charges
against him became public.  **Exhibit "F"**

   Furthermore, the above documentation illustrates that
Gabayzadeh was contrite and forthright with his lawyers, including
Brafman and his associates, from the very beginning of the case.
Brafman's belated assertions that Gabayzadeh recklessly rejected
plea negotiations is thus demonstrated to be a bogus attempt to
cover-up his malpractice.

The R&R thus does not address the critical failure of Brafman to provide minimally required billing records to Gabayzadeh during the period of the hourly billing contract between the parties.  The claim herein must survive a motion to dismiss on that point alone.

The plaintiff has made the allegations of unprofessional negligence, recklessness, breach of contract, and grievous mal-practice against Brafman with respect to the billing, excessive fees, and the plea negotiations issues.  These are sufficient to state a claim for relief, despite the inartful nature of this pro se plaintiff's first amended complaint.

Brafman's denials of the plaintiff's claims are not properly a part of the issue of whether a claim has been stated, or whether a claim can be properly stated by way of further amendment.

7.    The R&R does not mention that plaintiff did not learn the extent of Brafman's malpractice until Brafman sent him "several hundred pages" of materials with a cover letter dated May 9, 2007.  Included in the package was the 3-26-02 memo-randum referenced in the preceding paragraph, which the plaintiff then saw in 2009 for the first time.  **Exhibit "G"**

8.  The R&R doesn't mention that at no time during the representation of plaintiff by defendant Brafman did Brafman even once breach the subject of plea negotiations with the plaintiff. Instead, the R&R states that:

> "Upon evaluating the government's case against the plaintiff, Mr. Brafman urged him to consider a plea agreement in lieu of proceeding to trial.

(Letter of Benjamin Brafman dated July 10, 2006 ("July 2006 Letter"), attached as Exh. 27 to Complaint ("Compl."), at 3;  Letter of Benjamin Brafman dated May 9, 2007 ("May 2007 Letter"), attached as Exh. 7 to FAC, at 6).  However, Mr. Gabayzadeh refused and instead retained a different attorney, Raymond G. Perini, for trial. (July 2006 Letter at 3-4;  Affidavit of Raymond G. Perini dated Nov. 3, 2009 ("Perini Aff."), attached as part of Exh. 1 to Affidavit of Andrew S. Kowlowitz dated Nov. 30, 2009 ("Kowlowitz Aff.")."

The above conclusion represents impermissible fact-finding by the magistrate judge at a time when the only issue is whether the claim, accepted as true, states a cause of action.  All of the letters mentioned above by the R&R are letters sent by Brafman in response to plaintiff's allegations against him.  Admittedly, the defendant at that time tried to present his defense that he did in fact properly advise the plaintiff of the prospects and/or need for plea negotiations.  None of the affidavits cited by the R&R go to the sufficiency of plaintiff's claim that he suffered an unecessarily harsh sentence due to the defendant Brafman's failure to contemporaneously advise the plaintiff of entreaties by the government for cooperative assistance and negotiations.  Likewise, none of the foregoing detracts from the pleading sufficiency of plaintiff's allegations that Brafman neglected and failed to talk to plaintiff about negotiations because that would detract significantly from the very large legal fees that the defendant Brafman stood to earn should the case go to trial rather than be settled early.

9.     The R&R incorrectly concludes that this case was filed in bad faith or that the litigation has been used in a bad faith attempt to manipulate an outcome in Gabayzadeh's criminal case.   Based on that false conclusion, the R&R also concludes that, instead of granting leave to the plaintiff to amend, as would normally be the case, that the court should dismiss with prejudice due to the bad faith finding.   See Pages 20-21 of the R&R.

Contrary to the conclusions of the R&R, the fact is that plaintiff did not approach his criminal lawyer, Raymond Perini, to broker a deal with Brafman for the dismissal of this case in return for a § 2255 Motion to be filed in the criminal case by Brafman. In that respect, Perini's affidavit is perjurious, and seen in its best light, it tells an inaccurate and incomplete version of what transpired.   Perini and Brafman were friends prior to knowing Gabayzadeh and Brafman referred Gabayzadeh to Perini for representation when Brafman ceased representing Gabazadeh in the criminal case.

In the last pre-trial communication from Brafman to Gabayzadeh, which was a letter from Brafman dated April 15, 2004, a copy of which is enclosed, Brafman summarizes the status of his relationship with Gabayzadeh as follows:

> "Thereafter, at your request I met with you and your son on Thursday, April 8, 2004, at which time you requested that I remain as trial counsel in this case with the understanding that you would retain the law firm of Perini and Hoerger to act as co-counsel."

April 15, 2004 letter attached hereto, at the first paragraph, first page. That communication demonstrates the factual inacuracy upon which the R&R is based. At pages 2 and 3 of the R&R, the conclusion is made that Gabayzadeh refused to consider a plea agreement "and instead retained a different attorney...". R&R at p. 3. In the 4-15-04 letter cited above and attached hereto it is clear that Gabayzadeh did not want Brafman to cease repreenting him. It is also clear that the parties had no disagreement about plea negotiations because Brafman doesn't even hint that a new firm is being hired because Gabayzadeh is not cooperating with Brafman's suggestions that he plead guilty or otherwise negotiate. The 4-15 letter shows therefore that the R&R is based on factual inaccuracies and misperceptions. **Exhibit "H"**

Therefore, from the date of the fiing of this lawsuit the plaintiff has faced a barrage of adverse pressure from Perini and Hoerger to drop the lawsuit against Brafman. Unfortunately, during that period Perini and Hoerger continued to represent Gabayzadeh in a planned Rule 35(b) Motion intended to be presented in Gabayzadeh's criminal case to obtain a lesser sentence. At Perini's request, Gabayzadeh's family has paid tens of thousands to Perini's firm to obtain that relief. At Perini's urging, Gabayzadeh's family paid $10 thousand to a private investigator regarding the same matter.

On August 31, 2009 John LaPerla, the investigator hired by Perini to work on the Rule 35(b) intended motion to the criminal court, as aforesaid, sent Gabayzadeh's son a memo, a copy of which is attached. The private investigator reports that the FBI was "opening a file for the purpose of initiating a criminal

inquiry" into the facts that were associated with the Rule 35(b)
motion to be filed on Gabayzadeh's behalf.  This memo shows that
the Perini-hired investigator had obtained a significant break-
through with the FBI, and that this was accomplished even after
the 8-20-09 letter from Hoerger and Perini to Gabayzadeh. Also,
see attached letter dated Nov. 17, 2008, from LaPerla to Perini
confirming the representation obtained by Perini.

Notably also, Gabayzadeh paid Perini and the investigator
an amount in excess of $125,000 for these services.  It is in-
conceivable that Gabayzadeh would cancel this progress on the
35(b) activity in his criminal case in order to drop the civil
case for a § 2255 motion.  This demonstrates once again the
conflict of interest situation under which Perini was laboring
during the period when he attempted to support his friend and
associate Brafman by sabatoging his lawyer-client relationship
with Gabayzadeh.

The fact is that all attempts to manipulate the criminal
cases and the litigation have been inspired and instigated by
Brafman and Perini.  On August 12, 2009 Perini and his assoc-
iate, Maureen Hoerger appeared unannounced at Fort Dix Federal
Correctional Institution in Fort Dix, New Jersey and asked to see
Gabyzadeh.  The visit can be documented and such proof will be
attached to any amended complaint in this matter or in any other
appropriate manner permitted by the Court.   **Exhibit "I"**

Perini and Hoerger were working for Gabayzadeh when they
visited him at Fort Dix, but they were clearly meeting with him for
the specific purpose of convincing him to drop the Brafman suit.

-12-

They pressured him continuously during the meeting at Fort Dix, and Perini suggested that Gabayzadeh file a § 2255 Motion in his criminal case to obtain the quickest way of relief from his sentence. Perini stated that he felt that Brafman would file the § 2255 on my behalf based on the grounds that there was a breach of the "joint defense privilege" with a respect to a co-defendant in my criminal case.

During the meeting at Fort Dix, Perini told the Plaintiff that Brafman was traveling in Israel and that he would contact him as soon as possible and get his answer on such a proposal. Thus, it was Perini who tried to manipulate the outcome of this case by pressuring me to drop this case in return for what he described as my best chance to obtain a sentence reduction. Brafman's participation would purportedly lessen the bite I suffered from the malpractice that I complained of.

The Perini affidavit filed in this matter is further challenged by a letter from Maureen Hoerger to Gabayzadeh dated August 20, 2009, about one week after Hoerger and Perini visited Gabayzadeh at Fort Dix. In that letter, a copy of which is attached, Hoerger tells Gabayzadeh: "You have told us that you intend to continue the civil lawsuit concerning your previous representation by Mr. Brafman's firm." There is no mention of Gabayzadeh requesting a settlement of the case or suggesting that Brafman file a § 2255 Petition on his behalf.

Furthermore, Mr. Gabayzadeh is not sophisticated enough and has insufficient legal knowledge to have suggested or requested that Brafman file a § 2255 on his behalf. Additionally, it is

clear from the intensely adversarial nature of this litigation
that Gabayzadeh would never suggest such a resolution of the matter.
The real proof is in the Hoerger letter of 8-2009 confirming that
Gabayzadeh was intent and unyielding in continuing the litigation
against Brafman, making the bad faith conclusion of the R&R
a conclusion based on an unlikely and obviously inaccurate af-
fidavit filed by Perini, who is the Defendant Brafman's friend
and professional associate in various matters.   **Exhibit "K"**

Additionally, it cannot be suggested that Gabayzadeh con-
tacted Perini after the letter by Hoerger to him dated 8-20-09
because in that letter Hoerger tells Gabayzadeh that "our repre-
sentation is at an end."   Perini's affidavit states that
Gabayzadeh's son contacted him, but that is nothing more than
an unverified allegation  consisting of rank hearsay.

The fact is that all telephone calls made by the plaintiff
to anyone during the relevant time periods are a matter of record
at the federal institution where Gabayzadeh is incarcerated.   It
is a matter of record and will be absolutely proved by production
of the records that Gabayzadeh <u>never</u> contacted Perini by telephone
nor did he do so by letter regarding this issue.   The non-existence
of hard evidence reveals that Perini's affidavit is incorrect.

Moreover, any possible discussions about a potential
settlement of this matter were suggested and initiated by Perini
at the unannounced visit to Gabayzadeh in August 2009.   Any dis-
cussion of the subject by Gabayzadeh's son was an offshoot of a
subject matter raised by Perini and rejected by Gabayzadeh himself,
as strongly indicated by the August 20, 2009 letter from Hoerger
to Gabayzadeh.

Thus Perini and Hoerger, acting in a clear conflict of int-
erest situation, came to me at Fort Dix as stated and pressured me
to drop the civil lawsuit.  It may be that after Perini initiated
the idea of a § 2255 as a means of resolving the civil suit, that
Brafman, who was reportedly traveling in Israel, refused the sug-
gestion by Perini.  If need be, a discovery of Perini's records
will show a phone call to Brafman in Israel and/or phone calls to
Brafman's office on or shortly after August 12, 2009, as further
suport for the fact that it was Perini and not Gabayzadeh who
promoted the idea.   Gabayzadeh, being totally unversed in such
legal procedures and processes, did not know enough to initiate
such an idea.  And, as the 8-20-09 letter shows, he was resolute
in continuing the case in any event, and he has never waivered
from that course of action.

Moreover, proof of the improper pressure applied by Braf-
man against Gabayzadeh is demonstrated by two emails attached
hereto.  In one email dated July 10, 2009, Brafman writes to
Nima Nili, Gabayzadeh's son-in-law, asking for his address to
accept formal service.  He intimidates Nima Nili  in that
e-mail under the ruse of claiming that he needed Nima Nili
"current address" so that he could "accept formal service."
After announcing that fake purpose, Brafman engages in nine
paragraphs that can serve no purpose other than the intimidation
of Gabayzadeh's son-in-law   for the purpose of influencing
ultimately the father into dropping the suit.  Brafman grat-
uitously informs the son-in-law in that scurrilous e-mail that
"the allegations in Mehdi's lawsuit are frivolous and a complete

fabrication."   He casts a net of unjustified intimidation
at the son-in-law the hope of instigating fear.  For example,
he threatens plaintiff's son-in-law with the shameful and
unethical edict:  "In fact, it would make sense for you to have
your own counsel as we proceed, because some of the legal issues
that you will have to confront will require you to confer with
independent experienced civil and quite possibly criminal defense
counsel."   Here, Brafman brings the threat of possible criminal
involvement wrongfully to the awareness of Nima Nili in an
attempt to coerce and intimidate.

   He then tightens the noose around the son-in-law's neck
by telling him that "Ray Perini and Maureen Hoerger will not be
able to represent you, or Mehdi for that matter, as they too
will be major witnesses in this case...".

   Brafman continues his poorly-veiled threats against the
plaintiff's son-in-law with the following:

> "Unfortunately, some of what I will have
> to prove in order to have Mehdi's lawsuit
> dismissed will by necessity involve you
> personally in the litigation and investi-
> gation that will follow and accordingly,
>
> it would make sense for you to have
> counsel whether you remain a witness
> or become a defendant."

See paragraph 4 of the attached July 10, 2009 e-mail.  The unethical
diatribe continues with "While I do not hold you <u>primarily respon-
sible</u> for the fraudulent litigation Mehdi has initiated..."  (emp-
hasis provided), "...you may benefit from the advice of an ind-

ependent, experienced lawyer."  Paragraph 5 of the 7-10-09 e-mail.
The e-mail continues on to hammer onto the purported witness's
awareness that he will need a lawyer and that if he doesn't hear from
him  in 10 days he will use the address in "our files" or "have
our investigators locate your current addresses if the old ones are
no longer correct."

The foregoing e-mail is a disgraceful demonstration of un-
ethical manipulation and intimidation by Brafman.  Furthermore,
since when does the client, herein Brafman, who is represented by a
major New York law firm, take it upon himself to question and give
notice to prospective "witnesses"?  The outrageous pressure applied
by Brafman to Perini, Hoerger, the plaintiff's son-in-law, and the
plaintiff's family are the acts of an egotistical power gone un-
checked.  The  Court should recognize the real seat of the pressure
and improper manipulation herein.   **Exhibit "L"**

Brafman then outdoes even himself by sending an e-mail to
Gabayzadeh's daughter Deborah Gabayzadeh on 7-12-09, a copy of
which is attached hereto.  He right off tells plaintiff's daughter
"I will have to involve you in the litigation that your father
has initiated, I have no choice...".  Brafman tells Deborah that
she is a necessary witness in the case, which is an outright lie
since she has never met Brafman.  He then ratchets up the intimi-
dation by requesting "an address where you and your mother will
accept service of legal proceedings and or subpoenas so that we
can hopefull minimize the inconvenience to everyone." E-mail of
7-12-09 paragraph 4.  Brafman then notifies Deborah that he is
sending her a copy of the e-mail described above that was sent

to Mr. Nili, the plaintiff's son-in-law. He then raises with her the specter that she will need legal counsel. He then explains that "Ray and Maureen may not be able to guide you in this case because they too will be principal witnesses." **Exhibit "M"**

The foregoing presents a real and formidable threat to a layman not familiar with legal process. The attempt to coerce plaintiff's family is proof positive that Brafman does not generally act withing the constraints of the normal moral paradigm that most of us recognize and honor.  Here, Brafman, who is represented by counsel, takes it on his own shoulders to prepare the plaintiff's family for the menacing prospects of being served and obtaining their own legal counsel.  By repeating the more threatening e-mail sent to Nili to plaintiff's daughter and plaintiff's wife, Brafman made sure that his illegal and unethical attempt to influence the outcome was comprehensive enough.  The e-mail to Nili, it must be remembered, contained a very thinly veiled threat that Nili faced possible criminal involvement.  Of course, that kind of a threat in a civil case is a prominent prohibition in all ethical codes governing lawyers.  Furthermore, the complaint was met by a Motion to Dismiss and it is thus even a more suspect act of bad faith to try to intimidate possible witnesses, who are close family members, at that early point in the case.

Furthermore, Brafman always put in writing the issues where there was a possible dispute with Gabayzadeh.  For example, in a Feb. 24, 2003 letter to Gabayzadeh, a copy of which i attached, Brafman tells Gabayzadeh that: "I wanted to

confirm in writing that your decision to testify is **against**
my advice and in my judgment not consistent with your personal
best interest at this time." Also, on March 13, 2002, Brafman
ent Gabayzadeh a letter, a copy of which is attached hereto,
Brafman told Gabayzadeh: "So that it is absolutely clear, let
me once again explain to all concerned in writing, so that my
position is on record and so that all of the lawyers fully under-
stand my position and my concern." Attached letter at p. 2.
In the same letter at page 5, Brafman states: While this under-
standing may now already be in place based on my verbal convers-
ation with you, I wanted this understanding to be in writing so
that this issue does not again arise...".

Therefore, it is inconceivable that Brafman, being so
careful about written verification, would have had a disagreement
with Gabayzadeh regarding plea negotiations and not have mem-
orialized such dispute in writing as was his normal practice.

**Exhibit "N"**

10.    For the foregoing reasons, it is an incorrect and
inappropriate decision to penalize the plaintiff for supposed acts
of bad faith based solely on an affidavit of Brafman's friend
and associate who himself was acting in a clouded conflict of
interest situation. Perini was Gabayzadeh's lawyer during the
events testified to in the affidavit and, as such, the allegations
in the affidavit smack of self-protection and a too-casual concern
for client confidentiality and privilege, or more accurately, a
nonexistent concern for such matters. The plaintiff under these

circumstances should be given the opportunity, as would any litigant in similar standing, to amend his complaint.  For the reasons stated herein, the complaint as it now stands does state a cognizable claim but it is admittedly inartfully drawn, and the plaintiff should be given a chance to state his claim more adequately.  There is insufficient evidence to conclude that the plaintiff acted in bad faith, and there is a reasonable basis instead to attribute improper actions to the defendant rather than the plaintiff.

## CONCLUSION:

Based on the foregoing objections to the R&R, the plaintiff Gabayzadeh submits that this Court should not accept the recommendation and that the Court should rule that a claim has been stated adequately, or alternatively, that the Plaintiff should be granted leave to file  a Second Amended Complaint.

Respectfully submitted,

_____

Mehdi Gabayzadeh, Pro Se

## <u>Certificate of Service</u>

    I, Mehdi Gabayzadeh, do certify that I served the within Objections of Plaintiff to the Report and Recommendation of the Magistrate Judge by United States First Class Mail, prison cert-ified, on November 29, 2010, upon the following:

Andrew Kowlowitz, Esq.
Furman Kornfeld & Brennan Law Firm
61 Broadway, 26th Floor
New York, NY 10006

Dated: November 29, 2010        By: _____

                                      Mehdi Gabayzadeh, Pro Se

BRAFMAN & ROSS, P.C.

ATTORNEYS AT LAW

767 THIRD AVENUE

26TH FLOOR

NEW YORK, NEW YORK 10017

TELEPHONE: (212) 750-7800

FACSIMILE: (212) 750-3906

Exhibit "A"

BENJAMIN BRAFMAN

CHARLES A. ROSS

———

JENNIFER A. LIANG

MELINDA SARAFA

ANDREA ZELLAN

MARK M. BAKER

OF COUNSEL

March 18, 2003

**PERSONAL & CONFIDENTIAL**

Mr. Mehdi Gabayzadeh

President and Chief Executive Officer

American Paper Corporation

300 Rabro Drive

Hauppauge, New York 11788

## UNITED STATES v. MEHDI GABAYZADEH

Dear Mr. Gabayzadeh:

Following your Indictment in the United States District Court for the Eastern District of New York, you requested that we revise our original retainer agreement and convert our understanding from an <u>hourly</u>-billing fee arrangement to a <u>flat</u> fee agreement for the time between March 18, 2003 <u>and</u> the commencement of trial as well as a flat fee for a **trial,** should this case proceed to trial. Accordingly, upon execution of this letter/agreement, our previous retainer agreement will be deemed to be null and void, assuming of course the full payment of all fees reflected in the enclosed statement of account dated March 18, 2003.

In return for representation by this firm from March 18, 2003 up through but <u>not</u> including a trial of this case you have agreed to pay this firm a flat fee **$500,000.00 (FIVE HUNDRED THOUSAND DOLLARS)** to cover all proceedings in connection with this case up through but not including a trial. In the event this case is resolved by plea and/or dismissal of the charges without the need for a trial, then no additional fees will be due this firm over and above the flat fee of $500,000.00 discussed herein. Said pre-trial fee of $500,000.00 is to be separate and apart and over and above all fees previously paid to this firm and all fees still owed to this firm for the time charges incurred prior to Monday, March 18, 2003.

BRAFMAN & ROSS, P.C.

In the event that a **trial** of this case is required, you agree to pay this firm an additional **trial** fee of **$500,000.00 (FIVE HUNDRED THOUSAND DOLLARS)** to cover a trial that does not exceed <u>four weeks</u> from jury selection through verdict. In the event that a trial of this case is concluded within four weeks from jury selection through verdict then no additional fees will be due this firm over and above the $500,000.00 trial fee. In the event that a trial of this case <u>exceeds</u> four weeks from jury selection through verdict then you have agreed to pay an additional $100,000.00 **weekly** trial fee for each week or any part thereof that a trial of this case requires beyond four weeks.

It is expressly understood that you will be billed under <u>separate</u> cover for any out-of-pocket expenses incurred in connection with this case including but not limited to travel, Federal Express, messenger, telefax, long distance telephone services, transcript costs, photocopying and other ordinary miscellaneous expenses incurred in connection with your representation in a case of this complexity. It is agreed that no <u>extraordinary</u> out of pocket expenses will be incurred on your behalf without your prior approval.

So too is it agreed that any expenses that may be required to retain a Private Investigator whose assistance may be necessary in order to properly represent you or the payment for the services of a <u>forensic accountant</u> if needed are to be paid directly by you.

With respect to the schedule of payments, it is agreed that the **full** $500,000.00 <u>pre</u>-trial fee is to be paid in its entirety within 90 days from the date of this agreement, with a minimum of $100,000.00 to be paid within 30 days. Any balance due for the time charges incurred prior to March 18, 2003 are to be paid in full at this time. With respect to payment of the **trial** fee in the event this case proceeds to trial, it is agreed that the trial fee in its entirety is to be paid in <u>full</u> no later than 60 days <u>prior</u> to any <u>firm</u> trial date set by the Court. In the unlikely event that this case is resolved by plea or dismissal within 60 days prior to trial then, **80%** of the trial fee ($400,000.00) is to be refunded with **20%** ($100,000.00) to be retained by this firm as compensation for the extraordinary and intense trial preparation that will be required immediately prior to the commencement of the trial.

This fee agreement contemplates that **Benjamin Brafman** will be the principal attorney on this case and will <u>personally</u> appear at your trial as lead trial counsel. That understanding however, is expressly conditioned on full compliance with the amount and schedule of payments set out herein.

2

BRAFMAN & ROSS, P.C.

Finally, it is expressly understood that any fees discussed in this letter are fees to be paid exclusively to this firm and are not intended to include any other obligations you have undertaken or agree to undertake in connection with any other lawyers whose assistance may be necessary in order to represent you in any civil or regulatory proceedings, or any co-defendant whose legal fees you have agreed to pay. In addition, you have agreed to retain Robert F. Katzberg of the firm of Kaplan & Katzberg, P.C. to represent the two **corporate** defendants identified in the indictment. Any fee agreement that you arrive at with Mr. Katzberg and his firm are to be deemed separate and apart from the fees discussed herein.

If this letter accurately sets out the terms of our understanding in connection with this matter please so indicate by signing a copy of this agreement where provided.

Very truly yours,

Benjamin Brafman

**SIGNED AND AGREED TO:**

**MEHDI GABAYZADEH**

**DATE:** 03-28-2003

# BRAFMAN & ROSS, P.C.

ATTORNEYS AT LAW

767 THIRD AVENUE

26TH FLOOR

NEW YORK, NEW YORK 10017

TELEPHONE: (212) 750-7800

FACSIMILE: (212) 750-3906

March 18, 2003

**PERSONAL & CONFIDENTIAL**
Mr. Mehdi Gabayzadeh
President and Chief Executive Officer
American Paper Corporation
300 Rabro Drive
Hauppauge, New York 11788

---

FOR PROFESSIONAL SERVICES RENDERED:

| March 1, 2003 - March 17, 2003 | AMOUNT |
|---|---|
| Benjamin Brafman | |
| 62½ hours at $650 per hour | $40,625.00 |
| Jennifer Liang | |
| 74 hours at $375 per hour | $27,750.00 |
| Andrea Zellan | |
| 46 hours at $375 per hour | $17,250.00 |
| Paralegal Hours | |
| 31 hours at $125 per hour | $3,875.00 |

**Disbursements:**

Donald Waskover, Esq.
Legal Fees and New Jersey **Mortgage** Filing Costs .......................... $4,480.00

Oregon Deposition Costs
    Transcript .......................................................... $458.00
    Transcript .......................................................... $114.30
    Transportation, Lodging, Local Travel, Misc. ...................... $1,259.00

Miscellaneous Expenses
    Car Service Costs Re: Bail
    Proceedings Central Islip; Messengers;
    Federal Express; Photocopies; etc ................................. $844.00

**TOTAL** .................................................................. **$96,655.30**

Balance Carried Forward .................................................. $129,784.00

**BALANCE** ................................................................ **$226,439.30**

Payment (Wire 3/18/03) ................................................... -$64,740.00

**TOTAL BALANCE DUE** ...................................................... **$161,699.30**