Exhibit "B"

BRAFMAN & ROSS, P.C.
ATTORNEYS AT LAW
767 THIRD AVENUE
26TH FLOOR
NEW YORK, NEW YORK 10017
TELEPHONE: (212) 750-7800
FACSIMILE: (212) 750-3906

BENJAMIN BRAFMAN
CHARLES A. ROSS

JENNIFER A. LIANG
MELINDA SARAFA
ANDREA ZELLAN

MARK M. BAKER
OF COUNSEL

February 18, 2002

**VIA FEDERAL EXPRESS**
**PERSONAL & CONFIDENTIAL**
Mr. Mehdi Gabayzadeh
President and Chief Executive Officer
American Paper Corporation
300 Rabro Drive
Hauppauge, New York 11788

Dear Mr. Gabayzadeh:

You have requested that this firm undertake to represent you in connection with a criminal investigation presently being conducted by the United States Attorney's Office for the Eastern District of New York. To date, no formal criminal charges have been filed against you although you have been characterized as one of the principal "targets" of that investigation. The investigation, relates in part, to various financial relationships maintained by American Tissue Inc., a company that you were formally associated with and The LaSalle Bank.

In return for representation during the pre-indictment stage of the proceedings, you have agreed to pay this firm a retainer of $100,000.00 against which I will bill you at my hourly rate of $650.00 per hour for time expended by me in connection with this case, and at the rates of $450.00, $375.00 and $350.00 per hour for time required of any attorney associated with this firm whose assistance may be necessary in order to properly represent you in this inquiry. In addition, you will be billed at the rates of $125.00 per hour for work performed by any paralegal and/or law clerk whose assistance may be required.

BRAFMAN & ROSS, P.C.

It is understood that the $100,000.00 retainer, constitutes a <u>minimum</u> fee that this firm requires in matters of this kind, recognizing as I do when setting the minimum fee, the time that will be required, the degree of difficulty of the case, the urgency of the matter, the necessity of declining other work so as to have the time available to properly attend to this matter and my degree of expertise and experience in handling cases of this nature. Accordingly $100,000.00 is hereby specifically designated as a general <u>minimum</u> fee for assuring our availability to devote an appropriate amount of attention to this matter and to compensate this firm for the possibility of having to defer other work as a result of taking this case. It is thus understood and agreed that no portion of the $100,000.00 minimum fee is to be returned regardless of the amount of time that is involved in attempting to resolve this matter without criminal prosecution.

I will keep careful track of the time expended by me and the other attorneys associated with this firm in connection with these matters and so advise you by monthly statements of account that will be mailed to you at the above address. In the event this matter is resolved within the time period reflected by the initial retainer, then no additional fees will be incurred in connection with these proceedings. To the extent however, that the time required to properly represent you in these matters exceeds the period covered by the retainer then I will so inform you by monthly statements of account that will be mailed to you at the above address. Any balance due on any such statement is to be paid upon receipt of the statement in question.

It is understood that the fees discussed in this agreement relate to representation of you personally by <u>this</u> law firm. Accordingly, any fees incurred by any other attorneys and/or law firms whose services will be required in order to properly represent you in this and/or other proceedings are to be paid by you directly to those firms and are not to be considered the obligations of this firm. Nor is any part of the retainer discussed herein to be used to pay any fees incurred by any other firm whose assistance may be required in order to properly represent you in this matter. It is my understanding that you have already retained other counsel to represent you in connection with pending bankruptcy proceedings and/or other civil litigations that are either pending or are expected to be filed in the near future. Fees to those firms are to be paid by you and are not the obligations of this firm.

It is also understood that should the services of a private investigator and/or forensic accountant be required in order to properly represent you, any such fees incurred by any investigator and/or forensic accountant are to be paid directly by you, with the understanding that no such additional legal obligations will be incurred on your behalf without your prior approval.

## BRAFMAN & ROSS, P.C.

Finally, as we discussed, this retainer agreement will continue in force up until such time as you are formally charged by Indictment or formal Complaint, or a determination is made by the United States Attorney's Office that no criminal prosecution will be forthcoming. In the event that this case is resolved pre-indictment, no portion of the $100,000.00 retainer will be returned to you.

In the event that formal criminal charges are filed against you, however, a separate retainer agreement will be executed between us when and if necessary should you request that this firm continue to represent you if and when formal charges are filed. At that time, we will provide you with the option of continuing on an hourly basis and/or discuss with you the terms of a flat fee agreement to cover the post-indictment pre-trial period and any trial should one be held. If at that time we agree to change the terms of our fee agreement from an hourly agreement to a flat fee agreement I will apply as a credit against any flat fee, any unused portion of the $100,000.00 retainer if any credit balance remains at that time. Any modification of our fee agreement however, is to be documented in a separate retainer agreement executed between us if and when it becomes necessary for us to do so.

If this letter accurately sets out the terms of our understanding in connection with this matter, please so indicate by signing a copy of this agreement where provided and returning it to me at your very earliest convenience.

Very truly yours,

*[signature]*

Benjamin Brafman

**SIGNED AND AGREED TO:**

*[signature]*

**MEHDI GABAYZADEH**

DATE: 2/15/02

**PRIVILEGED AND CONFIDENTIAL ATTORNEY WORK PRODUCT**

## Memorandum

TO: Ben Brafman

FROM: Jennifer Liang

RE: Mehdi Gabayzadeh

DATE: March 26, 2002

**Exhibit "C"**

---

The following is a summary of yesterday's meeting with AUSA John Curran and representatives from the FBI, including Special Agent Charles Butruch, at the United States Attorney's Office for the Eastern District of New York.

The Government is currently conducting a full investigation with respect to the collapse of American Tissue, Inc. Curran indicated that it is early in the investigation. He has currently been on this case for one month.

Curran indicated that an indictment is not imminent. Curran was amenable to a voluntary surrender, keeping the lines of communication open prior to any indictment, and the possibility of a pre-indictment disposition. We agreed to accept service on Mehdi's behalf.

Curran would be interested in speaking to Mehdi. Curran described Mehdi as the "top guy at the company" but indicated that he was not saying that Mehdi was the "top guy in a fraud" at this point. Curran subsequently indicated that the agents know more about this case than he does and that it is going in the direction of a criminal matter.

Curran requested the names of the individuals at Lasalle with whom Mehdi spoke with respect to the loan agreement and the substance of those conversations. In addition, Curran requested the name of the New Hampshire detective with whom you spoke.

# BRAFMAN & ROSS, P.C.
ATTORNEYS AT LAW
767 THIRD AVENUE
26TH FLOOR
NEW YORK, NEW YORK 10017
TELEPHONE: (212) 750-7800
FACSIMILE: (212) 750-3906

Exhibit "D"

April 5, 2002

**PERSONAL & CONFIDENTIAL**
Mr. Mehdi Gabayzadeh
President and Chief Executive Officer
American Paper Corporation
300 Rabro Drive
Hauppauge, New York 11788

FOR PROFESSIONAL SERVICES RENDERED:

March 1, 2002 - March 31, 2002

| | AMOUNT |
|---|---|
| Benjamin Brafman<br>45 hours at $650 per hour | $ 29,250.00 |
| Jennifer Liang<br>85 hours at $375 per hour | $ 31,875.00 |
| Andrea Zellan<br>10 hours at $375 per hour | $ 3,750.00 |
| Paralegal<br>22 hours at $125 per hour | $ 2,750.00 |
| Mark Baker<br>6 hours at $450 per hour | $ 2,700.00 |
| Disbursements | $ 275.00 |
| Total | $70,600.00 |
| CREDIT BALANCE FORWARD | $ 15,750.00 |
| Balance | $ 54,850.00 |
| Payment (3/5/02) | -$ 50,000.00 |
| **TOTAL BALANCE DUE** | **$ 4,850.00** |

**PRIVILEGED AND CONFIDENTIAL ATTORNEY WORK PRODUCT**

**MEMORANDUM**

TO:     Ben Brafman

FROM:   Jennifer Liang

RE:     Mehdi Gabayzadeh

DATE:   February 22, 2002

**Exhibit "E"**

---

Yesterday, I met with Mehdi at American Paper Corporation in Happauge. The following is a brief summary of my visit to American Paper.

### Bankruptcy Proceedings and Civil Suits

Mehdi has approximately seventy-seven companies. Approximately twenty-eight of these companies are in bankruptcy. I believe that Moses & Singer is handling most of the bankruptcy proceedings. Cassandra Joseph has advised me that the "out of the box" (those that are not in bankruptcy) companies are currently represented by Nicholas Kaiser.

Besides the bankruptcy proceedings, there are numerous civil lawsuits wherein Mehdi is a party. Richard Freeman, a former associate of Kaiser, is handling most of them. However, Moses and Singer may be handling some as well. I have asked Cassandra Joseph for a list of all pending civil suits and the contact information with respect to each. I informed Mehdi that we now need to be advised prior to his attendance at any deposition and with respect to disclosure issues. However, it is imperative that we inform all civil counsel.

With respect to Chicago lawsuit, I spoke with Chris Tracy today. His firm has filed a motion to extend Mehdi's time to answer the complaint until March 29, 2002. He will have an answer on his motion by Tuesday. Presumably, the motion will be granted and at least extend the time until mid March. This will give us a chance to review the pleadings prior to service.

This afternoon, we received a notice for Mehdi's deposition in the ATI bankruptcy proceeding. I have a call into Cassandra about same.

### Background

Mehdi first came to the United States in 1980. Mehdi had the same business in Iran prior to his arrival in the United States. He was jailed in Iran overnight–Mehdi asserted that it was because he was Jewish. Shortly thereafter, his father informed him that they were leaving Iran. Mehdi fled Iran with his parents –31 family members in total. They went to Paris, then

Amsterdam, where they rented a place for 45 days, and then obtained visas to come to the United States. Mehdi became a United States citizen five years ago.

In October of 1981, American Tissue hired a salesman. The entire sales in 1991 were $700. American Tissue's first line of credit was with Northstar Bank, which subsequently became Fleet Bank.

Ed Stein was the Executive Vice-President and Chief Financial Officer. John Lorenz was the Vice-President of Finance and Nick Galante was the Chief Operating Officer of ATI. Frank Robinson was the assistant to all three. Another individual, Rob, worked with them. Sina Kohen worked in the accounting department. I have requested a list of employee names who worked closely with Stein, etc. Ron Gasper, American Paper's current CFO, was not at the company during the period involved. He may be helpful to speak to regarding overall procedures.

On November 2, 2001, Mehdi resigned from ATI. The company has lost over $90 million since he left. Prior to the bankruptcy, ATI alone had 4,500 employees. 40 of Mehdi's former employees are still at ATI during the liquidation. Some of these individuals have come back to work for Mehdi's other companies.

### LaSalle Line of Credit

In 1991 or 1992 American Tissue started a $16-17 million line of credit with LaSalle. It thereafter became $60 million. Then, in July of 1999, it became $100 million. It was then increased to $145 million in March or April of 2001. Mehdi dealt with Chris Clifford, the Vice President of LaSalle Bank, and Tom Brannon (phonetic), Clifford's assistant.

Nicholas Kaiser negotiated the loan agreement with LaSalle. In addition, Nicholas Kaiser also negotiated Mehdi's personal guarantee this past summer, which is the subject of the civil suit pending in Chicago.

The collateral reports forwarded to Lasalle on a daily basis were prepared by David Freechee, American Tissue's contact with LaSalle, and signed by either Ed Stein or John Lorenz. David Freechee and John Lorenz are still working at American Tissue.

Mehdi indicates that he had a very good and open relationship with Chris Clifford. "There were no secrets." Mehdi provided an example of their openness. When American Tissue obtained the business of Walmart in Mexico, Clifford indicated since it was located in Mexico, he would not give Mehdi more than $1 million. Approximately one year later, Clifford indicated that he decided he would not give Mehdi anything with respect to the Walmart in Mexico. Accordingly, Mehdi showed me a collateral report dated 7/31/01 wherein the Mexico inventory was subtracted from the eligible inventory, and, thus, was not a part of the borrowing base.

## Potential Areas of Concern

ATI did business with a Swedish company, Ekman. Ekman provided a large loan to ATI's "out of the box" (out of bankruptcy) affiliate, Super American Tissue. Accordingly, Ekman began paying only approximately 85 percent of ATI's invoices, indicating that they were deducting the difference from the loan owed by Super American. Mehdi indicated that Ed Stein will assert that Mehdi and he had an agreement with Ekman wherein they would provide payment for only a percentage of the invoice. While Ekman would be a part of the borrowing base, when Ekman's invoices were over 90 days delinquent, it was no longer part of the borrowing base. Mehdi could not remember the date of the loan to Super American or the date in which he began business with Ekman. (Nicholas Kaiser should have this information).

The same scenario occurred with CNG/Lindenmaier. Again, CNG provided a large loan to Super American. Accordingly, CNG only paid a percentage of its invoices. Again, Mehdi does not recall the relevant dates.

Mehdi also informed me that when ATI began having financial difficulties in May of 2001, Ampad, an "out of the box" affiliate, wire transferred money to ATI's vendors so that ATI did not lose its line of credit with LaSalle. Now, Ampad is an unsecured creditor of ATI in the bankruptcy proceeding. He has provided me with a list of wire transfers between affiliates and certain vendors from May, 2001 through August, 2001.

Mehdi previously had a good relationship with Kimberly Clark ("KC"), manufacturer of "Huggies" diapers. American Tissue had a deal with KC wherein KC would ship pulp to ATI on consignment. ATI would then sell the finished goods. LaSalle Bank was aware of ATI's agreement with KC. Contra Mehdi provided an example if KC owed ATI $7 million and ATI owed KC $4.7 million, only the difference, namely 3.3 million would be a part of the borrowing base. The term "contra" was noted on the collateral report, indicating that it was not a part of the borrowing base.

ATI had a similar relationship with Koplik Papers.

Mehdi agreed to attempt to identify other transactions that may be relevant. He agreed to provide us with additional information next week.

## Ed Stein's Discharge

On September 3, 2001, Labor Day, Mehdi with Nicholas Kaiser in attendance, fired Ed Stein since it was brought to Mehdi's attention that Stein had overevaluated ATI's inventory. Mehdi and Nicholas Kaiser confronted John Lorenz with respect to the overevaluation. John Lorenz admitted to Kaiser and Mehdi that he was involved in the overevaluation and that he did it since he did not want Ed Stein to fire him. Mehdi asked, "Why didn't you tell me?". Lorenz cried. Lorenz is still working at ATI.

Mehdi also indicated that despite the fact that the inventory was overevaluated, Arthur Andersen signed off on the overevaluated number. When confronted about this, Arthur Anderson indicated that it does random samplings for its audit and that everything that Arthur Anderson did was proper.

### Price Waterhouse Audit

David Heller was Lasalle's attorney in the bankruptcy. Nicholas Kaiser asked Heller to recommend a good company to perform an audit. Heller recommended PWC. Joe D'Amico was Mehdi's contact person to Price Waterhouse Coopers (PWC). Mehdi and Cassandra provided me with PWC's audit report marked "draft". Neither Mehdi nor Cassandra has a different report.

When Joe D'Amico from PWC informed Mehdi that his inventory was overevaluated, Mehdi informed D'Amico that the inventory had been evaluated by a company retained by Lasalle. Mehdi was charged $140,000 for the company's services to evaluate ATI's inventory. Joe D'Amico was forwarded a copy of the company's evaluation.

### Lasalle Audits

Mehdi advised me that four or five times a year–every three months–two people from LaSalle would come to the company to perform an audit. The audits would last ten days on the average. They never raised one issue during the period of their audits. Mehdi paid for all of their expenses while at the company. Mehdi would advise them that if they came across anything considered bad, to please inform Mehdi first. If he cannot clear it up, call Chris Clifford.

### Certifying Financials

Mehdi indicated that each year Ed Stein, John Lorenz and he were required to sign a documents verifying certain financials. The last time that he signed this, he asked John Lorenz, "Is this kosher?" Lorenz responded "yes". Mehdi indicated that Cassandra may be able to provide us with this documentation.

### Sina Kohen (inflated numbers and inter-company transfers)

I spoke with Sina Kohen, current employee of American Paper and former employee of ATI. Sina Kohen was employed at American Tissue from September of 1997 until January of 2000. He primarily worked for Mehdi's partner during this period. From January of 2000 until September of 2000, he went to Europe to finish his schooling. Beginning in September of 2000, he began working in the accounting department at American Tissue.

He indicated that Ed Stein was the top man with respect to the accounting department. John Lorenz reported to Ed Stein. There was a buffer, namely Lorenz, between Stein and the rest of the department–approximately ten-fifteen individuals.

Although Kohen could not provide specifics, he indicated that many of the numbers that

they were dealing with on a day to day basis did not make sense to him. He indicated that if the company was doing as well as the numbers said then why were they having financial difficulties. He also indicated that many inter company transfers seemed inappropriate. He said that people would make jokes but noone would come right out and say it for fear of losing their job or getting in trouble. For weeks, Kohen attempted to reconcile certain transfers but to no avail. The people in accounting would joke and call him "due to, due from". Arthur Anderson always posed questions involving the inter-company transfers. He did not have answers for them. In addition, the Price Waterhouse auditors posed questions with respect to the transfers. He indicated to Price Waterhouse that they appeared inappropriate but provided no specifics.

Kohen also indicated that some of the transfers involved transfers from "Lakeview Tennessee". However, there was no Lakeview Tennessee. It was a bogus company. He indicated that he may have a document evidencing this. He agreed to provide it to Cassandra if found.

Kohen indicated that Ed Stein was "fishy". He was a dictator, who pushed middle management away. He also described him to be a heavy drinker, a workaholic and a bully. He would work from 5:30 a.m until between 5:00 and 8:00 p.m.

I later spoke with Cassandra Joseph, who indicated that she had heard that Ed Stein had "child porn" on his computer in the office. She also informed me that Laura Eckerle, ATI's former in house corporate counsel, quit because she would not take Stein's directives to do things that she felt were unethical or inappropriate. Cassandra can likely provide the contact information for Eckerle.

### Status

Cassandra Joseph, American Paper Corporation's corporate counsel, has only been with the company for three weeks. Accordingly, she has extremely limited knowledge. In addition, most individuals with personal knowledge are no longer employees of Mehdi. Nicholas Kaiser appears to be the only person with intimate knowledge of the various corporations. However, Cassandra has informed me that he will likely be very hesitant to provide us with too much information since he has been conflicted out (according to Cassandra, he is representing Mehdi's "out of the box" companies at the present time). Subsequent to our review of the documents provided by Mehdi, I believe it is very imperative that we get a meeting with Nicholas Kaiser to pick his brain about the loan agreement, the circumstances surrounding Stein's resignation, his involvement in negotiations with the bank, the PWC audit, inter-company transfers, etc. In addition, it may become necessary to hire a forensic accountant.

Mehdi has provided us with two boxes of documents, which I am currently reviewing. I will supplement this memo upon my review.

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA )
)
vs. ) PRESENTENCE INVESTIGATION REPORT
)
MEHDI GABAYZADEH ) DOCKET NO. 03-CR-162(S-2)-04

Prepared for: The Honorable Joanna Seybert
United States District Judge

Prepared by: Gregory Giblin
United States Probation Officer

| | |
|---|---|
| **Assistant U.S. Attorney**<br>James Miskiewicz, Esq.<br>John Martin, Esq. | **Defense Counsel** (Retained)<br>Raymond Perini, Esq.<br>1770 Motor Parkway<br>Hauppauge, New York 11749<br>(631) 232-2224 |
| Sentence Date: | December 16, 2005 @ 10:00 a.m. |
| Offense: | See Page 3. |
| Arrest Date: | March 10, 2003 |
| Release Status: | Released on March 10, 2003, on $5,000,000 property-secured bond, subject to home detention with electronic monitoring. The defendant was removed from home detention on April 11, 2003, with no Pretrial Services reporting conditions. He was subsequently remanded on April 13, 2005. |
| Detainers: | None |
| Other Defendants: | Edward I. Stein, Amzad Ali, Yaghoub Lavi (docket # 05-CR-55), and John Lorenz (docket # 02-CR-1017) are awaiting sentencing before Your Honor. |
| Date Report Prepared: | November 21, 2005 |

8

These sales figures were reported to the LaSalle Syndicate in, among other documents, the collateral reports.

15. Between November 2000 and May 2001, **Gabayzadeh** and Stein diverted millions of dollars due and owing to "inside the box" companies, which were required to be paid to the LaSalle Lockbox to "outside the box" companies, including Super American Tissue, Inc. Specifically, in November 2000 and March 2001, Gabayzadeh and Stein solicited two pulp brokers, Central National Gottesman and Eckman, to make loans totaling $9 million to Super American Tissue, Inc. According to the agreements reached with these brokers, the brokers would be repaid with inventory belonging to Pulp Paper of America, an American Tissue affiliate, which was an "inside the box" company subject to the security provisions of the LaSalle Revolver. American Tissue and Pulp Paper of America invoiced these purchases, which created over $9 million worth of accounts receivables reported to the LaSalle Syndicate for the purposes of borrowing under the LaSalle Revolver. American Tissue had no hope of collecting these accounts receivables, as Central National Gottesman and Eckman already paid for the pulp.

16. In furtherance of the scheme, Stein created a shell company by the name of New England Market Pulp. Under certain transactions with Central National Gottesman and Eckman, Stein used New England Market Pulp, who would in turn invoice Central National Gottesman and Eckman. This diverted inventory created an uncollectible receivable on Pulp Paper of America's books against New Engalnd Market Pulp. It further disguised sales to Central National Gottesman and Eckman, which both already had sizable and aging receivables.

17. According to agents, from April 2001 to May 2001, **Gabayzadeh**, Stein and Amzad Ali reached out to various customers in an effort to obtain purchase orders. Specifically, Stein contacted officials from three customers of American Tissue: Cellulose Sales, Aaron Enterprises, and Mid Atlantic Pulp and Paper. Amzad Ali contacted officials from Hansen Paper, and Gabayzadeh contated officials from Royal paper and Plastirun, a company owned by his brother-in-law, Yaghoub Lavi. These company's officials agreed to create false invoices to purchase rolls of paper at no risk, knowing that American Tissue would buy back the rolls if the companies were unable to sell any portion of them. This meant that the purchases were not genuine sales that would enable borrowing through the LaSalle Revolver. As a result of the foregoing, Gabayzadeh and Stein created false invoices and related false documentation for $20 million worth of fictitious sales transactions in an effort to further inflate American Tissue's borrowing capacity through the LaSalle Revolver. The fictitious sales were then claimed as accounts receivable amounts reported to the LaSalle Syndicate in collateral reports.

        be seeking confirmation of more than $4 million worth of receivables and requested that Eckman acknowledge the debt. The Eckman official refused the request, stating that all the pulp was paid for in advance and that Eckman owed no money to American Tissue. **Gabayzadeh** implored the Eckman official to give the auditors an answer that would provide American Tissue with some leeway with the LaSalle Syndicate, however, the official refused.

22. At a bank meeting on August 15, 2001, **Gabayzadeh** and Stein ultimately acknowledged that American Tissue had diverted approximately $25 million owed to the LaSalle lockbox. Specifically, **Gabayzadeh** stated that American Tissue directed its customers to pay invoices owed to the lockbox to outside the box companies, and then used the funds to pay off American Tissue's debts. Following this disclosure, officials representing the LaSalle Syndicate sent auditors and consultants to American Tissue's headquarters to investigate the status of American Tissue's accounts receivables. The auditors and consultants confirmed that more than $30 million of the accounts receivables were uncollectible. Officials from the LaSalle Syndicate directed American Tissue to retain a crisis management team, and American Tissue hired Price Waterhouse Coopers on August 17, 2001. Price Waterhouse Coopers auditors found additional accounting irregularities, including a $20 million overvaluation of American Tissue's inventory, and that American Tissue was selling its inventory at a loss. According to the Government, as a result of the bank fraud scheme, the La Salle Syndicate suffered a total loss of $64,682,588.38.

### The Collapse of American Tissue

23. In approximately September 2001, in an effort to save the company, **Gabayzadeh** forced Stein to resign and advised Lorenz to disclose all information to Price Waterhouse Coopers. Consequently, Lorenz disclosed that there was massive accounting fraud at American Tissue. On September 5, 2001, American Tissue filed a notice with the United States Securities and Exchange Commission (SEC) advising that Edward I. Sten resigned and that there were materially false statements made in American Tissue's publicly filed consolidated financial statements for fiscal years 1999 and 2000. Although American Tissue's equity was privately held, as previously noted, American Tissue issued approximately $165 million in bonds in July 1999. On September 10, 2001, American Tissue and over twenty affiliated companies filed for Chapter 11 bankruptcy protection in United States Bankruptcy Court in Delaware. A number of other companies, which had been created or acquired by **Gabayzadeh** that fell under the American Tissue umbrella, were not forced into bankruptcy, including Super American Tissue Inc. and Middle American Tissue. The bankruptcy of American Tissue was caused in large part by the repeated fraudulent acts committed by **Gabayzadeh**, Stein, Lorenz, Ali, and others.

**BRAFMAN & ASSOCIATES, P.C**

ATTORNEYS AT LAW

767 THIRD AVENUE

26TH FLOOR

NEW YORK, NEW YORK 10017

TELEPHONE: (212) 750-7800

FACSIMILE: (212) 750-3906

E-MAIL: BBRAFMAN@BRAFLAW.COM

Exhibit "G"

BENJAMIN BRAFMAN

JENNIFER A. LIANG
ANDREA ZELLAN
BRIAN E. KLEIN
KAREN NEWIRTH

MARK M. BAKER
OF COUNSEL

May 9, 2007

**LEGAL MAIL TO BE OPENED
ONLY IN PRESENCE OF INMATE
VIA EXPRESS MAIL
PERSONAL & CONFIDENTIAL**
Mehdi Gabayzadeh
Inmate #68419-053
FCI - Fort Dix
P.O. Box 7000
Fort Dix, New Jersey 08640

Dear Mr. Gabayzadeh:

**A.   Introduction.**

I want to take this opportunity to respond to your letters of April 4, 2007 and April 23, 2007. In those letters you "demand" that I provide you with copies of all of my firm's records of billable hours (including a breakdown of billable hours of time, etc.); and you further request proof that my firm reviewed thousands of documents and arranged for interviews of various witnesses. You also assert that if I fail to comply with your demands, you will file some type of unspecified attorney grievance against me.

You are, of course, free to present any complaint you have with any appropriate disciplinary authority. I stand ready to advise such an authority of the facts and circumstances of my firm's representation of you. My response would demonstrate that at all times I and my firm acted competently and diligently in representing you. Furthermore my response would demonstrate that I have no legal or ethical responsibility to spend thousands of dollars of my firm's resources compiling a summary of my firm's work in your case, particularly, given the fact that when you substituted the firm of Perini and Hoerger for this firm in 2004, you then

PAGE (1)

BRAFMAN & ASSOCIATES, P.C.

owed this firm approximately $350,000.00, pursuant to a fixed fee agreement.

To fully review your entire file and to summarize all the work performed, would cost a substantial amount of time and effort in attorney and paralegal time. It is my view – and the view of an independent ethics expert with whom I have consulted that – that I have no legal obligation to prepare a summary of the work performed, including a summary of the witnesses interviewed, unless you: 1) pay your outstanding balance of approximately $350,000; and 2) forward to me a payment of at least $15,000.00 to secure payment for time which would be expended in preparing a summary of the work performed in your case.[1] Should you pay my firm your unpaid legal balance and should you pay my firm for the time to be spent in preparing a summary of the work performed, I stand ready to provide you with the materials you request.

Having provided the short answer to your requests for a <u>summary</u> of the work performed by my firm, my comments below are addressed to several larger issues.

**B.  <u>The History Of My Firm's Representation Of You.</u>**

Although it is not clear from your two letters, it appears that you are seeking to somehow challenge your current fifteen year prison sentence, by arguing that my firm did not adequately represent you at the time of your sentence. Although I am not required to do so, I do want to address that issue briefly.

I have attached to this letter, several hundred pages of materials which are easily printable from my firm's computer hard-drive system which reflect that I and my firm's legal staff competently, diligently and zealously represented you.[2] In

---

[1] I am advised by my firm's outside ethics consultant that cases such as <u>Sage Realty Corp. V. Proskauer Rose Goetz & Mendelson</u>, 91 N.Y.2d 30 (1997), stand for the proposition that a client is not entitled to a copy of his or her file if the client still owes the attorney money; and, the client is responsible for any assemblage and delivery charges in terms of producing the files to the client. I am advised that the same principles articulated in the <u>Sage Realty</u> case apply to your request.

[2] Included within those enclosed documents are summary bills which were sent to you during the initial phase of my firm's representation of you during which you were billed by the hour. The underlying "time sheets" from which those summary bills were prepared were handwritten time sheets that were not preserved <u>after</u> the completion of the matter, nor are they are required to be maintained. <u>See</u> 22 N.Y.C.R.R. Section 1200.46(d)(5) (attorney need only maintain for designated period the bills actually rendered to the client); New York County Lawyer's Association Opinion 725 (1998) (only case documents belonging exclusively to the client [such as a will or deed or other personal document] need be returned to the client at the conclusion of a lawyer's representation of a client); New York State Bar Association Opinion 623 (Nov. 7, 1991) (same). Had you during the course of the representation or even months thereafter, asked for the "back up" for the bills you received, that back up would have been provided to you. However, that backup documentation is

**BRAFMAN & ASSOCIATES, P.C.**

addition to the attached documents, there are approximately 100 storage boxes of legal materials – containing tens of thousands of documents pertinent to you case – which my firm and Perini and Hoerger maintain in storage. I also note that your son John already has taken possession of many boxes of documents as well. All of these materials together, demonstrate that my firm capably represented you and in part, also reflect the work performed by my firm, the volume of materials we needed to review, as well as the firm that handled your trial. I invite your representative to contact my firm and I will allow those documents to be reviewed under supervision (with the costs of delivery from storage and the costs of supervision to be paid by you in advance).

As you are aware, Perini & Hoerger, the law firm which represented you at your trial, currently has tens of thousands of documents maintained in approximately 60 boxes relating to your case. Those boxes include work performed by my firm. The majority of documents contained in those 60 boxes were turned over to the Perini & Hoerger by my firm at your request, in April of 2004 when you hired that firm to replace my firm to represent you in the continuing pre-trial and trial phases of your Federal criminal case. It is also my further understanding that the Perini & Hoerger firm gave your son John, many additional boxes of materials. I assume that John still maintains those files and they too are reflective of work performed by my firm and the Perini firm.

Although I am not in a position to detail the specifics of the work performed by my firm – and could not do so without a costly a review of the tens of thousands of case documents – suffice it to say that:

- **During the course of my firm's representation of you, work was performed in a variety of areas that**

---

simply no longer available, so many years after the end of my firm's representation of you – which is the very first time you made any request for information relating to the specifics of the work performed in your case, at a time when we billed you on an hourly basis.

Finally, let me remind you that my firm is not obligated to provide you with any form of financial "accounting" of the work for the fees received beyond the bills you received when you were an hourly client. Please remember that you initially retained my firm with the understanding that it would bill you on an hourly basis for the work that we were to perform on your behalf at the rates set out in the original Agreement. In October of 2002, several months after my firm was initially retained to represent you on an hourly basis, at your request, your case was converted to a fix fee matter (for which no accounting is due to you for services rendered). Also, in April of 2004, more than three years ago, after being competently represented by my firm – you replaced my firm with Perini & Hoerger who handled your trial. Thereafter, following your conviction, you again retained my firm to represent you on a fixed fee basis at the post-conviction stage. Again, my firm's representation of you at that post-conviction stage was on a fixed fee basis and for which you are not entitled to an accounting. Copies of a computer printout of the various Retainer Agreements are included with the materials I am providing.

PAGE (3)

**BRAFMAN & ASSOCIATES, P.C.**

extended far beyond the purely criminal aspect of the case. As you know, you were facing far more than just a criminal investigation being conducted by the United States Attorney for the Eastern District of New York. For example, there was a pending Bankruptcy Proceeding against American Tissue that was being litigated before Judge Burton R. Lifland in the United States Bankruptcy Court for the Southern District of New York. My firm was required to review voluminous files in connection with those proceedings to determine their impact on the criminal case.

- There were also various other civil litigations pending against you in New York and Chicago. My firm had to communicate on your behalf with more than a dozen law firms in order to keep abreast of these matters which at first you insisted on trying to defend on the merits. While we ultimately referred you to civil counsel to handle these litigations, my firm also had to work with that firm as well, because my primary concern was how these related litigations would impact on the criminal investigation in the Eastern District of New York.

- My firm was required to participate in and monitor not only multiple civil litigations that were being filed against you on a regular basis, but my firm's staff also had to review and respond to a Complaint filed against you by the Securities and Exchange Commission.

- My firm was also required to review the ongoing bankruptcy proceedings in which you figured very prominently. Although my firm was ultimately able to refer some of these legal matters to other lawyers who then undertook primary responsibility for monitoring those proceedings, all of the issues in those cases were passed through my firm at some point, because they all impacted in some fashion on the Eastern District of New York criminal investigation.

PAGE(4)

BRAFMAN & ASSOCIATES, P.C.

- My firm conducted a professional and competent fact investigation of your case. The attached documents include some of the important witnesses who were debriefed by my firm during our service as your counsel. These memoranda were retrieved off of computers at my firm that were easily downloaded. Other memoranda and documents reflecting work by my firm is available for your representatives to examine in the more than 100 banker size boxes of materials.

- The bail proceedings in your case represented another <u>major</u> commitment of time and resources by this firm. There was an extensive and hotly contested bail proceeding in April of 2003, when my associate, Jennifer Liang, Esq., and I spent several full days in Central Islip interviewing more than a dozen suretors and eventually persuading the Court to allow you to remain free on $5 million bail up until after you were convicted at trial when you were remanded. In connection with the bail proceeding alone, Jennifer and I had to review many financial records provided by the many suretors you produced, many of them were interviewed by us and then in our presence, by agents of the Federal Bureau of Investigation.

- Me and members of my staff also spent many hours working with Pernini and Hoerger after they were substituted as trial counsel in place of this firm, in order to ensure an orderly transition.

- Although my firm was replaced as your trial counsel, <u>you and</u> your family literally <u>pleaded</u> with me to come back into the case and serve as co-counsel with Perini and Hoerger to represent you at sentencing. I believe that it was because of the extraordinary efforts by my firm that you received only a 15 year sentence, as opposed to the possible life sentence which you would have received had the Court accepted the initial Guideline calculation arrived at by the Probation Department; or at the very least, the 20 year sentence

PAGE (5)

BRAFMAN & ASSOCIATES, P.C.

> strongly recommended by the Government. The various members of your family who spoke to me subsequent to the sentencing, said quite openly that it was my efforts on your behalf at sentencing, that ultimately persuaded the Court that a 15 year sentence was more than adequate. In connection with those proceedings we also produced a massive Sentencing Memorandum on your behalf.

After all is said and done, there is no question that my firm represented you capably and competently, and should you or your representative undertake a full review of the documents in this case, you will clearly see that to be true.

### C. Conclusion.

It appears from the tone of your letters, that you intend to blame your conviction and/or your sentence on me in some manner; and/or that you hope to somehow recoup the fees paid to my firm by claiming that my firm did not represent you properly. I simply will not go along with such tactics.

The only one to blame for your conviction is **you**; and you most assuredly, are <u>not</u> entitled to any refund of fees. You committed the crimes for which you are incarcerated; my firm ably represented you during the <u>pre</u>-trial and sentencing phases; and your attempt to assess blame against my firm is part of the same mind set that caused you to commit the crimes in question and caused you to persist in your decision to proceed to trial, when <u>all</u> of your lawyers strongly urged you to plead guilty, as in our collective judgment, an acquittal was virtually impossible in view of the overwhelming evidence against you.

I will not undertake to review and summarize the many boxes of documents which reflect the work performed by my firm, nor do I have any legal obligation to do so. Of course, should your family choose to pay my firm for that factual review, and to pay my firm's outstanding balance, my firm stands ready to undertake that task.

I know that you are very bitter about the length of the sentence you received and I recognize that you feel the need to find someone to blame for the predicament you find yourself in. I hope that you one day will come to realize however that it was only because of my firm's extraordinary efforts on your behalf that you did not

PAGE (6)

**BRAFMAN & ASSOCIATES, P.C.**

receive an even more onerous sentence and that while we were your attorneys, we did our <u>best</u> to represent you.

Very truly yours,

*[signature]*

Benjamin Brafman

Encl.

cc: John Gabayzadeh
(By facsimile [516-639-8333])

Perini & Hoerger
( By facsimile [631-232-2344])

PAGE(7)